UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-61308-CIV-ALTMAN/Hunt

625 FUSION, LLC d/b/a
RED DOOR ASIAN BISTRO, *et al.*,

     *Plaintiffs*,

*v.*

CITY OF FORT LAUDERDALE, *et al.*,

     *Defendants*.

_____/

## ORDER

If you want to open a restaurant in the City of Fort Lauderdale, you need a permit. The Plaintiffs own and operate a restaurant in the City. Robert Gonzalez was the Chief Mechanical Inspector the City assigned to inspect the Plaintiffs' restaurant. The Plaintiffs allege that Gonzalez discriminated against them because of their Asian heritage, that he illegally (and secretly) revoked their permits, and that he badgered and belittled them with anti-Asian slurs. Gonzalez—a Defendant here—hasn't moved to dismiss, and the Plaintiffs' claims against him will proceed.

But the claims against the City are more of a mixed bag. On the one hand, the Plaintiffs have done just enough to advance their equal protection claim against the City to summary judgment. On the other, they come nowhere near stating a viable due process claim against the City. The City's Motion to Dismiss is therefore **GRANTED in part and DENIED in part**.

## THE FACTS

The Plaintiffs—Antonio Asta, Zhi Yu Liu, and the Red Door Asian Bistro—wanted to open a new Asian bistro to "enhance the Las Olas Boulevard retail area" and to "contribute[] to the overall pride and quality of life of the City." Second Amended Complaint ("SAC") [ECF No. 53] ¶ 24. On

August 11, 2017, the Plaintiffs obtained a "Business Tax Receipt"—"the equivalent of a business license," *id.* ¶ 18—and began construction on November 20, 2017, *id.* ¶ 19. Their target date for "final approval" was "no later than February 2018." *Id.* ¶ 20. And, with approvals in hand from the City's Fire Department, electrical inspectors, and "other mandatory City inspectors," the Plaintiffs were on track to meet that timeline. *Id.* ¶ 21.

All that changed when the City's Chief Mechanical Inspector—Robert Gonzalez—arrived on the scene. *Id.* ¶¶ 10, 30. "Early in the construction project," Gonzalez came into the restaurant and told the Plaintiffs that "I'm in charge here. We do things different from what you get away with in New York. I know all about how these Chinese guys do things. No chink from New York is going to tell me how to do my business." *Id.* ¶ 30. And that was just the beginning. Gonzalez, the SAC says, constantly admonished them that "Las Olas is not China Town" and told Plaintiff Liu to "go back to Hong Kong where he belongs[.]" *Id.* ¶ 31. Gonzalez claimed absolute authority, declaring that "the Chief Building Officer 'assigned' decisions" to him and that "no one overruled [him] when it came to mechanical permits." *Id.* ¶ 32. Gonzalez cautioned the Plaintiffs that "he was in contact with . . . the Broward Board of Appeals and that any appeal . . . would be futile since he . . . [had] 'already taken care of that.'" *Id.* ¶ 34. Gonzalez warned that any challenge to his authority would be met with reprisals. *Id.* ¶ 35.

On April 30, 2018, Gonzalez issued a "red flag" notice on one of Red Door's "kitchen hood[s]." *Id.* ¶ 36. According to the Plaintiffs, this "red flag" came more than one year after the deadline for the City to impose such a flag had expired—and even though the flag was entirely unsupported by any evidence. *Id.* When the Plaintiffs challenged the red flag, "Gonzalez became irate and emphatically explained his rules: what Gonzalez decided to do was the law, the policy, and the process for the City . . . . Gonzalez intimidated the Plaintiffs by stating there was no right to appeal him[.]" *Id.* ¶ 40. "No documentation was produced sufficient for Plaintiffs to take any administrative

or other action as such documentation is a condition precedent to any such legal challenge and Gonzalez refused to issue any such documentation because his determination was final." *Id.*[1] In challenging the red flag, the Plaintiffs reached out directly to the kitchen hood's manufacturer—only to discover that "Gonzalez intentionally misled and provided false information to the manufacturer of the insulation of the hood in order to procure a letter falsely suggesting that there was something wrong" with the hood. *Id.* ¶ 48. The Plaintiffs had to "obtain letters and hire[] experts to prove the kitchen hood . . . was in fact the correct piece of equipment[.]" *Id.* ¶ 52.

On May 3, 2018, the Plaintiffs told "all in attendance" at a meeting—which included Chief Building Official John Travers ("CBO Travers"), Deputy Building Official Luis Hernandez ("DBO Hernandez"), Business Coordinator Andre Cross, and "representatives of the City Manager and City Mayor's Office"—about Gonzalez's "animus" towards the Plaintiffs. *Id.* ¶ 73. On May 9, 2018, "Travers himself wrote a memo to these same officials . . . acknowledging that Gonzalez's denials were not predicated upon correct information." *Id.* ¶ 74.[2]

On May 7, 2018, Mechanical Inspector Tony Sedoff "initially agreed" that Gonzalez's actions were not properly motivated "and told [CBO] Travers and [DBO] Hernandez." *Id.* ¶ 42. Sedoff specifically informed CBO Travers, DBO Hernandez, and the "City Manager's Office" that approval was, in his words, a "no-brainer" and that "Gonzalez's actions in keeping the business closed made

---

[1] At some point—the allegation is undated—Gonzalez required the Plaintiffs to add hoods above their hibachi tables, despite "being shown documentation by Plaintiffs that hoods were unnecessary[.]" *Id.* ¶ 46.

[2] The Plaintiffs also say that the City held meetings on May 1, May 3, and May 7, 2018—all memorialized in City memoranda—at which "City supervisors and policy makers . . . were well aware of the improper actions of Gonzalez yet explicitly ratified his conduct and made it the equivalent of City policy." *Id.* ¶ 16. The Plaintiffs don't say whether they attended these meetings. Nor do they attach the City's memoranda, identify the "City supervisors and policy makers," or describe the job titles or duties of these "supervisors and policy makers" in a way that might help us understand whether they, in fact, qualify as "final policymakers" under the law. And, of course, the Plaintiffs never explain how these "supervisors and policy makers" came to ratify Gonzalez's conduct. Was it by voice vote? An internal email to staff? A public proclamation? Mere acquiescence? No one can say.

no sense." *Id.* ¶ 43. Sometime later, Sedoff withdrew his approval, *see id.* ¶ 45, citing "intimidat[ion], harass[ment] and [being tape recorded] by his superiors" for "dar[ing] to challenge the decisions of Gonzalez," *id.* ¶¶ 76–77.

At some point in this process, the Plaintiffs told "City officials" about "Gonzalez's improper actions and motivations, affirmatively requesting his removal from all matters" pertaining to Red Door. *Id.* ¶ 44. After the Plaintiffs threatened litigation, the City "assign[ed] its Building Official to visit the Red Door personally, while another inspector—a different inspector who handles national training—looked at the kitchen hood device. Only then did the City" withdraw the red flag. *Id.* ¶ 55.

By May 9, 2018, the Plaintiffs were ready for their final permit. While they were at City Hall to pick it up, though, Gonzalez approached Plaintiff Liu and made another offensive comment. *Id.* ¶¶ 58–59. Seven days later, on May 16, 2018, Gonzalez "surreptitiously accessed the City's computer system with his official access and authority as a City official . . . and cancelled the mechanical approval" for the Red Door; and, the Plaintiffs add, CBO Travers "explicitly allowed the illegal withdrawal." *Id.* ¶¶ 63–64. The City never told the Plaintiffs about this cancellation, and Red Door only discovered it when the restaurant's architect "heard Gonzalez brag that he deliberately cancelled approvals for the Red Door." *Id.* ¶ 65.

The Plaintiffs arranged a meeting on May 23, 2018 with "the City" to "address all issues the City required addressing," but "the City" cancelled the meeting, and "[e]very subsequent request by the Plaintiffs to reschedule the meeting and address all possible issues raised by Gonzalez and the City were ignored[.]" *Id.* ¶¶ 79–81. The Plaintiffs scheduled another meeting for June 11, 2018 to discuss "Gonzalez and the City's contrived 'new issues,'" but, when the Plaintiffs arrived, "they were abruptly informed by City officials that the meeting had been cancelled." *Id.* ¶¶ 82–85. On July 6, 2018, "the City Mayor, Manager, and all policy makers were again informed of Gonzalez's improper and discriminatory behavior[.]" *Id.* ¶ 85. Red Door eventually opened in September 2018. *Id.* ¶ 71.

4

The City has filed a Motion to Dismiss (the "Motion") [ECF No. 56], which is now ripe for adjudication, *see* Response [ECF No. 63]; Reply [ECF No. 67].

## THE LAW

On a motion to dismiss, the Court must accept the plaintiff's factual allegations as true, construing the complaint in the light most favorable to the plaintiff. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

 "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

## ANALYSIS

The Plaintiffs bring two counts against the City. In Count I, they allege that Gonzalez violated their rights under the Equal Protection Clause by discriminating against them on the basis of their

race and national origin. *See* SAC ¶ 97. As to this first count, the Plaintiffs say, the City should be liable for Gonzalez's misconduct because "City officials were aware of this conduct and their actions and inactions effectively adopted this behavior as policy and ratified it." Response at 7. In Count II, the Plaintiffs aver that the City's conduct deprived them of "a property right in their business . . . . without due process." SAC ¶¶ 112, 114. They also maintain that "[t]he City . . . enforced a practice and custom of threats intimidation, and extortion to deprive . . . Plaintiffs[] of their property and rights without procedural and substantive due process[.] *Id.* ¶ 110. In saying so, they seem to be conflating (what should be) separate substantive and procedural due process claims into a single count. The City treats these disparate theories as separate sub-counts—and we will, too.

## I.     Municipal Liability

"[T]he Supreme Court has placed strict limitations on municipal liability under § 1983." *Grech v. Clayton Cty.*, 335 F.3d 1326, 1329 (11th Cir. 2003). A municipality can be liable under § 1983 only when "the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). That's because "*Monell*, the Supreme Court has explained, is a case about responsibility, and is meant to limit the § 1983 liability to acts which the municipality has officially sanctioned or ordered." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (cleaned up). A municipality "causes" a violation where (1) it acts via "an official policy enacted by its legislative body (e.g., an ordinance or resolution passed by a city council)"; (2) "final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure"; or (3) "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Id.*

The Plaintiffs proceed here under the third of these avenues—ratification. Response at 13. "[R]atification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policy making authority." *Matthews v.*

*Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002). "The final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it." *Id.* In other words, "local government policymakers [must have] had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis[.]" *Garvie v. City of Ft. Walton Beach*, 366 F.3d 1186, 1189 (11th Cir. 2004) (cleaned up). Merely knowing about the unconstitutional motive is insufficient, though; the final policymaker *must adopt* the motive as his or her own. *Matthews*, 294 F.3d at 1298 ("Lawmakers' support for legislation can come from a variety of sources; one commissioner may support a particular piece of legislation for a blatantly unconstitutional reason, while another may support the same legislation for perfectly legitimate reasons. A well-intentioned lawmaker who votes for the legislation—even when he votes in the knowledge that others are voting for it for an unconstitutional reason and even when his unconstitutionally motivated colleague influences his vote—does not automatically ratify or endorse the unconstitutional motive.").

Ratification thus "generally requires more than acquiescence." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part on other grounds sub nom. City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015). "[I]t is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval." *Christie v. Iopa*, 176 F.3d 1231, 1240 (9th Cir. 1999); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) (plurality opinion) ("Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy."); *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 781 (9th Cir. 1997) ("To hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983." (cleaned up)); *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) ("Mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification.

Otherwise, the City would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from *respondeat superior* liability.").

On the other hand, "[i]t would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker." *Praprotnik*, 485 U.S. at 130. That said, "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decisions arises from a retaliatory motive or other unstated rationale. In such circumstances, the purposes of § 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy." *Id.*

"It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997) (citing *Monell*, 436 U.S. at 658).

Admittedly, "[c]laims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof. That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably." *Id.* at 406–07. But "[a] plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020). At bottom, then, "[a] county is liable under section 1983 only for acts for which the county is actually responsible." *Grech*, 335 F.3d at 1329.

## II.        Count I: Equal Protection

The City doesn't contest the viability of the Plaintiffs' equal protection claims *against Gonzalez*. *See generally* Motion.[3] Its position, rather, is that it cannot be liable for Gonzalez's misconduct—such as it was—because the City never "ratified" his actions. *Id.* at 2. As we've said, to prevail on their claim of municipal liability, the Plaintiffs must allege that the City's "final policymakers" knew about Gonzalez's decisions, understood the unconstitutional basis for those decisions, and ratified them anyway. *City of Canton*, 489 U.S. at 385.[4]

Let's face it: the SAC is no model of clarity. While it details many of Gonzalez's abuses, it generally fails to show that the City "ratified" Gonzalez's misconduct—other than by repeatedly reciting the following conclusory incantation: "and then the City ratified Gonzalez's conduct." *See, e.g.*, SAC ¶¶ 15, 16, 29, 92, 93. To make matters worse, the SAC omits almost all dates. So, for instance, it never tells us when the City removed the red flag, when Gonzalez challenged the Plaintiffs' hibachi hood, when the City withdrew that challenge, when the City restored the Plaintiffs' permit, or when

---

[3] The SAC never references even a single comparator. *See generally* SAC. To state a viable equal protection claim, a plaintiff must "first show that the State will treat him disparately from other similarly situated persons" and that it does so on the basis of "a suspect classification," such as race. *Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012). "To be similarly situated, comparators must be prima facie identical in all relevant respects." *Matthews v. Town of Autaugaville*, 574 F. Supp. 2d 1237, 1243 (M.D. Ala. 2008) (quoting *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006) (cleaned up)). The SAC's equal protection claim thus suffers from a glaring deficiency. But, because the City has elected not to raise this issue, it has waived the point (at least for now). *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."). Nevertheless, this Order doesn't end the case, so the lack of a comparator may well prove fatal to the Plaintiffs' claims at summary judgment.

[4] This Court has already found that Gonzalez is *not* a "final policymaker" whose unconstitutional misconduct can be imputed to the City. *See* Order Granting Motion to Dismiss [ECF No. 48] at 1 (holding that Gonzalez—as a Chief Mechanical Inspector—was not a "final policymaker"). And the Plaintiffs, for their part, don't seem to dispute this finding. At the hearing on the first Motion to Dismiss, in fact, the Court invited the Plaintiffs to seek reconsideration of its Order Granting Motion to Dismiss if they found some support for their view that a non-final policymaker (like Gonzalez) could become a "final policymaker" via some kind of "apparent authority." Hr'g Tr. [ECF No. 50] at 35. The Plaintiffs never filed any such motion, *see generally* Docket, and they've advanced no such argument here, *see generally* SAC; Response.

the Plaintiffs hired counsel to contest Gonzalez's actions. This date disorientation, in turn, makes it almost impossible to recreate an accurate timeline of events. And this timeline will eventually become relevant, of course, because the SAC glosses over the most important detail of all—namely, that the restaurant ultimately did open, which means that the City (at some point) withdrew Gonzalez's red flag, allowed the hibachi hood, and reissued the Plaintiffs' permit. In other words, because the City eventually *overruled* Gonzalez, it will be hard for the Plaintiffs to argue at summary judgment or trial that the City *ratified* his misconduct.

All that said, at this *early* stage of the case, the Plaintiffs *have* advanced at least one plausible allegation of ratification. They say that, on May 15, 2018, Sedoff (the Mechanical Inspector) wrote a memo to CBO Travers, DBO Hernandez, the City Attorney, and the City Manager's Office about the harassment he (Sedoff) was experiencing as a result of his opposition to Gonzalez's red flag. *See* SAC ¶ 76. Instead of listening to Sedoff's concerns, however, "[c]ity policy makers closed ranks and . . . even threatened Sedoff's career if he did not go along[.]" *Id.* ¶ 78. When he learned that the City Attorney and the City Manager's office supported Gonzalez, and "due to City policy and pressure, Sedoff withdrew his approval of the Red Door's opening for business so he would not lose his job." *Id.* ¶ 77. The natural inference, then, is that the City's policymakers harassed Sedoff precisely because they supported—and intended to ratify—Gonzalez's illegal revocation of the Plaintiffs' permit. *Id.* ¶ 64.

Even this allegation, though, underscores another of the SAC's shortcomings—the lack of specificity about *who* is acting. The SAC frequently attributes decisions to "the City" or "to the City's final policymakers." *See, e.g.*, *id.* ¶¶ 16, 28, 40, 42–43. At later stages of the case, the Plaintiffs will have to identify the specific officials through which (they allege) the City acted. But they need not do so here. *See Hoefling*, 811 F.3d at 1280. In *Hoefling*, the Eleventh Circuit reinstated a *Monell* claim the district court had dismissed because the district court had improperly required the plaintiff to identify the

10

relevant "final policymaker" in his complaint. *See id.* In the Eleventh Circuit's view, "identifying and proving that a final policymaker acted on behalf of a municipality is an evidentiary standard, and not a pleading requirement." *Id.* (internal citations omitted). And it's on this thinnest of reeds that the Plaintiffs' equal protection claim against the City survives.

Of course, the Plaintiffs cannot complain about the (alleged) harassment *Sedoff* experienced. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). But if it's true (as the SAC suggests) that the City's final policymakers initiated the harassment in order to provide cover for—or lend support to—Gonzalez's misconduct, then that harassment *could be* an example of ratification. Here's how: the SAC says that, because of his anti-Asian animus, Gonzalez denied the Plaintiffs' permit. *See* SAC ¶ 36. Sedoff, however, disagreed with Gonzalez's decision and believed that the Plaintiffs deserved their permit. *Id.* ¶ 42. Presented with this conflict, the SAC avers, the City's final policymakers sided with Gonzalez and, as part of their efforts to ratify Gonzalez's behavior, coerced Sedoff's acquiescence. *Id.* ¶¶ 76–77. Admittedly, the ultimate viability of this claim is belied (at least in part) by the City's decisions, sometime later, to *reverse* Gonzalez and to allow the Red Door to open (in September 2018). *See id.* ¶ 71. Nevertheless, if it's true that the City's initial decision to ratify Gonzalez's misconduct delayed the restaurant's grand opening—say, from the day Sedoff acceded (whenever that was) to the day the Red Door finally opened—then the City *could be* liable for the damages the Plaintiffs sustained during that period of delay.

Against all this, the City makes only one argument: the Plaintiffs, the City insists, have not alleged that the City "adopted the unconstitutional *basis* as [its] own." Motion at 7 (emphasis added). As the City points out, to ratify a decision, a final policymaker must be "aware that Gonzalez was motivated by discriminatory bias towards Asians <u>and</u> that the City adopted those motivations as its own." *Id.* at 8 (citing *Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir. 1998)). In essence, the City contends

that, while the Plaintiffs may have warned City officials about Gonzalez's *behavior*, they never mentioned his discriminatory *motivations*. *See id.* at 8–9.

Here, the City paints with too fine a brush. Accepting all the Plaintiffs' factual allegations as true—and construing all reasonable inferences in their favor—the SAC does aver that the Plaintiffs told City officials about Gonzalez's improper *motivations*. So, for instance, the SAC alleges (without a date) that "the City Mayor, City Manager Lee Feldman," and some others were "informed in meetings of Gonzalez's actions and explicitly approved of, condoned, and ratified his behavior." SAC ¶ 72. Given the SAC's repeated reference to Gonzalez's "discriminatory" conduct, it's at least reasonable to infer from this sentence that Gonzalez's expressed anti-Asian bias was one of the "actions" the City was "informed" about. In any event, the SAC gets more explicit. On May 3, 2018, it alleges, the Plaintiffs told "[CBO] John Travers, [DBO] Luis Hernandez, Business Coordinator Andre Cross, and representatives of the City Manager and City Mayor's Office . . . *of the animus* directed by Gonzalez at the Plaintiffs[.]" *Id.* ¶ 73 (emphasis added). On some other unknown day, the SAC says, the Plaintiffs flew to Fort Lauderdale "at great expense" to meet with "Gonzalez and other City building officials and staff to address Gonzalez and the City's contrived 'new issues.'" *Id.* ¶ 83. When the Plaintiffs arrived, "City officials . . . abruptly informed" them that the meeting had been cancelled. *Id.* ¶ 84. As the Plaintiffs were leaving, however, Gonzalez "made another caustic, racially disparaging comment about [Plaintiff] Lui [sic] being Chinese." *Id.* "At this cancelled meeting," the Plaintiffs claim, they "directed complaints about Gonzalez" to "City officials." *Id.* ¶ 85. Then, at some (again unknown) point in this process, the Plaintiffs told "City officials" about "Gonzalez's improper actions *and motivations*, affirmatively requesting his removal from all matters" pertaining to Red Door. *Id.* ¶ 44 (emphasis added). And, the Plaintiffs continue, on July 6, 2018, they told the City Mayor, City Manager, and "all policymakers" about "Gonzalez's improper *and discriminatory* behavior." *Id.* ¶ 86 (emphasis added).

The SAC alleges, in other words, that the Plaintiffs warned City officials about Gonzalez's "motivations," "animus," and "discriminatory behavior"—all of which suggests that the Plaintiffs did, in fact, complain about Gonzalez's improper *motivations*. *See, e.g.*, *Animus*, *Merriam-Webster Unabridged*, https://www.merriam-webster.com/dictionary/animus (last visited Mar. 15, 2021) (defining "animus" as "an usually prejudiced and often spiteful or malevolent *ill will*" (emphasis added)); *Discrimination*, *Merriam-Webster Unabridged*, https://www.merriam-webster.com/dictionary/discrimination (last visited Mar. 15, 2021) (defining "discrimination" as "*prejudiced* or prejudicial outlook, action, or treatment" (emphasis added)). As we've said, these allegations may prove baseless at summary judgment. But, on a motion to dismiss, they do just enough to get the SAC past *Twombly*'s relatively low bar.[5]

Finally, the City cites three cases—all irrelevant here. *See* Motion at 7 (citing *Gattis*, 136 F.3d at 727, *Matthews*, 294 F.3d at 1282, and *Campbell*, 434 F.3d at 1313). In *Gattis*, the chief of police didn't know about his deputy's retaliatory (but hidden) motivations when he adopted the deputy's recommendations about which officers to demote. *See Gattis*, 136 F.3d at 727. Critically, *Gattis* involved a complaint that had been allowed to proceed *to summary judgment*. *See id.* (affirming the district court's order granting the defendants' motion for summary judgment). Both differences are salient here. *First*, as we've explained, the SAC specifically alleges that the Plaintiffs told City officials about Gonzalez's improper "motivations," "animus," and "discriminatory behavior." At this stage of the case, then, we

---

[5] In support of its argument that the Plaintiffs never told the City about Gonzalez's *motivations*, the City appends four emails, which purport to show the Plaintiffs complaining to the City about Gonzalez's *conduct*—without any mention of discrimination. *See* E-mails [ECF Nos. 56-1–56-4]. But, on a motion to dismiss, the Court may consider only the complaint and any documents attached to it. *See Basson v. Mortgage Elec. Reg. Sys. Inc.*, 741 F. App'x 770, 771 (11th Cir. 2018). The Court may also consider "documents referenced in the complaint, even if they are not physically attached" so long as "the documents are [] central to the complaint" and "no party questions their authenticity." *Id.* Because the Plaintiffs *have* challenged the emails' authenticity, *see* Response at 4, the Court will not consider them here. As always, however, those emails may be fair game at summary judgment.

must accept the proposition that Gonzalez's racial animus was not, as the deputy's was in *Gattis*, hidden. *Second*, unlike *Gattis*, this Order resolves only the City's motion to dismiss. The City may ultimately prevail at summary judgment—as the defendants did in *Gattis*. But that's an issue for another day.

This last point applies with even greater force to *Campbell*, where the Eleventh Circuit reversed the district court's order denying the defendant's Rule 50 motion because "there is not a scintilla of *evidence* that the Commission knew of and ratified an unconstitutional motive[.]" 434 F.3d at 1313 (emphasis added). Absent "any *evidence* showing that a majority of the members of the final policymaker, the Planning Commission, acted with an unconstitutional motive," Rainbow City wasn't liable. *Id.* (emphasis added). In our case, again, the City may one day show—either at summary judgment or on a Rule 50 motion—that the Plaintiffs failed to notify any "final policymaker" about Gonzalez's *motivations*. But, on a motion to dismiss, this Court must accept the SAC's factual averments as true and construe all reasonable inferences in the Plaintiffs' favor.

Finally, in *Matthews*, the Eleventh Circuit similarly reversed the district court's order denying a Rule 50 motion. The plaintiff in *Matthews* had charged the county with retaliating against her because of public comments she'd made about a company the county was thinking about contracting with. *See* 294 F.3d at 1295. After reviewing *the evidence* that came in *at trial*, the Eleventh Circuit concluded that "[a]n unconstitutional motive on the part of one member of a three-member majority is insufficient to impute an unconstitutional motive to the Commission as a whole." *Id.* at 1297. Again, we're not at trial; we're not even at summary judgment. We're here on a motion to dismiss, which the Court must evaluate without the benefit of evidence and only after accepting the Plaintiffs' factual allegations as true. In any case, *Matthews* also involved a separate concern about the viability of ratification claims in the *legislative* context. As the Eleventh Circuit explained:

> Lawmakers' support for legislation can come from a variety of sources; one
> commissioner may support a particular piece of legislation for a blatantly

> unconstitutional reason, while another may support the same legislation for perfectly legitimate reasons. A well-intentioned lawmaker who votes for the legislation—even when he votes in the knowledge that others are voting for it for an unconstitutional reason and even when his unconstitutionally motivated colleague influences his vote—does not automatically ratify or endorse the unconstitutional motive. If we adopt the rule suggested by Plaintiff, the well-intentioned lawmaker in this hypothetical would be forced either to vote against his own view of what is best for his county or to subject his county to Section 1983 liability. We think the law compels no such outcome.

*Id.* Because the relevant decisionmakers in our case are executive (rather than legislative) employees, *see* SAC ¶ 34, *Matthews*'s concerns may well be inapposite here.

In the end, the SAC plausibly alleges that the City—knowing about Gonzalez's improper "motivations" and racial "animus"—pressured Sedoff to "go along" with Gonzalez's "discriminatory behavior." This pressure, in turn, allowed Gonzalez's illegal revocation of the Plaintiffs' permit to stand. Thus ratified, the illegal revocation delayed the Red Door's grand opening by some unstated number of days—during which the Plaintiffs sustained some damage. It may not be much, but it's enough to get the Plaintiffs past the City's Motion to Dismiss Count I.

### III.   Count II: Due Process

In Count II, the Plaintiffs assert a due process claim against the City, *see* SAC ¶ 110, which the City has now moved to dismiss, *see* Motion at 10–14. As we've explained, this due process claim seems to include both a procedural and a substantive component, which we address separately.

#### A.  Procedural Due Process

"It is axiomatic that, in general, the Constitution requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994). "A § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *J.R. v. Hansen*, 736 F.3d 959, 965 (11th Cir. 2013) (cleaned up).

"Assuming a plaintiff has shown a deprivation of some right protected by the due process clause," a court should next consider "whether the available state procedures were adequate to correct the alleged procedural deficiencies." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000). "If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." *Id.* "To be adequate . . . the state procedure must be able to correct whatever deficiencies exist and to provide plaintiff with whatever process is due." *Id.* A due process violation is not complete, however, "unless and until the State fails to provide due process." *McKinney*, 20 F.3d at 1557. "In other words, a state may cure a procedural deprivation by providing a later procedural remedy; only when a state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *Id.*; *see also Lasker v. Peterson*, 771 F.3d 1291, 1300 (11th Cir. 2014) ("Accordingly, [the plaintiff's] federal due process claim did not exist until after Georgia's state courts dismissed his petition.").

There are two dispositive problems with the Plaintiffs' procedural due process claim here. *First*, they acknowledge that, had their permit been denied, they could have appealed that denial to the Florida Building Commission. *See* Response at 18 ("The Florida Building Commission (FBC) has appellate authority over Florida Building Code interpretations by local building officials."). In fact, Florida's review process is quite a bit more robust than that. As the Plaintiffs concede, the permitting process begins with a review by a "Mechanical Inspector." SAC ¶ 32. The Plaintiffs admit that, if you don't like the Mechanical Inspector's decision, you can take an appeal to the Broward Board of Appeals. *Id.* ¶ 34. And, the Plaintiffs agree, if you don't like the outcome at the Board of Appeals, you're entitled to seek review before the Florida Building Commission. *See* Response at 18 (citing FLA. STAT. § 553.775 (3)(a) ("Upon written application by any substantially affected person or state agency or by a local enforcement agency, the commission shall issue declaratory statements pursuant to

s. 120.565 relating to the enforcement or administration by local governments of the Florida Building Code or the Florida Accessibility Code for Building Construction.")). But there's more. If you're still unhappy with the result, you could always file suit in Florida state court. *See City of St. Pete Beach v. Sowa*, 4 So. 3d 1245, 1247 (Fla. 2d DCA 2009) ("When an administrative official or agency acts in an executive or legislative capacity, the proper method of attack on the official's or agency's action is a suit in circuit court for declaratory or injunctive relief on grounds that the action taken is arbitrary, capricious, confiscatory, or violative of constitutional guarantees." (quoting *Bd. of Cty. Comm'rs of Hillsborough Cty. v. Casa Dev. Ltd.*, 332 So. 2d 651, 654 (Fla. 2d DCA 1976) (cleaned up))).

This system of multiple review layers is more than adequate to satisfy this Circuit's due process test. As the Eleventh Circuit has said, "even if a plaintiff suffered a procedural deprivation at his administrative hearing, there is no procedural due process violation if the state makes available a means to remedy the deprivation." *Laskar*, 771 F.3d at 1300. In *Laskar*, the plaintiff—a tenured engineering professor—was fired after discovering "misappropriation of . . . resources for the benefit of a company . . . of which [he] was a part owner." *Id.* at 1294. Seeking redress, the plaintiff filed a petition "for a writ of certiorari, or in the alternative, a writ of mandamus with" the Georgia Superior Court— a writ the court summarily dismissed for lack of jurisdiction. *Id.* at 1300. The Eleventh Circuit concluded that the plaintiff had plausibly asserted that the state courts "effectively refuse[ed] to make available [to the plaintiff] a means to remedy the constitutional error alleged." *Id.* at 1301.

Our Plaintiffs, by contrast, admit that they've availed themselves of *none* of the appellate procedures Florida law has afforded them. *See generally* SAC. They never sought review from the Broward Board of Appeals; they never appealed to the Florida Building Commission; and they never pursued their remedies in state court. This failure to pursue appellate remedies is, of course, fatal to their claim because, "[i]f adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of

procedural due process." *Cotton*, 216 F.3d at 1331. In other words, the Plaintiffs' "federal due process claim d[oes] not exist until after [the] state courts dismiss[] [their] petition." *Laskar*, 771 F.3d at 1300. Since the state courts never had a chance to review the Plaintiffs' petition, the Plaintiffs' procedural due process claim "d[oes] not exist." *Id.*

*Second*, the Plaintiffs' procedural due process claim fails because their restaurant eventually opened. *See* SAC ¶ 71. They thus received all the relief they were due. *See McKinney*, 20 F.3d at 1557 ("[T]he state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise.").

Trying to parry this result, the Plaintiffs argue that, "[g]iven the final decision eventually to allow Red Door to open after plaintiffs expended otherwise unnecessary funds, no declaratory and injunction action could be filed." Response at 19; *see also id.* at 18–19 (explaining that they didn't appeal "because there was no adverse official interpretation that would allow an appeal either to the Florida Building Commission or to the Broward County Board of Rules, because after a prolonged process and threats to pursue litigation, the City relented.").[6] But this delay—and the harm it allegedly

---

[6] The Plaintiffs insist that they couldn't sue the City in state court because there is no "cause of action for the deprivation of rights sought to be vindicated in this complaint." Response at 19. This argument fails for two reasons. *First*, the only case the Plaintiffs cite for their position held that *Georgia* law *does* provide a cause of action against a police officer who confiscated the plaintiff's property and then failed to return it. *See Evans v. Holt*, 2018 WL 2294224, at *1 (N.D. Ga. Feb. 22, 2018). The Plaintiffs never explain how this Georgia-law case vindicates their view that *Florida* law *doesn't* provide a cause of action for a building officer who improperly cancels a restaurant's permits. *Second*, the Plaintiffs never really address the City's primary contention—that the Plaintiffs could have asked a state-court judge to issue an injunction or to grant them a declaratory judgment. *See* Motion at 12 (citing *City of St. Pete Beach*, 4 So. 3d at 1245). That's probably because, as the Second DCA has made clear, Florida law *did* afford the Plaintiffs a cause of action for the arbitrary and capricious deprivation of a property interest. *See City of St. Pete Beach*, 4 So. 3d at 1247 ("When an administrative official or agency acts in an executive or legislative capacity, the proper method of attack on the official's or agency's action is a suit in circuit court for declaratory or injunctive relief on grounds that the action taken is arbitrary, capricious, confiscatory, or violative of constitutional guarantees." (cleaned up)). Nor do they deny

caused—doesn't absolve the Plaintiffs of their obligation to seek redress under Florida law because due process also includes "the remedial process state courts would provide if asked." *Horton*, 202 F.3d at 1300. In other words, if a state court *could* remedy the deprivation "if asked," then the plaintiff's decision not to seek redress doesn't trigger a due-process violation. *See id.* (discussing *McKinney*, 20 F.3d 1550, and noting that "McKinney was complaining of a biased decisionmaker at the board level, but under Florida law an adequate remedy for that could be obtained in the state courts. So McKinney had an opportunity for procedural due process and that is all the Fourteenth Amendment requires.").

The Eleventh Circuit put this requirement to work in *Freeman v. Town of Eatonville*, 225 F. App'x 775 (11th Cir. 2006). There, a club and its owner sued the Town, alleging that a Town police officer had violated their due process rights by shutting down the club for a couple of hours. *Id.* at 780. The Eleventh Circuit affirmed the district court's dismissal of the plaintiffs' complaint because the "[p]laintiffs could have pursued remedies in state court for lost profits or damages[.]" *Id.*; *see also 6420 Roswell Rd., Inc v. City of Sandy Springs*, 484 F. Supp. 3d 1321, 1335 (N.D. Ga. 2020) ("Here, like in *Freeman*, [p]laintiff has not shown that it could not have pursued remedies in Georgia state court for lost profits. The Court therefore finds that [d]efendants did not violate [p]laintiff's procedural due process rights.").

And this makes sense. If plaintiffs could circumvent the state's review procedures by pointing to the damages they incurred from the government's delay, no one would ever exhaust their state remedies. After all, in *every* case in which an alleged due process violation has been remediated by the government's reversal of a prior decision, that remediation necessarily occurred at some point *after* the initial deprivation. To allow plaintiffs to sue in federal court by relying on the harm they suffered

---

that, to the extent they're here to recuperate the damages they incurred as a result of the City's permitting delay, they could just as easily have sought those damages in state court. *See, e.g.*, *Freeman v. Town of Eatonville*, 225 F. App'x 775, 780 (11th Cir. 2006) (dismissing due process claim because "[p]laintiffs could have pursued remedies in state court for lost profits or damages")

during that interregnum would thus eviscerate the requirement that plaintiffs pursue their available remedies *before* asserting a federal constitutional claim. Not surprisingly, then, the Plaintiffs have failed to cite a single case in support of their proposed damages-from-the-delay exception—nor has the Court found any.[7]

The City's Motion to Dismiss the Plaintiffs' procedural due process claim is therefore **GRANTED**.

## B.     Substantive Due Process

"[S]ubstantive due process is untethered from the text of the Constitution so the Supreme Court has been reluctant to expand its scope." *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1329 (11th Cir. 2020) (cleaned up). Courts must thus "exercise the utmost care" when considering substantive due process claims. *Id.*

Substantive due process protects rights that "are fundamental, that is, rights that are implicit in the concept of ordered liberty." *McKinney*, 20 F.3d at 1556 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). These include the "penumbral right of privacy," *id.* (citing *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992)), certain sexual rights in the home, *see Lawrence v. Texas*, 539 U.S. 558 (2003), and the right to marry, *see Obergefell v. Hodges*, 576 U.S. 644 (2015). Unlike a procedural due process claim, "a violation of a substantive due process right . . . is complete when it occurs . . . .

---

[7] Along similar lines, the SAC purports to lay the foundations for a possible futility argument. *See* SAC ¶ 40 (quoting Gonzalez as suggesting that he'd "already taken care of" any appeal). But the Plaintiffs didn't articulate this argument in their Response. *See generally* Response. Nor did they cite any case for the proposition that the process's futility might excuse them from pursuing their available state remedies. *Id.* They've thus waived any such argument. *See, e.g., Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."). Even if they had made the argument, though, the Plaintiffs would have had a tough time asserting a plausible claim that Gonzalez had the power to "take care of"—that is, to control—the Broward Board of Appeals, the Florida Building Commission, *and* the Florida state-court system.

Because the right is 'fundamental,' no amount of process can justify its infringement." *McKinney*, 20 F.3d at 1557.

Substantive due process also prohibits government conduct that "shocks the conscience." *Nix v. Franklin Cty. Sch. Dist.*, 311 F.3d 1373, 1375 (11th Cir. 2002) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998)). So, while mere negligence is "categorically beneath the threshold of constitutional due process," *id.* at 1375–76, "deliberately malign" acts are "most likely to rise to the conscience-shocking level," *id.* at 1376 (quoting *Sacramento*, 523 U.S. at 849). But "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Sacramento*, 523 U.S. at 846.

While substantive due process is an elastic concept, its outer boundaries are circumscribed in two main ways. *First*, "areas in which substantive rights are created only by state law . . . are not subject to substantive due process protection . . . because substantive due process rights are created only by the Constitution." *McKinney*, 20 F.3d at 1556 (cleaned up); *see also Hillcrest Prop., LLP v. Pasco Cty.*, 915 F.3d 1292, 1298 (11th Cir. 2019) ("As we made clear in *McKinney*, fundamental rights in the constitutional sense do not include 'state-created rights.'" (cleaned up)). *Second*, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims." *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) (cleaned up).

The SAC has failed to state a plausible substantive due process claim against the City—either as a deprivation of a fundamental right, *see Obergefell*, 576 U.S. at 644, or as conduct that "shocks the conscience," *see Nix*, 311 F.3d at 1375. For starters, the Plaintiffs never actually allege that the City deprived them of a fundamental right. They say only that they were deprived "without procedural and

substantive due process" of "a property right in their business operation." SAC ¶¶ 110, 112.[8] But "[p]roperty rights are state common law rights and are not equivalent to fundamental rights." *Hamilton*, 680 F.3d at 1319; *see also Abele v. Hernando Cty.*, 161 F. App'x 809, 814 (11th Cir. 2005) ("Non-legislative deprivations of state-created property rights, including land-use rights, cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrarily and irrationally." (cleaned up)). In the end, the permit the Plaintiffs sought was "established [by state law], not the Constitution, and is therefore not a fundamental right." *Coventry First, LLC v. McCarty*, 605 F.3d 865, 870 (11th Cir. 2010).[9]

The Plaintiffs' appeal to the "shocks the conscience" standard fares no better. Here, the Plaintiffs insist that Gonzalez's racial slurs are "no different from the conscious shocking atmosphere arising from calling someone a '[n*****]' in the workplace[.]" Motion at 20. The Plaintiffs then cite

---

[8] In their Response, the Plaintiffs suggest that the right they're asserting is "the right not to be discriminated against on account of one's race[.]" Response at 19–20. But they never make this claim in the SAC. *See generally* SAC. And "a Response to a Motion to Dismiss is not properly used as an attempt to add additional claims or allegations." *W. Surety Co. v. Steuerwald*, 2017 WL 52484499, at *3 (S.D. Fla. Jan. 17, 2017). In any event, "a particular Amendment"—the Fourteenth Amendment's Equal Protection Clause—already "provides an explicit textual source of constitutional protection," *Echols*, 913 F.3d at 1327, for the Plaintiffs' "right not to be discriminated against on account of one's race." As a result, "that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims." *Id.*

[9] One could argue that the Supreme Court's recent foray into marriage law casts some doubt on this general principle. S*ee, e.g., Obergefell*, 576 U.S. at 656. Like property rights, after all, marriage is a creature of state law. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 7 (1967) ("[T]he state court is no doubt correct in asserting that marriage is a social relation subject to the State's police power[.]"). One might thus justifiably suppose that the Supreme Court's analysis of fundamental marriage rights reveals some fissure in the old rule that fundamental rights cannot arise from state-created property interests. But we don't read the Court's recent marriage cases so broadly—principally because, in those cases, the Court treated marriage, not as some construct of state law, but as a kind of timeless (and universal) human ritual that constitutes part of the fabric of any "ordered conceptions of liberty." *Obergefell*, 576 U.S. at 656; *see id.* ("From their beginning to their most recent page, the annals of human history reveal the transcendent importance of marriage."). Even since *Obergefell*, therefore, the Eleventh Circuit has reiterated the principle "we made clear in *McKinney*"—namely, that "fundamental rights in the constitutional sense do not include 'state-created rights.'" *Hillcrest Prop., LLP*, 915 F.3d at 1298 (cleaned up).

two cases for their view that racist words alone can "shock the conscience." But neither case has anything to do with either substantive due process or the "shocks the conscious" standard. *See Williams v. Asplundh Tree Expert Co.*, 2006 WL 2131299, at *14 (M.D. Fla. Jul. 28, 2006) (concluding that the plaintiff's Title VII and § 1981 claims survived summary judgment because of testimony that the plaintiff's supervisors regularly called the plaintiff a "[n*****]"); *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir. 1989) (holding that the quantum of force an officer deployed against an arrestee was "objectively unreasonable" under the multi-factor test articulated in *Graham v. Connor*, 490 U.S. 386 (1989), and expressly declining to find a fundamental right because, "to the extent that [the plaintiff] asserts a claim based on substantive due process[,] it cannot be sustained under *Graham*"), *abrogated in part by Harper v. Harris Cty.*, 21 F.3d 597, 600 (5th Cir. 1994) ("We now hold that the *Johnson* standard is no longer valid in the wake of *Hudson v. McMillian*, 50 U.S. 1 (1992) . . . . A plaintiff is no longer required to prove significant injury to assert a section 1983 Fourth Amendment excessive force claim[.]").

We shouldn't be too disappointed, though, because there are no cases espousing the Plaintiff's position that racial slurs alone can "shock the conscience" in a constitutional sense. To the contrary, the Eleventh Circuit has time and again made clear that only a very narrow range of governmental conduct will "shock the conscience"—a list that, for instance, doesn't even include a state-employed college professor's violent and intentional battery against a student or a firefighter's sexual assault of an apprentice. *See, e.g., Dacosta v. Nwachukwa*, 304 F.3d 1045, 1049 (11th Cir. 2002) (holding that a college professor's intentional physical misconduct—viz., shoving a female student in the face and then slamming a door on her arm with so much force that the glass in the door panel shattered—didn't "shock the conscience" and thus didn't violate the plaintiff's right to substantive due process); *Skinner v. City of Miami*, 62 F.3d 344, 346 (11th Cir. 2006) (holding that stripping an apprentice firefighter naked, threatening to rape him, handcuffing him, and sexually assaulting him as part of a

23

hazing ritual didn't "shock the conscience" and thus didn't violate the plaintiff's right to substantive due process); *accord Costell v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 922 (8th Cir. 2001) (holding that a band teacher's verbal abuse against a student—which included saying that "[the plaintiff] could no longer play in the band because she was too stupid"—was "singularly unprofessional," but did not "raise a genuine issue of material fact on whether his behavior was sufficiently shocking to the conscience"); *Koorn v. Lacey Tp.*, 78 F. App'x 199, 203 (3d Cir. 2003) (finding that the "Mayor and Committeeman's alleged racist remarks . . . had no direct, legal effect on the [plaintiff's] property rights . . . . Certainly they had no legal effect on a requisite fundamental right."); *Abeyta v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253, 1257–58 (10th Cir. 1996) ("We are unwilling to hold that actions which inflict only psychological damage may never achieve the high level of brutal and inhuman abuse of official power literally shocking to the conscience," but finding that a teacher who repeatedly—and over a month-and-a-half—called a twelve-year-old student a prostitute in front of the whole class didn't "shock the conscience").

Indeed, the only two published decisions in which the Eleventh Circuit *has* found that a defendant's conduct "shocked the conscience" involved violent and intentional physical assaults by teachers against children. In *Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.*, for example, the Eleventh Circuit concluded that a high school coach violated a student's right to substantive due process when he struck the student in the face with a metal lock and dislodged his eye. *See* 229 F.3d 1069, 1076 (11th Cir. 2000). And, in *Kirkland ex rel. Jones v. Greene Cty. Bd. of Educ.*, the court found that "repeatedly striking a thirteen-year-old student with a metal cane, including once on the head as he was doubled over protecting his chest, when he was not armed or physically threatening in any manner" violated the boy's substantive due process rights. 47 F.3d 903, 905 (11th Cir. 2003).

Without minimizing for a moment the extent of the Plaintiffs' alleged monetary and emotional injuries, *see* SAC ¶¶ 97–122, they haven't identified a single case in which words alone—even combined

with the temporary denial of a business permit—have been found to "shock the conscience." Nor have they pointed to a single case in which something less grievous than violent physical battery has been held to constitute a violation of substantive due process. Even death itself, in fact, sometimes fails to meet this (very) high bar. *See, e.g., Sacramento*, 523 U.S. at 833 (finding that a police officer's "conscious disregard" of the risk of death to another motorist was not conscience shocking); *Nix*, 311 F.3d at 1374 (finding that a high school science teacher's conduct didn't "shock the conscience," even though the teacher brought in a live wire, which—when the teacher looked away—*killed* one of the students).

In the end, the SAC alleges only that the City "ratified" Gonzalez's discriminatory conduct by failing to overrule him quickly enough—a kind of tacit acquiescence. *See, e.g.*, SAC ¶ 93 ("The City was aware of Gonzalez's transgressions and bias, and by allowing it to continue against the Plaintiffs tacitly approved his actions, knowing or reasonably being aware of the harm it caused[.]"). If true, this conduct is wrong and should be subject to moral opprobrium. But it doesn't implicate a fundamental right, and it doesn't—at least not in an unconstitutional way—"shock the conscience."

The City's Motion to Dismiss the Plaintiffs' substantive due process claim is, therefore, **GRANTED**.

***

In their Response, the Plaintiffs ask for leave to amend, *see* Response at 22—a request this Court **DENIES** for two reasons. *First*, the deadline to amend pleadings—November 12, 2019, *see* Original Scheduling Order [ECF No. 27]—has long passed. *Second*, the Court has already granted a motion to dismiss the Plaintiffs' First Amended Complaint *without* prejudice—thus affording the Plaintiffs one final opportunity to state a claim against the City. *See* Order Granting Motion to Dismiss [ECF No. 48]. Despite three tries—as the name implies, the operative Second Amended Complaint is the Plaintiffs' third go at it—the Plaintiffs have failed to plead a viable due process cause of action

against the City. Even if the request for leave were timely, in other words, this Court would deny it anyway because of the Plaintiffs' "repeated failure to cure deficiencies by amendments previously allowed[.]" *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1341 (11th Cir. 2014).

After careful review, the Court hereby **ORDERS AND ADJUDGES** that the City of Fort Lauderdale's Motion to Dismiss [ECF No. 56] is **GRANTED with prejudice as to Count II and denied as to Count I**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 17th day of March 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record