UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-61308-CIV-ALTMAN/Hunt

625 FUSION, LLC d/b/a
RED DOOR ASIAN BISTRO, *et al.*,

      *Plaintiffs,*

*v.*

CITY OF FORT LAUDERDALE, *et al.*,

      *Defendants.*

_____/

## ORDER

    Our Plaintiffs—an Asian-fusion restaurant (Red Door) and its owners, Antonio Asta and Zhi

Yu Liu—allege that the Defendants, the City of Fort Lauderdale and its former Chief Mechanical

Inspector (Robert Gonzalez), violated their constitutional rights by delaying Red Door's opening for

discriminatory reasons. In their Second Amended Complaint [ECF No. 53] (the "SAC"), the Plaintiffs

advanced three claims under 42 U.S.C. § 1983: In Count I, they claimed that the Defendants violated

their equal-protection rights under the Fourteenth Amendment; in Count II, they averred that the City

deprived them of their property rights without due process; and, in Count III, they contended that

Gonzalez interfered with their due-process rights under the Fourteenth Amendment. In a previous

order, we dismissed Count II. *See 625 Fusion, LLC v. City of Fort Lauderdale*, 526 F. Supp. 3d 1253, 1272

(S.D. Fla. 2021) (Altman, J.) ("MTD Order"). Now, the Defendants have moved for summary

judgment on the remaining two counts.[1] This Order follows.

---

[1] That Motion for Summary Judgment [ECF No. 94] (the "MSJ") is ripe for resolution, *see* Plaintiff's Response and Memorandum of Law in Opposition to Defendants' Amended Motion for Summary Judgment [ECF No. 105] (the "Response"); Defendants' Reply in Support of Amended Motion for Summary Judgment [ECF No. 109] (the "Reply").

## THE FACTS

"The facts are described in the light most favorable to [the plaintiff]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant].").[2]

Before we begin, we address an ancillary (and preliminary) matter. The Plaintiffs contend that several paragraphs in the Defendants' SOF violate Local Rule 56(b)(1)(B) because they don't contain "specific pinpoint references to particular parts of record material[.]" Plaintiffs' SOF at 5 (quoting S.D. FLA. L.R. 56(b)(1)(B)). And the Plaintiffs are right to say that paragraphs 6, 10–11, 18–21, 23–25, 37–39, 47–48, 51–52, and 55–56 of the Defendants' SOF cite only generally to certain affidavits—but include no pincites at all. Still, because we, like the Plaintiffs, have no trouble locating the specific paragraphs the Defendants relied on—and given that no one (least of all the Plaintiffs) is confused about what the Defendants are saying—we decline the Plaintiffs' invitation to disregard the Defendants' evidence. *See* S.D. FLA. L.R. 56(d) (explaining that the Court "may"—but need not— strike a non-compliant statement of facts).

---

[2] We draw these facts from the Defendants' Amended Statement of Facts in Support of Summary Judgment [ECF No. 95] (the "Defendants' SOF"), the Plaintiffs' Response Statement of Material Facts [ECF No. 106] (the "Plaintiffs' SOF"), and the Defendant's Reply Statement of Material Facts [ECF No. 110] (the "Reply SOF"), along with the following evidence: the deposition of the Plaintiffs' Corporate Representative, Antonio Asta, *see* [ECF Nos. 95-1 & 104] ("Red Door Dep."), and the attached exhibits [ECF No. 95-2] ("Red Door Dep. Exhibits"); the declaration of Antonio Asta [ECF No. 100-1] ("Asta Decl."); the declarations of the City's employees, including: (1) Gonzalez [ECF No. 95-3] ("Gonzalez Decl."); (2) the Building Official, John Travers [ECF No. 95-4] ("Travers Decl."); and (3) the then-Mechanical Inspectors, Andres Vera [ECF No. 95-6] ("Vera Decl."), and Tony Sadolf [ECF No. 95-7] ("Sadolf Decl."); all exhibits attached to the above declarations; the depositions of Tony Sadolf [ECF Nos. 95-9 & 103-1] ("Sadolf Dep.") and of the Plaintiffs' engineer, Raja Buchanan [ECF No. 101-1] ("Buchanan Dep."), and contractor, Joseph Dobos [ECF No. 102-1] ("Dobos Dep."); the records of the City's inspections of Red Door [ECF No. 95-8] (the "Inspection Records"); and the Plaintiffs' responses to the City's first set of interrogatories [ECF No. 95-10] (the "Plaintiffs' First Interrogatory Responses") and second set of interrogatories [ECF No. 95-11] (the "Plaintiffs' Second Interrogatory Responses").

### I.      November 2017–January 2018: Red Door and the Kitchen Hood

Asta and Liu are restauranteurs and business partners from Long Island. *See* Red Door Dep. at 13:7–14:2. Liu is a "native of China and of Asian heritage, nationality, and culture, who was educated in China before immigrating to the United States." Plaintiffs' SOF ¶ 105 (cleaned up). In September 2017, after owning and operating several restaurants in Long Island, Asta and Liu decided to build Red Door on Las Olas Boulevard, in Fort Lauderdale. *See* Red Door Dep. at 15:7–17:13. They signed a lease to rent the space, and they hired an architect and a contractor (Joseph Dobos) to renovate it. *See id.* at 17:14–19:12. In November 2017, Dobos applied to the City for certain permits, which the City issued on January 23, 2018. *See* Defendants' SOF ¶¶ 10–11; Plaintiffs' SOF ¶¶ 10–11 (not disputing this point).

One of these permits was for a new kitchen hood—a piece of equipment that removes exhaust from the restaurant's kitchen. *See* Travers Decl. ¶ 5. The new kitchen hood was important because the "kitchen hood that was there was so old and outdated, and when they took it down we even seen that there was already timber that was already charred. Like, literally the place could have went on fire any time." Red Door Dep. at 29:12–30:2 (errors in original). So, to design and install the kitchen hood, Dobos hired an engineer (Raja Buchanan) who, in turn, worked with a company called Hood Depot. *See* Dobos Dep. at 9:2–10:21; *see also* Buchanan Dep. at 7:14–8:7. The kitchen hood was manufactured by CaptiveAire and was to be installed with insulation material from Owens Corning, a supply company. *See* Red Door Dep. at 51:14–52:20. The kitchen hood was a "zero clearance hood," which means that it was to be installed with no space (*i.e.*, "zero clearance") between the hood and any "combustible material" around it. *See* Dobos Dep. at 36:10–24. This design, as we're about to discover, caused major problems.

### II.      February–April 2018: The City's Initial Inspections

The City began inspecting Red Door in February 2018, shortly after construction on the

restaurant began. And those inspections continued through May 2018. Here's a schedule of those inspections and what they uncovered:

| Scheduled Date | Inspection Type | Sequence | Inspector | Result | Notes |
|---|---|---|---|---|---|
| February 2, 2018 | Rough | 1 | 879 | "I" | Pending PDF for insulation used for 0" clearance for hood. |
| February 6, 2018 | Rough | 2 | 875 | "C" | Cancel by contractor |
| February 8, 2018 | Rough | 3 | 879 | "I" | Partial insulation inspection |
| February 21, 2018 | Rough | 4 | 878 | "P" | No notes |
| February 26, 2018 | Rough | 5 | 877 | "I" | Duct Rough Light Test Inspection Approved, At Kitchen Hood Type I Metal Exhaust Duct, Ready to Insulate. |
| March 6, 2018 | Rough | 6 | 878 | "P" | No notes |
| April 17, 2018 | Final | 1 | 878 | "F" | Need revision showing new current layout of equipment and one ad[d]itional nozzle. FBC 107.4.5. |
| May 7, 2018 | Final | 2 | 877 | "F" | Not ready for inspection FBCM BCA 110.5. Also exhaust and plumbing roof vent shall be 10" away from mechanical intakes air (RTU and kitchen hood intake air) FBCM BCA 401.4/501.3.1 (highlighted area on plans), Kitchen Hood Test/Balance/Performance Report Requested FBCM 507.16 |
| May 8, 2018 | Final | 3 | 814 | "C" | (1) 5/16/18<br><br>Final inspection result is changed to 'cancel,' per Building Official John |

| | | | | | Travers. |
|---|---|---|---|---|---|

*See* Inspection Records (cleaned up).

The initial inspections on February 2 and 8, 2018, were conducted by both Gonzalez and Andres Vera, a City Mechanical Inspector who (at the time) was Gonzalez's subordinate. *See* Plaintiffs' SOF ¶¶ 18–19.[3] During those inspections, Vera saw "insulation material that [he] was not familiar with being used on the exterior of the zero-clearance kitchen hood[.]" Vera Decl. ¶¶ 5, 11. The Plaintiffs, for their part, deny using any improper insulation material and insist—albeit without much evidence—that Vera fabricated these observations as part of his efforts to facilitate Gonzalez's anti-Asian animus. *See* Plaintiffs' SOF ¶¶ 20–25 (disputing Vera's contention that he conducted the inspections alone and rejecting the proposition "that there was any improper installation material"); *see also* Asta Decl. ¶ 9 ("Defendant Gonzalez directed numerous racial and cultural slurs against Mr. Liu in my presence, took impermissible and unwarranted official action against all of us because of his racial animus toward Mr. Liu, and . . . attempted to use his official position to stymie, obstruct, and delay the opening of the Red Door. Gonzalez was present with Andres Vera and others from the City during the initial inspection.").[4] Indeed, despite the fact that, "[o]n February 2, 8, and 21, 2018, inspections by the Fire Department, electrical inspectors, and other mandatory City inspectors passed the Red Door project for final inspection," Asta has claimed that Gonzalez "determined the Red Door failed the mechanical portion of the inspections due solely to his discriminatory animus toward us,

---

[3] Dobos testified that Vera and Gonzalez were "always" together. *See* Dobos Dep. at 28:22–29:5 ("Q: Did you ever meet with [Gonzalez] on site when he was by himself or was he always with another inspector from the city? A: No. Actually, he was always with Andres [Vera], and funny you say that, because I noticed those two guys walking down Las Olas going to other restaurants, too. We said why those two. It should be just one inspector. There is no need to have two inspectors going to something as, you know, as easy as this.").

[4] In their Reply SOF, the Defendants repeatedly ask us to ignore Asta's declaration because (they say) it is unsigned. *See, e.g.*, Reply SOF ¶ 18 ("Moreover, the 'declaration' of Asta is unsigned and therefore insufficient for purposes of summary judgment."). But the document has a clear signature on it—and that signature appears to belong to Mr. Asta. *See* Asta Decl. ¶ 17.

because of Mr. Liu's Asian heritage." Asta Decl. ¶¶ 15–16.

But the inspections didn't end there. In March and April 2018, Gonzalez and Vera visited Red Door "to discuss the issue related to the [kitchen hood's] exterior insulation material" and, at these meetings, "harass[ed] and insult[ed] the owners of Red Door due to anti-Asian discrimination." Plaintiffs' SOF ¶ 26. For two reasons, the Plaintiffs came to believe that they were being discriminated against. *First*, they had installed Red Door's kitchen hood according to the manufacturer's specifications and precisely as they had at other restaurants. *See* Dobos Dep. at 19:11–19 ("I got a phone call from Mr. Gonzalez stating that you guys retrofitted this hood and that it's all like a Mickey Mouse job or whatever. I said that's not the case. This is a hood that you buy. It's a $55,000 hood. Why would I want to mess with the insulation and putting the wrong insulation up[?] That's the way it's shipped."); *see also* Asta Decl. ¶ 18 ("We used and installed the same type of kitchen equipment and incorporated the same construction techniques for the Red Door as [we] did with [our] other successful restaurants, all of which were designed and approved by . . . engineers and architects and were constructed according to applicable Code provisions.").

*Second*, and as we'll see in a moment, Gonzalez routinely offered offensive remarks about Liu's heritage and race. Gonzalez would "do[ ] little things with his eye," for example, and ask (rhetorically): "[W]hat does this chink know?" Red Door Dep. at 39:10–40:24. He would also wonder aloud: "[D]oes he [referring to Liu] even speak English?" and say that "he should go back to China, this isn't how we do things in America." *Id.* at 43:9–13. Gonzalez also "regularly expressed his disdain for Mr. Liu and Asians in general, spouting both direct and subtle racial comments," including:

> (1) "What does this chink think he is doing here?";
> (2) "There is a reason we don't have many chinks trying to open";
> (3) "Las Olas is not China Town";
> (4) "Does that Chinaman believe he knows more than me?";
> (5) "I don't know what kind of business that guy does, but we do things different in America";
> (6) "How long has he even been here?";
> (7) "He should go back to Hong Kong where he belongs";

(8) "This junk (referring to the kitchen hoods) might pass in China, but
this is not a Third World country";
(9) "[D]oesn't he even understand English?";
(10) "Where is this guy from?";
(11) "I love working with these Chinese. They think money buys
everything. But he's got another thing coming."

Plaintiffs' SOF ¶ 152 (quoting Asta Decl. ¶ 23).

During the City's Red Door inspections, moreover, Gonzalez flaunted his power. "Early in
the construction project," for instance, he "came to the Red Door location and announced in the
presence of [Asta] and Mr. Liu [and] others associated with us: 'I am in charge here. We do things
different from what you get away with in New York. I know all about how these Chinese guys do
things. No chink from New York is going to tell me how to do my business." Asta Decl. ¶ 22.
According to the Plaintiffs, Gonzalez also "routinely attempted to intimidate and humiliate [Asta] and
[Liu] by making it clear it was his job to 'call the shots.'" *Id.* ¶ 24. Gonzalez claimed, in this regard,
that "he was the decision maker in his department and that what he said goes." *Id.* ¶ 25; *see also id.*
("Gonzalez claimed the Chief Building Officer 'assigned' decisions to him, and that 'no one overruled
me' when it came to mechanical permits."). Gonzalez apparently "gave the impression to [Asta] and
others including Tony Liu and Joseph Dobos that he had the full support of his superiors and, with
their ratification, was able to carry out City policy." *Id.* ¶ 26; *see also id.* ¶ 27 ("Gonzalez informed me
and the Red Door that he was in contact with Rolando Soto of the Broward Board of Appeals and
that any appeal by us to the Broward Board of Appeals would be futile since he (Gonzalez) has already
'taken care of that.' Thus, the appeal to Gonzalez's supervisors were [sic] futile and any appeal to the
Broward County Board of Appeals would likewise be futile.").

In reality, though, Gonzalez's claim to "power" was illusory. Gonzalez, as Chief Mechanical
Inspector for the City, had several layers of supervision over him. His work was reviewed, first, by
John Travers, the City's Chief Building Official. *See* Travers Decl. ¶ 1 (noting that he is "the Building
Official for the City of Fort Lauderdale" and that, "[a]s the Building Official, I supervise the City's

Building Department"). Travers, in turn, was supervised by the Broward County Board of Rules and Appeals ("BORA"). *See* FLORIDA BUILDING CODE: BROWARD COUNTY AMENDMENTS § 113.9.1 (2018) ("The Board shall hear all appeals from the decisions of the Building Official, Assistant Building Official or Chief Inspector[.]"). The oversight doesn't end there. On top of BORA, there's also the Florida Building Commission, which has jurisdiction over BORA. *See id.* § 113.14.1 (noting that "[a]ny person aggrieved by a decision of BORA . . . may file an appeal" with the "Florida Building Commission"). And, of course, if all else fails, a business can always challenge a decision under the Building Code in state court.

The Plaintiffs *never* made use of any of these levels of review. *See generally* Plaintiffs' SOF. Describing BORA's role, Dobos testified that BORA employees are "super inspectors" who, "[w]hen you have an issue like this, you call them and get them involved and they try to help you out so that you can get through the process." Dobos Dep. at 31:3–24. But (notably) Dobos *never* filed a complaint with BORA about the inspection problems Red Door was having. *Id.* at 33:13–16. When asked why, Dobos said that he didn't want to "los[e] time" and that, in any event, "[i]t was not that great of a deal that it needed to be addressed." *Id.*

### III.   April 30, 2018–May 7, 2018: The Correction Notice

By the end of April 2018, the kitchen hood still hadn't passed the City's final inspection. *See* Inspection Records at 5 (showing that the inspection scheduled for April 17, 2018, required a "revision showing new current layout of equipment and one [additional] nozzle"). The City urged the Plaintiffs to "retrofit" the kitchen hood, but the Plaintiffs resisted because doing so would "void the warranty from [the manufacturer] CaptiveAire[.]" Red Door Dep. at 49:12–18; *see also* Dobos Dep. at 17:10–16 ("We have a $55,000 hood. We would not want to change the insulation. It would kind of insult your intelligence basically to say you change the insulation, you voided the warranty, this doesn't pass, and that was one of the issues and we've had several meetings regarding that.").

Dobos—searching for other ways to pass the City's inspection—contacted CaptiveAire, which produced a letter dated April 24, 2018, explaining: (1) that Red Door's kitchen hood was "designed for 0' Clearance to combustible," and (2) that the "method was tested and approved." Exhibit 5 to Red Door Dep. at 3 ("CaptiveAire's Letter"). Dobos also contacted Rolando Soto—BORA's Chief Mechanical Code Compliance Officer—to resolve some lingering issues with the kitchen hood. *See* Exhibit 4 to Dobos Dep. (showing that Dobos reached out to Soto on April 27, 2018, "with regards to a failed mechanical inspection at [Red Door]"). Soto, in response, sent Dobos a long (and somewhat vague) email that mainly block-quoted several sections of Florida's Building Code. *See* Exhibit 3 to Dobos Dep.

So, Dobos pushed the City to issue a "Correction Notice" (also known as a "Red Tag" or a "Red Flag") as a way of getting the City to articulate its grievances in writing. *See* Dobos Dep. at 22:7–16 ("Q: How far in advance of April 30, 2018 was the first time an issue with the hood came up, if you recall? A: Actually, probably a month or two prior to that, and it was finally when I got fed up and I said okay, I told both Robert and Andres, said if I have a problem and you're not passing this, because it got passed by another inspector and it wasn't an issue. I said if that's the case, I want a red tag that tells me what I'm doing wrong[.]").

On April 30, 2018, Vera issued the Plaintiffs a Correction Notice. As relevant here, it alleged that "[m]aterial used for clearance reduction on the hood is not UL approved for that application" and asked Red Door to "[p]lease provide alternative method for material to be used for the clearance reduction on the hood and submit to city for approval." Defendants' SOF ¶ 28 (citations omitted); Plaintiffs' SOF ¶ 28 (not disputing the contents of the Correction Notice). Dobos testified that what the Correction Notice called for—"chang[ing] the insulation and waiv[ing] the warranty for a zero clearance hood that's up against combustible material"—was a "catastrophe waiting to happen." Dobos Dep. at 22:21–23:2. The Plaintiffs took this as yet another indication that Gonzalez was

fabricating problems with the kitchen hood. *See* Asta Decl. ¶ 29 ("Gonzalez, for reasons entirely inconsistent with the lawful and proper application of the building codes and laws governing the City of Fort Lauderdale, issued a 'red flag' notice.").

Asta also accuses Gonzalez of issuing the Correction Notice "despite . . . having good and reliable evidence" that the hood was proper, including "documentation that the subject kitchen equipment was stamped as being certified for its intended purpose by the equipment manufacturer," and "ha[ving] ready access to available documentation that demonstrated the kitchen equipment was compliant with applicable code and safety requirements and was appropriate for the Red Door's usage." *Id.* ¶¶ 30–32. Asta objected to the Correction Notice, after which "Gonzalez became irate and emphatically explained his rules: what Gonzalez decided to do was the law, the policy, and the process for the City if we [the Plaintiffs] ever expected to do business in Fort Lauderdale." *Id.* ¶ 33. Frustrated, the Plaintiffs retained a lawyer (Michael Pizzi), who began to schedule meetings with City officials to try and resolve the kitchen-hood issue. *See* Red Door Dep. at 51:1–9 ("A: So between his [Gonzalez's] comments and Asian stuff, and this and that, and now he want[s] me to retrofit, if I were to [take] that hood down, that hood would have no longer been a zero clearance hood by law. Even—once even the engineer was like, what is he talking about? Even he knew[.] Q: So my understanding is your next step was to retain counsel? A: Absolutely.").

Meetings with "City supervisors and policy makers" were scheduled for May 1, 3, and 7, 2018. Plaintiff's SOF ¶ 140 (citing Asta Decl. ¶ 11). The night before the May 3 meeting, Pizzi sent an email to several City supervisors—including Travers and Gonzalez—writing about "some confusion that they [the Plaintiffs] are confident will be worked out tomorrow with some brief discussion, so they can move forward and start serving customers." Exhibit 5 to Red Door Dep. at 1. The email added:

> Apparently, one of the inspectors has asked them [the Plaintiffs] to change the insulation used for clearance reduction on the hood. But, this is the identical hood that they use in all of their restaurants and the same one that was approved for a nearby restaurant.

> The engineer who designed the hood actually came out and certified that the clearance reduction materials are the exact materials designed for this product and that it is not possible to "mix and match." The manufacturer sent the attached letter also certifying that this is the proper insulation and the one appropriate for this application.
>
> If they were to use a different clearance reduction material[,] they would lose their warranty on the entire product. They look forward to coming out tomorrow and working with you and obtaining your guidance. They are not asking the City to do anything outside of what would normally be done under existing circumstances.

*Id.* The letter Pizzi was referencing here had been sent on April 24, 2018, by the kitchen hood manufacturer (CaptiveAire)—and that letter *did* say (as Pizzi recounted) that the "0 [inch] clearance to combustible method was tested and approved[.]" *Id.* at 3 (the "CaptiveAire Letter").

Asta claims that, "[a]t [the] meeting on May 3, 2018, at the City of Ft. Lauderdale Zoning Department between the owners of the Red Door and Building Official John Travers, Deputy Building Official Luis Hernandez, Business Coordinator Andre Cross, and representatives of the City Manager and City Mayor's Office, we informed all in attendance of the animus directed by Gonzalez at us, as well as the lack of due process and equal protection in the manner in which we were not being permitted to officially open and operate their restaurant." Asta Decl. ¶ 66.

After the May 3, 2018, meeting, Vera contacted David Burd—an employee of the insulation supplier, Owens Corning—and relayed to him a "question" and "concern" about the Owens Corning insulation product the Plaintiffs were using for Red Door's kitchen hood. *See* Exhibit D to Vera's Decl. at 12 ("Burd's May 3, 2018 Email"). Appended to Burd's May 3, 2018 Email was a letter he drafted on company letterhead, in which he suggested that the Plaintiffs had used the wrong insulation material. *See id.* at 13 ("Because of [a] temperature rating difference, Owens Corning does not recommend the use of" the Plaintiffs' insulation product.).

The next day, on May 4, 2018, Travers forwarded Burd's May 3, 2018 Email to Pizzi, contending that he's "obligated to hold the final inspections on the hood installation until such time as the modifications are completed, using a more appropriate product, as recommended by Owens

Corning." Exhibit B to Travers Decl. at 16; Defendants' SOF ¶ 41; *see also* Plaintiffs' SOF ¶ 41 ("As to [the Defendants' SOF] ¶ 41, the email from Building Official Travers to Attorney Pizzi and the attached letter from Owens Corning speak for itself.").

But the Plaintiffs quickly followed up with Burd, who sent a second letter (dated May 7, 2018), in which he retracted his prior comments. *See* Exhibit 7 to Red Door Dep. ("Burd's May 7, 2018 Letter). In this second message, Burd wrote:

> Concerning my letter dated May 3, 2018
>
> It has been brought to my attention that [the Owens Corning product in the Plaintiffs' kitchen hood] is a component of a commercial kitchen hood assembly manufactured by CaptiveAire. It has also been brought to my attention that CaptiveAire has had this assembly tested and certified by Intertek – (ETL) as an acceptable assembly in a zero-clearance application. This information was not made known to me at the time of my letter dated May 3, 2018.
>
> Based on this information, as long as CaptiveAire has the data and/or report from Intertek certifying their assembly to include [the Owens Corning product in the Plaintiffs' kitchen hood,] Owens Corning has no issue with the use of the [product] in this CaptiveAire application.
>
> If you have any further questions, you should directly contact CaptiveAire regarding their product.

*Id.* Trying to explain Burd's reversal, Asta (at his deposition) pulled out his phone and retrieved an email from Burd to Vera, in which Burd justified his May 7, 2018 Letter as follows: "Andre[s] [Vera], referencing my letter to you dated May 3rd regarding the use of Owens Corning QuietR one-inch type 475 duct board as a thermal barrier on a commercial kitchen hood, I have received new and validated information that this application is not a retrofit installation but rather a manufactured assembly which has been tested and certified by Intertek ETL for the intended application. Given this new information, I am using the attached letter." Red Door Dep. at 86:13–21.

The upshot of this back-and-forth with Owens Corning is this: Asta surmised that Vera had initially *lied* to Burd about the manufacturing of the kitchen hood to further delay the Plaintiffs' grand opening. *See id.* at 86:22–87:9. ("Now, why would they do that? Why would you call up Owens Corning

and lie to them other than that they wanted to stop us and they are racist? There's no other reason for them to do that. Okay? They were racist. And you don't go and – let me just say one more thing. They had, prior to these letters, proprietary information. It's like Coca-Cola giving you their ingredients to their soda. Okay? So you can't play that they didn't know. They have proprietary information. We are talking right from CaptiveAire. Okay? So why do you go and tell David Burd that it's a retrofit? You knew it's not retrofitted. It's been there from day one, you have been seeing there was no retrofit. Lies, lies, because they are racist.").[5]

### IV.     May 7–16, 2018: The City's "Final" Inspection

Notwithstanding the parties' dueling communications with CaptiveAire and Owens Corning, "final" kitchen-hood inspections were scheduled for May 7 and 8, 2018. *See* Inspection Records at 1–2, 4 (containing printouts of records for each inspection). On May 7, 2018, an inspector named Tomas Perez determined that the kitchen hood failed the inspection. *See id.* at 4; Defendants' SOF ¶ 45; *see also* Plaintiffs' SOF ¶ 45 (not disputing this point). There's absolutely no evidence that Perez harbored any racial animus towards the Plaintiffs or that he was otherwise influenced by Gonzalez. *See generally* Plaintiffs' SOF.

On May 8, 2018, however, an inspector named Tony Sadolf issued Red Door a *passing* inspection. *See* Defendants' SOF ¶ 48; Plaintiffs' SOF ¶ 48 (not disputing this). And, on May 9, 2018, "the City removed the correction notice, closed out 'all permits,' and issued 'the requisite occupational license' needed for the restaurant 'to open.'" Defendants' SOF ¶ 49 (quoting SAC ¶ 56); Plaintiffs' SOF ¶ 49 (admitting this point); *see also* Asta Decl. ¶ 49 ("On May 9, 2018, I visited City Hall, verified

---

[5] The Plaintiffs contend that Gonzalez, too, lied to Burd about the kitchen hood. *See* Asta Decl. ¶ 41 ("Owens Corning ultimately disclosed that Gonzalez intentionally misled and provided false information to the manufacturer of the insulation of the hood in order to procure a letter falsely suggesting that there was something wrong – when Gonzalez and the City officials knew such was not the case. Gonzalez's improper conduct was concealed from us until Owens Corning made the disclosure only after the significant passage of time.").

all permits were complete, and received its occupational license from the City to open shortly thereafter, followed by receipt of its liquor license.").

Unfortunately for Red Door, this wasn't the end to the story. Asta says that, when he "went to City Hall to obtain the Occupational License, Gonzalez came up to me and stated in a threatening and intimidating manner and tone intended to be heard only by me: 'You win. You win. You think you win. We will see how long you stay open. Let me be clear – you are not going to win.'" Asta Decl. ¶ 51. Asta further claims that Gonzalez "smirked and stated in an apparent attempt to mimic and mock a Chinese accent: 'Your boss should go back to China Town. We don't need chinks here.'" *Id.* ¶ 52.

At this point, Soto (from BORA) reemerged. On the afternoon of May 9, 2018, Soto sent an email to Gonzalez, raising an issue that, according to the Plaintiffs, no City inspector had ever raised before. "[T]here is a misunderstanding," he wrote, "about what is the issue. The issue [with the kitchen hood] is not the clearance rating. *The issue is the hood penetrating a fire rated ceiling.*" Exhibit D to Travers Decl. at 25–27; *see also* Defendants' SOF ¶ 53 (referencing Soto's email); Plaintiffs' SOF ¶ 53 (not disputing the contents of this email). When Travers answered that "the assembly appears to be compliant for the installation"—based on a "further review of the listing" and Sadolf's "final inspection on 5-7-18 with a passing result"—Soto nonetheless asked to meet with Gonzalez and Sadolf to discuss the inspection. Exhibit D to Travers Decl. at 23–25.

On May 15, 2018, Sadolf and Soto did meet, and Sadolf summarized this meeting in an email he sent later that day to Soto, Travers, Gonzalez, and others (including a City attorney):

Hello Everyone,

I had a visit today from 2 members from BORA, that wanted to interview and tape record me concerning an inspection I approved recently. The "meeting" was in Robert [Gonzalez's] office. Rolando [Soto] told me this was an "investigation," and was insistent that I am tape recorded.

When I asked what this was about and what prompted this "investigation," I was told

14

by Ken [Castronovo], that someone in my department made a complaint that I passed the inspection.

This was the first I had heard that this was an issue. Rolando from BORA told me he sent me an email, indicating that it was explained to me. His email below indicates he wanted to meet me and Robert to discuss.

I explained that I did not feel comfortable and I asked who made the complaint. I was not told.

I spoke with Assistant Building Official, Luis Hernandez, and explained that BORA was in [Gonzalez's] office. The meeting was then transferred to Luis' [the Assistant Building Official's] office. After further conversation, Ken again stated that someone in my office made a complaint, and told Rolando that they might as well tell me anyway. Rolando was adamant that I answer questions and that I am tape recorded. Again, I was not told who made the complaint.

I explained to Rolando and Ken, that if I approved the inspection in error, or by mistake, I can change the result from pass to fail.

I feel that this entire situation was handled extremely unprofessional [sic].

The last words that Ken told me were that if I'm guilty, I'm screwed.

Please advise.

*Id.* at 22–23.

Sadolf sent a second email a few minutes later to Travers and Gonzalez, saying "I am extremely irritated by this entire situation, and I would prefer to 'fail' the mechanical inspection, and send the prior mechanical Inspector that failed the inspection before me. I think it was Tomas [Perez]." *Id.* at 22; *see also* Defendants' SOF ¶ 54; Plaintiffs' SOF ¶ 54 (not disputing the authenticity of this email). Again, there's no evidence that Perez bore any animus against the Plaintiffs. *See generally* Plaintiffs' SOF.

Sadolf got his wish the very next day (May 16, 2018). Soto sent an email to Travers and Gonzalez (and some others) indicating that he (Soto) and one other BORA member, together with Travers (the Chief Building Official), conducted a review of what had happened with the passing inspection. *See* Exhibit F to Travers Decl. at 32; *see also* Defendants' SOF ¶ 59 (citing Exhibit F to

Travers Decl. at 32); Plaintiffs' SOF ¶ 59 (not disputing this point). Here's what Soto said:

> Good morning to all,
>
> After interviewing Mr. Robert Gonzalez, Mechanical Chief Inspector and Ft. Ldl. Building Official Mr. John Travers, Ken Castronovo and I have concluded, there was no violation of section **104.4. Powers and Duties of the Chief Electrical, Mechanical, Plumbing and Structural Inspector, of** Ch. 1, Broward County Administrative Provisions for the 2017 FBC (6th Edition). In particular the highlighted sentences. . . .
>
> This conclusion doesn't relieve the fact that the Type 1 grease hood installed at this location under permit 18010831 is, to the best of our knowledge, in violation of sections **507.2.7 Type I hoods penetrating a ceiling** and **506.3.11 Grease duct enclosures** of the 2017 Florida Building Code – Mechanical, Sixth Edition. Corrective action has to be taken by the Building Department. See also attached email with a response from ETL. Please keep us informed on the communications and actions to correct this situation. Also, if we can provide any additional help with the case don't hesitate [to] get us involved in it.
>
> Respectfully,
>
> *Rolando Soto*

Exhibit F to Travers Decl. at 32. Travers subsequently allowed Sadolf to reverse his inspection and to cancel the approved permit for Red Door's kitchen hood. *See* Inspection Records at 1–2 (showing that Sadolf was the inspector who recorded the cancellation, leaving a note that said: "(1) 5/16/18 Final inspection result is changed to 'cancel' per Building Official John Travers.").[6]

The City, moreover, "did not inform . . . the Plaintiffs that the [kitchen-hood permit] had been changed from passed to cancelled." Defendants' SOF ¶ 57; Plaintiffs' SOF ¶ 57 (admitting this fact).

---

[6] Asta contends—despite this clear documentary evidence—that it was actually Gonzalez who "accessed the City's computer system using his official access and authority as a City official, after the Red Door received its permit, and cancelled the mechanical approval [of] the Red Door." Asta Decl. ¶ 56. But he offers no evidence of this. Nor does he explain how he could possibly know this. We don't credit pure speculation at summary judgment. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (cleaned up)). In any event—as we're about to see—even if Asta were right, our result would remain unchanged.

Indeed, "[t]he Plaintiffs only learned of the cancellation from Dobos, who heard it from another inspector on a different jobsite." Defendants' SOF ¶ 58; Plaintiffs' SOF ¶ 58 (admitting this fact). Red Door had begun serving customers on May 14, 2018—two days before the permit's cancellation. *See* Red Door Dep. at 66:24–67:25, 76:24–77:6. And, on the Plaintiffs' telling, the cancellation affected Red Door's operations. *See id.* at 91:17–25 ("Q: How did [the cancellation of the permit] impact Red Door's ability to operate? A: So at this point I know for a fact that once you have an open mechanical, which is a fire safety, okay, you could be closed at any time. So we did not do any kind of advertisement. We just kept it at minimal, because I didn't need to put all kinds of money in place and do advertisement and, you know, just ramp things up just so any day, any minute, the fire marshal could walk in and shut us down. We just literally kept it as soft as we could.").

### V.      May 16–September 12, 2018: The Road to Red Door's Grand Opening

In the wake of the permit cancellation, the Plaintiffs' lawyer (Pizzi) continued to hound City officials for final approval. Pizzi sent an email to that effect on May 21, 2018, requesting a meeting and saying that he "spoke with Raja Buchanan, the engineer, who told me and the owners that the [kitchen hood] was installed according to his design and no corrections are needed. I went out there . . . on Saturday with the contractor and verified same." Exhibit 8 to Red Door Dep. at 19; *see also* Defendants' SOF ¶ 60 (referencing the email); Plaintiffs' SOF ¶ 60 (not disputing the contents of this email). In this same email, Pizzi added: (1) Owens Corning "states that the Hood was always good to go . . . there was never an issue and . . . the project was needlessly held up"; (2) "nothing is protruding into the ceiling"; and (3) "even some of the City staff have informed the owners that they are at a loss to explain why Robert [Gonzalez] or anyone else is raising issues at this point." Exhibit 8 to Red Door Dep. at 19 (cleaned up).

On the morning of May 23, 2018—two days later—Gonzalez emailed Buchanan (the kitchen hood's engineer) to "discuss/resolve the [kitchen hood] installation . . . during this week or next week."

*Id.* at 21; *see also* Defendants' SOF ¶ 61 (quoting this email); Plaintiffs' SOF ¶ 61 (not disputing the contents of this email). Asta claims that the City scheduled a meeting for that day and then cancelled it without prior notice. *See* Asta Decl. ¶¶ 71–72. But Pizzi sent another email to Travers later that day, which didn't mention a meeting. *See* Exhibit 8 to Red Door Dep. at 20; *see also* Defendants' SOF ¶ 62 (quoting the email); Plaintiffs' SOF ¶ 62 (not disputing this). Instead, Pizzi wrote the following:

> John et al:
>
> Red Door is off to a good start and things are going smoothly. They are glad to be serving the people of Ft. Lauderdale.
>
> After they received all of their approvals and their occupational license opened, Robert Gonzalez raised an issue that was responded to.
>
> They assume there are no issues.
>
> Please call me at (305) 986-2277 if there is any issue that needs to be discussed.
>
> Mr. Asta and his partner have invested their money and reputations in the RED DOOR and it is gaining traction. Any interruption would really be a disaster.
>
> I am available all day tomorrow. Please call me 24/7 with any question. If we don't hear anything they will assume everything is copacetic. All they want to do is cooperate. Thanks.
>
> Mike.

Exhibit 8 to Red Door Dep. at 20.

The correspondence continued into June. On June 5, 2018, Pizzi emailed Travers directly, "assuming that the technical issues are resolved." *Id.* at 18; *see also* Defendants' SOF ¶ 63 (quoting the email); Plaintiffs' SOF ¶ 63 (not disputing this). Later that day, Pizzi wrote Travers again, confirming a meeting that Buchanan had scheduled with Gonzalez for June 8, 2018. *See* Exhibit 8 to Red Door Dep. at 21; *see also* Defendants' SOF ¶ 64 (citing the emails); Plaintiffs' SOF ¶ 64 (not disputing this). But the City cancelled that meeting, re-scheduled it for June 13, 2018, and then cancelled it again. *See* Defendants' SOF ¶¶ 64–65 (citing these emails); Plaintiffs' SOF ¶¶ 64–65 (not disputing this). Following those cancellations, Pizzi emailed Travers on June 18, 2018, asking whether Travers still

wanted to meet after Buchanan inspected the kitchen hood and found "no problems and no safety

issues." Exhibit 8 to Red Door Dep. at 16. Pizzi, in *this* email, also said:

> Once again, based on his bias and unfair treatment of the Red Door, if a meeting is
> still requested even after Raja inspected the place again and found total compliance, it
> is requested that Robert Gonzalez be recused and have no further involvement in this
> project for reasons stated.

*Id.*; *see also* Defendants' SOF ¶ 68 (quoting this email); Plaintiffs' SOF ¶ 68 (not disputing the contents

of this email).

It appears that Travers didn't respond to this email because, on July 6, 2018, Pizzi sent a formal

letter, requesting a meeting with Dean Trantalis and Lee Feldman (the Mayor and City Manager,

respectively). *See* Exhibit 8 to Red Door Dep. at 7–10 ("Pizzi's Letter"); *see also* Defendants' SOF ¶¶

69–71 (referencing Pizzi's Letter); Plaintiffs' SOF ¶¶ 69–71 (not disputing the contents of Pizzi's

Letter). Here's that letter:

Dear Mayor Trantalis and Manager Feldman,

> The Red Door owners are requesting a meeting with the Mayor and Manager
> to discuss and amicably resolve what they believe are obstacles placed in their path to
> obstruct their ability to operate their new and exciting restaurant on Las Olas. These
> obstacles have cost the establishment hundreds of thousands of dollars. Attached are
> photographs of Ft. Lauderdale residents enjoying birthday and family celebrations at
> the Red Door[ ] and being served by Ft. Lauderdale residents in good paying jobs. The
> Red Door would like to discuss and understand why there are efforts to harm this
> business, as opposed to welcoming this new business and helping them. They are
> confident that under your leadership all issues will be successfully resolved.

> The owners of the Red Door Asian Fusion Restaurant are proud to have
> invested over one million dollars in the opening [of] their first Broward County Asian
> Fusion Restaurant after many years of operating some of the most successful
> restaurants in the Hamptons in Long Island, New York. The owners of the Red Door
> had a goal of working with the City of Ft. Lauderdale to continue to enhance Las Olas
> Boulevard with new and exciting establishments that would contribute to the pride of
> your great city. If you pass by 625 E Las Olas you will see how much money was spent
> to produce a wonderful dining experience that is attracting customers to your great
> City.

> The Red Door has opened the same restaurant with the same business model
> and same architecture that they have used in half a dozen successful restaurants
> throughout New York, and more recently at the Trump Tower in Sunny Isles beach.

They have used the same kitchen equipment, the same construction techniques, designed by the finest engineers and architects. Unfortunately, the original opening was delayed for months because a mechanical inspector working with your Building Department erroneously issued a red flag on April 30th, 2018, a year after this issue should have been addressed, stating that the kitchen hood was not properly certified for that purpose by the manufacturer. A simple good search would have disclosed that this is the very product appropriate for that usage. The owner was needlessly forced to obtain letters from the manufacturer of the appliance, and also from the manufacturer of the insulation of the hood, along with confidential and privileged photographs and drawings from the actual safety tests done on the hood and the hood's apparatus. It was later disclosed in the attached letter from Owens[ ] Corning, that Mr. Robert Gonzalez, the City's Chief Mechanical Inspector, misled and provided false information to the manufacturer of the insulation of the hood in order to procure a letter falsely suggesting that there was something wrong. As you can see from the attached letters, there was NEVER anything wrong with the hood or any of the kitchen equipment and the owners were forced to go through a torturous process of obtaining letters and hiring experts over a kitchen hood that was already in usage throughout the City.

The City's Building [O]fficial had to visit the Red Door personally, while another inspector—a different inspector—who does national training, looked at the hood device and quickly concluded that there were absolutely no issues and the red flag was erroneously issued. On that date, the building official, other safety officials, and the mechanical inspector signed off on the remainder of the permits in the presence of undersigned Counsel, congratulated them on the opening of the new restaurant, and wished them luck serving food that evening.

The owner then visited City Hall, verified that all the permits were completed, and received his Occupational License to open shortly thereafter, following [sic] by receipt of the liquor license. This should have had a happy ending, despite the hundreds of thousands of dollars spent as a result of the erroneous determinations by the Chief Mechanical Inspector. However, when the owner went to City Hall to get the Occupational License, Mr. Robert Gonzalez went up to him and stated sarcastically, "You win. You win. See how long you remain open." In other words, instead of being happy that a multi-million dollar restaurant was going to help energize Las Olas Boulevard, Mr. Gonzalez, the City's Chief Mechanical Inspector[,] threatened the owner and let him know that he had been embarrassed and was going to do everything possible to create problems.

The restaurant opened, and has served hundreds of customers and has become one of the most popular sites on Las Olas. At some point it came to the attention of the owner that Robert Gonzalez, true to his word, went into the City's computer system after the business opened and cancelled the mechanical approval. The Red Door was never notified of this and found out on the rumor mill when their architect was visiting the City for other purposes and heard that Mr. Gonzalez was bragging that he took the unprecedented step of trying to cancel an approval, one given in the presence of the building Official and other witnesses. This new issue by Mr. Gonzalez was raised months after all approvals were given, after all permits were closed and after

the Red Door opened with their occupation license.

On June 11th, 2018, the Red Door's engineer, architect, and fire expert performed a front to back inspection of the property and found that Mr. Gonzalez'[s] new concerns were once again baseless. On that date, the owner flew to Ft. Lauderdale at great expense and paid his engineer to come to a meeting with Mr. Gonzalez and other Ft. Lauderdale building officials and staff to address the issues. When they arrived, they were rudely informed that the meeting had been cancelled, and that they had all wasted their time coming to the meeting. A subsequent meeting was arranged, at which time the owner, the engineer, undersigned Counsel, and everyone else re-arranged their schedules to attend the meeting to address any issues the City felt needed to be addressed. That meeting was also cancelled.

Every request to re-schedule the meeting and address ANY possible issues has fallen on deaf ears. I would note that on these three occasions, it was requested that Robert Gonzalez, the Chief Mechanical Inspector, recuse himself and end his involvement in this matter for the following reasons:

1. The original denial of the mechanical inspection permit was found to be based on erroneous information.

2. On more than one occasion Mr. Gonzalez indicated that he was embarrassed by what had transpired and confronted the owner and pledged to do whatever he could within his power to create problems to obstruct the business.

At this point, the owners have invested well over a million dollars in opening up an establishment that they hope to be one of the crown jewels of a revitalized Las Olas Boulevard. They have done nothing but cooperate with the City in every respect. It is unfair that their lives have been made miserable and that they have been harassed and threatened at the whim of a single official who made an erroneous determination.

I am attaching my correspondence with the City which is self-explanatory and the letters they were forced to obtain attesting to the certification that was never in question by simply looking at the box that the parts came in. Based upon everything outlined here, it is hereby respectfully requested by the Red Door that they have an opportunity to meet with the Mayor and Manager, to insure [sic] that your pro-business and pro customer policies are being carried out. Red Door is proud to serve the City and only wants to cooperate and help make Las Olas beautiful.

Pizzi's Letter. Note that, in this long and (very) detailed letter, Pizzi says absolutely nothing about

racism or any other kind of ethnic prejudice.

Pizzi's Letter prompted a meeting at Red Door in "early August 2018" between "the Plaintiffs,

Attorney Pizzi, Dobos, . . . Buchanan[,] Building Official Travers, an assistant city manager, and persons

from code enforcement and the fire department." Defendants' SOF ¶ 72; (citing Red Door Dep. at 101–02, 112–13); *see also* Plaintiffs' SOF ¶ 72 (admitting that the meeting took place). At that meeting, "the City agreed with the Plaintiffs regarding the [kitchen hood] installation." Defendants' SOF ¶ 75; (citing Red Door Dep. at 112–13); *see also* Plaintiffs' SOF ¶ 75 (admitting this). Asta (again) informed those in attendance that "Gonzalez had made derogatory statements regarding Asians towards Liu." Plaintiffs' SOF ¶ 81. Following the meeting, Buchanan sent the City a letter (dated August 10, 2018), in which he said:

> I inspected the hood installation and in my professional opinion, the hood was installed per plans. The hood is a listed hood (zero clearance to combustibles). The grease exhaust duct is wrapped with fire rated wrap from the hood to the exhaust fan. The supply air duct has a fire damper thru the ceiling. The installation of the hood in my professional opinion is safe and I did not see any issue[s] with the way it is installed.

Defendants' SOF ¶ 76 (citing Exhibit G to Travers Decl. at 35); *see also* Plaintiffs' SOF ¶ 76 (not disputing this point). Finally, in September 2018, Red Door hosted a "grand opening"—which (according to the Plaintiffs) had been delayed "due to the issues related to the [kitchen hood] because [the Plaintiffs] knew they could be shut down due to the open permits." Plaintiffs' SOF ¶ 77. As a result of all this, the Plaintiffs missed out on their "original February 2018 opening date" and the "lucrative winter visitor season." *Id.* ¶ 148 (citing Asta Decl. ¶ 19).

### PROCEDURAL HISTORY

The SAC asserted three counts against the Defendants. In Count I, the Plaintiffs alleged that Gonzalez and the City had violated their rights under the Equal Protection Clause by discriminating against them on the basis of their race and national origin. *See* SAC ¶¶ 96–108. As to this first count, the Plaintiffs said, the City should be liable for Gonzalez's misconduct because "City officials were made explicitly aware of Gonzalez'[s] actions in improperly removing City approval, yet endorsed and ratified his improper conduct." *Id.* ¶ 101. In Count II, the Plaintiffs averred that the City's conduct deprived them of "a property right in their business . . . . without due process." *Id.* ¶¶ 112, 114. They

also maintained that "[t]he City . . . enforced a practice and custom of threats, intimidation, and extortion to deprive . . . Plaintiffs[ ] of their property and rights without procedural and substantive due process[.] *Id.* ¶ 110. In Count III, the Plaintiffs alleged that "Gonzalez violated Plaintiffs' due process rights when he took improper and illegal official City actions against the Plaintiffs." *Id.* ¶ 127.

The City filed a motion to dismiss Counts I and II of the SAC, *see* City's Motion to Dismiss [ECF No. 56] ("MTD"), which we granted *in part*, *see 625 Fusion*, 526 F. Supp. 3d at 1272. As to the equal-protection count, we found that the Plaintiffs had done *just enough* to state a plausible claim to relief. In particular, we felt that the SAC's allegations about the threats Sadolf had received from City officials after he inspected and approved the kitchen hood raised the "natural inference . . . that the City's policymakers harassed [Sadolf] precisely because they supported—and intended to ratify—Gonzalez's illegal revocation of the Plaintiffs' permit." *Id.* at 10. In saying so, we added this:

> Of course, the Plaintiffs cannot complain about the (alleged) harassment [Sadolf] experienced. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). But if it's true (as the SAC suggests) that the City's final policymakers initiated the harassment in order to provide cover for—or lend support to—Gonzalez's misconduct, then that harassment *could be* an example of ratification. Here's how: the SAC says that, because of his anti-Asian animus, Gonzalez denied the Plaintiffs' permit. *See* SAC ¶ 36. [Sadolf], however, disagreed with Gonzalez's decision and believed that the Plaintiffs deserved their permit. *Id.* ¶ 42. Presented with this conflict, the SAC avers, the City's final policymakers sided with Gonzalez and, as part of their efforts to ratify Gonzalez's behavior, coerced [Sadolf's] acquiescence. *Id.* ¶¶ 76–77. Admittedly, the ultimate viability of this claim is belied (at least in part) by the City's decisions, sometime later, to *reverse* Gonzalez and to allow the Red Door to open (in September 2018). *See id.* ¶ 71. Nevertheless, if it's true that the City's initial decision to ratify Gonzalez's misconduct delayed the restaurant's grand opening—say, from the day [Sadolf] acceded (whenever that was) to the day the Red Door finally opened—then the City *could be* liable for the damages the Plaintiffs sustained during that period of delay.

*Id.* at 11.

The due-process claim was a different matter. We opened our discussion by noting that, with respect to Count II, the Plaintiffs "seem to be conflating (what should be) separate substantive and

procedural due process claims into a single count." *Id.* at 6. So, we treated the cause of action as asserting two separate claims—one procedural, the other substantive—and dismissed both. As to the former, we pointed out that the Plaintiffs had "availed themselves of *none* of the appellate procedures Florida law has afforded them." *Id.* at 17–18. And, in any event, the Plaintiffs had undeniably received all the process they were due—a review by City officials that resulted in a *reversal* of the original red flag. *Id.* at 18. As to the latter, we found that "[t]he SAC has failed to state a plausible substantive due process claim against the City—either as a deprivation of a fundamental right or as conduct that shocks the conscience[.]" *Id.* at 21 (cleaned up). We therefore dismissed Count II *with prejudice.*

In their MSJ, the Defendants attack the two remaining counts: Count I (the equal-protection claim against both Defendants) and Count III (the due-process claim against Gonzalez). With respect to Count I, they say that Gonzalez is entitled to qualified immunity, that Gonzalez didn't *cause* the Plaintiffs' injuries because he wasn't *actually* the decisionmaker, and that the City can't be held responsible for Gonzalez's (alleged) misconduct. As to Count III, Gonzalez again requests qualified immunity and, in the alternative, asks us to apply our reasoning from the MTD Order to the due-process claim the Plaintiffs have advanced against him.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and

summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

**ANALYSIS**

### I.     The Case against Gonzalez

Gonzalez proceeds along two fronts. *First*, he contends that he can't be liable *at all* because he didn't make any of the decisions that *caused* the Plaintiffs' injuries. MSJ at 3–5. *Second*, he seeks to shroud himself in qualified immunity. *Id.* at 8–9. Because Gonzalez is entitled to qualified immunity, we'll stop there—without addressing whether the evidence is sufficient to show that he engaged in the conduct the Plaintiffs here complain about.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). By imposing liability *only* for violations of clearly established law, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To qualify for the immunity, the official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)).

In our case, Gonzalez was, at all relevant times, acting within his discretionary authority because the act of applying the Florida Building Code to burgeoning businesses is a "power[ ] that legitimately form[s] a part of [his] job" as Chief Mechanical Inspector. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1267 (11th Cir. 2004); *cf.* FLA. STAT. § 468.603(5)(e) (defining a "mechanical

inspector" as a "person who is qualified to inspect and determine that the mechanical installations and systems for buildings and structures are in compliance with the provisions of the governing mechanical code"); Exhibit F to Travers Decl. at 32 ("The Chief Inspector shall have the sole authority to render interpretations of this [Mechanical] Code[.]" (quoting FLORIDA BUILDING CODE: BROWARD COUNTY AMENDMENTS § 104.4 (2018))). And, unsurprisingly, both sides agree on this point. *See* MSJ at 9 ("First, it is undisputed that Gonzalez was at all times operating within his discretionary authority as the City's Chief Mechanical Official."); MSJ Response at 18–19 (not disputing this point).

Where, as here, "the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. "To overcome a qualified immunity defense, the plaintiff must make two showings." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). *First*, "the plaintiff must establish that the defendant violated a constitutional right." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). *Second*, "the plaintiff must show that the violation was clearly established." *Id.* Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Corbitt*, 929 F.3d at 1311 (quoting *Pearson*, 555 U.S. at 236).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Vinyard*, 311 F.3d at 1350 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "Put another way, the defendant must have fair notice of his conduct's unconstitutionality, which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (citing *Vinyard*, 311 F.3d at 1350–52). "The critical inquiry is whether the law provided [the official] with 'fair warning' that his conduct violated the [plaintiff's rights]." *McClish v. Nugent*, 483

F.3d 1231, 1248 (11th Cir. 2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). In this Circuit, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." *Id.* at 1237.

### A.  Equal Protection

The Plaintiffs have failed to adduce sufficient evidence to show that Gonzalez violated their "clearly established" rights. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "Equal protection claims can be divided into three broad categories." *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987). The first "is a claim that a statute discriminates on its face." *Id.* The second is a claim that "neutral application of a facially neutral statute has a disparate impact" and was enacted with "purposeful discrimination." *Id.* The third is a claim that the "defendants are unequally administering a facially neutral statute." *Id.*; *see also* 3 R. ROTUNDA & J. NOWAK, TREATISE ON CONST. LAW § 18.4 (updated May 2021) ("A classification within a law can be established in one of three ways.").

Our case falls into the third bucket: The Plaintiffs contend that Gonzalez *unequally applied* the Florida Building Code to them. *See* MSJ Response at 14 (arguing that "Asta and Liu were intentionally treated differently" and "denied permits where they are typically approved"). "In order to prevail on an equal protection claim based upon the application of a facially neutral statute, it must be establish[ed] that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff." *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996); *see also E & T Realty*, 830 F.2d at 1111 (same). In fact, the Eleventh Circuit has said that "[a]djudging equality necessarily requires comparison[.]" *Griffin*, 496 F.3d at 1205.

In our case, no reasonable jury could find, based on the evidence the Plaintiffs have presented, that they were "treated differently than similarly situated persons." Hunting for "similarly situated persons" who were treated better than they were, the Plaintiffs point to two (and only two) pieces of evidence—both unavailing. *First*, they say that "Sadolf performed over 50,000 inspections and never saw anyone treated the way Red Door was treated." MSJ Response at 14; *see also* Sadolf Dep. at 53:23–54:13 ("Q: Okay. And you had never seen anything like this in 50,000 inspections, correct? A: Correct."). *Second*, they argue that "Buchanan ha[d] done the mechanical engineering work on hundreds of restaurant kitchens" and that he "never saw any restaurant singled out for the delays and bad treatment received by the Red Door." MSJ Response at 14; *see also* Buchanan Dep. at 25:13–21 ("Q. How many kitchen hoods have you done in restaurants over your career? A. I don't remember, but at least -- I am sure it is way over 100. Q. Is it fair to say no other inspector made these requests? A: Never. I never had anybody make that request on the listed hood, no." (cleaned up)).

The problem with all this is that Sadolf and Buchanan tell us *nothing* about any of their other inspections. Did these other restaurants have the same hood? The same insulation material? Were they subject to the same requirements? Were they even in the same jurisdiction? Did Gonzalez have anything to do with those other inspections? The Plaintiffs never say. Nor do they tell us whether *any* of the owners of those hundreds (or thousands) of other businesses were Asian. Imagine a scenario in which all 50,000 of the restaurants Sadolf had worked with were owned by other Asian businessmen. If that were the case, then the mere fact that none of those 50,000 owners encountered the problems Red Door faced would tell us *nothing* about whether those other businesses were treated *better* than Red Door *because of* race. Note, too, that this would remain true *even if* only some of those 50,000 businesses were owned by Asians. Indeed, unless all 50,000 of those other restaurants were owned by non-Asians, those other businesses simply cannot satisfy our Circuit's strict comparator requirement. *Cf. Jones v. Unity Behav. Health, LLC*, 2021 WL 5495578, at *4 (11th Cir. Nov. 23, 2021) ("When a

plaintiff seeks to prove discrimination with evidence that a similarly situated employee *outside his protected class* was treated more favorably than he was, he must show that the comparator is *similarly situated in all material respects*." (cleaned up & emphases added)). We needn't speculate about the racial composition of Sadolf and Buchanan's samples here, however, because the Plaintiffs never do the hard work the law required them to do—never, in other words, tell us *anything* about those other businesses.

The Eleventh Circuit has routinely held that a selective-enforcement claim (like the one the Plaintiffs bring here) cannot survive without a similarly situated comparator. *See, e.g.*, *Young Apartments, Inc. v. Town of Jupiter*, 406 F. App'x 376, 378 (11th Cir. 2010) ("[B]ecause [the plaintiff-landlord] failed to show that a similarly situated landlord of non-Hispanic tenants was treated differently from it, the grant of summary judgment [on the selective-enforcement claim] is due to be affirmed."); *Roy v. Fulton Cnty. Sch. Dist.*, 288 F. App'x 686, 688 (11th Cir. 2008) (affirming the dismissal of a race-based "selective-enforcement claim . . . under the Equal Protection Clause" because the plaintiff never alleged that he "was similarly situated with any other parties"—and so, did "not establish[] the necessary elements of an equal protection violation"); *B.T. by & through Jackson v. Battle*, 2021 WL 4147087, at *5 (11th Cir. Sept. 13, 2021) (affirming the district court's order granting qualified immunity to an officer on a race-based selective-enforcement claim because there was "no evidence that students of other races engaged in conduct similar to B.T.'s, but [the officer] declined to arrest or otherwise discipline them").[7]

In response to all this, the Plaintiffs advance one retort—that they're actually proceeding under a "class of one" theory. *See* MSJ Response at 15. As an initial matter, however, a "class of one" claim

---

[7] At least some of the other circuits have suggested the same thing. *See, e.g.*, *Suber v. Wright*, 574 F. App'x 207, 211 (3d Cir. 2014) (affirming summary judgment on a "selective enforcement claim" partly because the plaintiff failed to show "that he was treated differently from other similarly situated individuals" (cleaned up)).

"does not allege discrimination against a protected class." *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306–07 (11th Cir. 2009); *see also Rebalko v. City of Coral Springs*, 552 F. Supp. 3d 1285, 1321–22 (S.D. Fla. 2020) (Altman, J.) (same). Instead, a "class of one" claim avers that some individual was "irrationally singled out" for discrimination—*without* regard for his or her membership in any particular group. *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 601 (2008). In our case, then, a "class of one" theory doesn't *really* fit since the Plaintiffs allege—not that they were singled out for *no reason*— but (rather) that they were singled out "*because of racial animus.*" MSJ Response at 19 (emphasis added). So, we're not sure it makes sense to view the Plaintiffs as asserting a "class of one" claim here. *See Alford v. Consol. Gov't of Columbus*, 438 F. App'x 837, 839 (11th Cir. 2011) ("In a 'class of one' equal protection claim, however, a plaintiff does not allege discrimination against a protected class or on account of membership in a particular group[.]").

But here's the thing: Even if we *were* to analyze the Plaintiff's claim under a "class of one" theory, that leniency wouldn't help them here. Why? Because, as we've said, the Plaintiffs' equal-protection claim fails for lack of a valid comparator. And, as the Plaintiffs concede, that comparator requirement applies with equal force to "class of one" claims. *See* MSJ Response at 12–13 (accepting this point); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."). That's why courts have said that "[a] 'class of one' plaintiff might fail to state a claim by omitting key factual details in alleging that it is 'similarly situated' to another." *Griffin*, 496 F.3d at 1205. And that, of course, is exactly what happened here. Other than pointing to nameless "other" restaurants, the Plaintiffs haven't given us *any* information about *any* of those other businesses—rendering it impossible for us to engage in the comparison the law requires.

Unsurprisingly, the Eleventh Circuit has dismissed equal-protection claims in similar circumstances:

> With regard to the "similarly situated" prong, the complaint does not present a single instance in which a similarly situated developer was granted a permit; it merely alleges that nameless, faceless "other" permit applicants were given better treatment. Bare allegations that "other" applicants, even "all other" applicants, were treated differently do not state an equal protection claim; a complaint must attempt to show in some fashion that these "other" applicants were situated similarly to the plaintiff.

*GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1367–68 (11th Cir. 1998).[8] Our Plaintiffs' case is even weaker: While *GJR* was decided at the motion-to-dismiss stage, our Plaintiffs had nearly *eighteen months* to develop factual support for their claims in discovery. Yet here we are, at summary judgment, *without* any evidence of a single similarly situated comparator.

There is, however, one issue—one the parties never raise—that we'll consider *sua sponte*. And it's this: Do we really need a similarly situated comparator when the plaintiff presents *direct* proof of selective enforcement? Of course, the Plaintiffs *never* argue that they can do without the comparator requirement. So, they've forfeited any such contention. *See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances"); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("In the first place, the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

But let's consider for a moment some of the arguments they *could've* made. They could've pointed to the employment context, where an employee can establish a claim of discrimination—not

---

[8] *GJR* has been overruled on other grounds by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Schwarz v. Ga. Composite Med. Bd.*, 2021 WL 4519893, at *2 (11th Cir. Oct. 4, 2021).

only through the *McDonnell Douglas* comparator test[9]—but also through "direct evidence of discriminatory intent . . . or [through] a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination[.]" *Lewis v. City of Union City*, 918 F.3d 1213, 1221 n.6 (11th Cir. 2019) (en banc). And this would make some sense. It is, after all, both logically—and practically— possible for an official to discriminate against a business on the basis of race, *even without* any evidence that a similarly situated company was treated better. Imagine, for instance, a hypothetical city official who, in the course of denying a business permit, tells the proprietor: "I'm denying your permit because of your race." It seems absurd to deny that such a statement, even standing alone, would be enough to state a viable claim of invidious intent. Or consider another example. Suppose an official who hates the members of a particular race so much that he's willing to deny *all* permits to *everyone* just to make sure he doesn't have to grant permits to the one group he loathes. In that case, again, there'd be no similarly situated comparator who received better treatment. Still—we think—it would make sense for courts to invalidate the racist official's actions. In the context of a facially neutral law, after all, the fact that the law causes harm *beyond* the suspect class isn't enough to withstand a constitutional challenge—so long as the plaintiff can show that the law was passed with a discriminatory purpose. *See Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 544 (1982) ("[A] law neutral on its face still may be unconstitutional if motivated by a discriminatory purpose."); *Lawrence v. Texas*, 539 U.S. 558, 600 (2003) (Scalia, J., dissenting) ("A racially discriminatory purpose is always sufficient to subject a law to strict scrutiny, even a facially neutral law that makes no mention of race."); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1218 (11th Cir. 2005) ("Of course, the Equal Protection Clause prohibits a state from using a facially neutral law to *intentionally* discriminate on the basis of race.").

---

[9] The test takes its name from the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

Indeed, in the employment context at least, the Eleventh Circuit has recognized *just* this problem—and it has agreed that the *McDonnell Douglas* test (which requires a similarly situated comparator) "is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013); *see also Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1387 (11th Cir. 1983) ("We therefore reaffirm that the *McDonnell Douglas* . . . test, while a viable one, is not the alpha and omega of possible tests in the age discrimination context." (cleaned up)). Instead, an employee can survive summary judgment (on an employment-discrimination claim) by producing direct or circumstantial evidence of discriminatory intent—even *without* a comparator. *See, e.g.*, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("[T]he plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case. Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.").

And this view appears to conform to basic equal-protection principles. "The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." *Loving v. Virginia*, 388 U.S. 1, 10 (1967); *see also Miller v. Johnson*, 515 U.S. 900, 904 (1995) ("Its central mandate is racial neutrality in governmental decisionmaking."); *Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 492 n.5 (1954) (explaining that, under the Equal Protection Clause, "all persons . . . shall stand equal before the laws of the States" (cleaned up)). It's somewhat hard to see how an official complies with this "central purpose" when he bases his actions on "invidious racial" intent.

Some federal circuits, in fact—recognizing this doctrinal dilemma—have applied something like our employment-discrimination doctrine to selective-enforcement claims. The Second Circuit, for instance, has held that a "plaintiff alleging an equal protection claim under a theory of discriminatory application of the law . . . generally need not plead or show the disparate treatment of other similarly

situated individuals." *Pyke v. Cuomo*, 258 F.3d 107, 108–09 (2d Cir. 2001). To hold otherwise, the court said, would prevent a plaintiff from asserting a selective-enforcement claim in situations where it's "difficult, if not impossible, to find other individuals whose situation is similar." *Id.* The Ninth Circuit has suggested the same thing, rejecting a defendant's argument that "no plaintiff could state an equal protection claim '*of any stripe*' without an identical comparator, no matter how strong the direct or circumstantial evidence that the reason the plaintiff was detrimentally treated was her sex—or, for that matter, her race." *Ballou v. McElvain*, ___ F.4th ___, 2022 WL 891791, at *8 (9th Cir. Mar. 24, 2022); *see also Awabdy v. City of Adelanto*, 368 F.3d 1062, 1071 (9th Cir. 2004) ("[I]n order to prevail under § 1983 on his Fourteenth Amendment claim against the particular defendants involved, [the plaintiff] need only prove that they purposefully caused the state to institute proceedings against him because of his race or ethnicity, and not . . . that similarly situated members of other, usually majority, groups were treated differently.").

But the Plaintiffs have pointed us to no Eleventh Circuit decision suggesting that a § 1983 selective-enforcement case can survive without a "similarly situated" comparator. Nor have we found any. To the contrary, this Circuit's selective-enforcement decisions uniformly hold that a plaintiff *must*, to survive summary judgment, produce evidence of a "similarly situated" comparator. Consider the Eleventh Circuit's opinion in *Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008). In that case, the plaintiff (a halfway house), in bringing a Fair Housing Act action, showed that "a few neighbors and city commissioners allegedly said at public hearings that they did not want halfway houses for recovering substance abusers in their neighborhoods." *Id.* at 1216. This appears to have been *direct* evidence of discriminatory animus against a protected class. Nevertheless, it wasn't enough to establish selective enforcement of the city's "occupancy-turnover rule" because the sober home couldn't "muster a single instance in which the City failed to enforce the occupancy-turnover rule against non-handicapped people." *Id.* The commissioners' invidious comments, the court said, were

"irrelevant absent some indication that the recoverers were treated differently than non-recoverers." *Id.* "With selective-enforcement claims like this," the court added, "evenhanded application of the law is the end of the matter." *Id.* at 1217.[10] This reasoning is dispositive in our case.

And *Schwarz* is no aberration. The Eleventh Circuit has consistently held that a selective-enforcement plaintiff must present a similarly situated comparator to withstand summary judgment. In *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027 (11th Cir. 2008), for instance, the court rejected (in a § 1983 "unequal enforcement" case) the proposition that the comparator requirement applies only in class-of-one cases. In the court's words, a selective-enforcement plaintiff "must show disparate treatment compared to a similarly situated party, whether it is alleging discrimination based on a suspect classification or under a 'class of one' theory." *Id.* at 1045–46; *see also, e.g.*, *Martinez v. Warden*, 848 F. App'x 864, 867 (11th Cir. 2021) ("A plaintiff must also satisfy the 'similarly situated' requirement regardless of whether his claim is based on a suspect classification."); *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318–19 (11th Cir. 2006) ("To establish an equal protection claim, a [plaintiff] must demonstrate that (1) he is similarly situated to other[s] . . . who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis.").

---

[10] In reaching this conclusion, the *Schwarz* panel appeared to rely on two Supreme Court decisions: *United States v. Armstrong*, 517 U.S. 456, 458 (1996), and *Ah Sin v. Wittman*, 198 U.S. 500, 503 (1905). But it's not clear that either of those two decisions require a comparator in *all* cases. In *Armstrong*, for example, the Court held that, in a selective-*prosecution* action, the plaintiff must point to a similarly situated comparator. But that was "where the power of a federal court [was] invoked to challenge an exercise of one of the core powers of the Executive Branch of the Federal Government, the power to prosecute." *Armstrong*, 517 U.S. at 467. In *Wittman*, the Supreme Court found insufficient the plaintiff's allegation that a state criminal law was applied "solely and exclusively against persons of the Chinese race, and not otherwise," because "[t]here [was] no averment that the conditions and practices to which the ordinance was directed did not exist exclusively among the Chinese, or that there were other offenders against the ordinance than the Chinese, as to whom it was not enforced." *Wittman*, 198 U.S. at 507–08. And that makes sense when a plaintiff is relying *solely* on statistical evidence. But where there is other direct or circumstantial evidence of purposeful discrimination, it's not entirely clear why something *more* would be necessary.

In light of all this, we cannot say that Gonzalez violated the Plaintiffs' "clearly established" rights. As we've discussed, the Eleventh Circuit has "identified three different ways a plaintiff can show that the state of the law gives officials fair warning of a clearly established right." *Corbitt*, 929 F.3d at 1312. *First*, the plaintiff can "show that a materially similar case has already been decided." *Id.* "When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law[.]" *Vinyard*, 311 F.3d at 1352. *Second*, a plaintiff can "show that a broader, clearly established principle should control the novel facts of a particular situation." *Corbitt*, 929 F.3d at 1312 (cleaned up). For a broad principle to "clearly establish" the law, "it must do so with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard*, 311 F.3d at 1351. *Third*, "the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*." *Id.* at 1350. This might happen when (for example) the "federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." *Id.* "Notwithstanding the availability of these three independent showings, this Court has observed on several occasions that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Corbitt*, 929 F.3d at 1312.

These three methods do not apply here. *First*, our Plaintiffs haven't identified any materially similar case. The one decision they point to—*Smith v. Lomax*, 45 F.3d 402 (11th Cir. 1995)—is an employment (not a selective-enforcement) case. As a result, neither the facts nor the law of that decision align squarely with ours. *Second*, the Plaintiffs haven't pointed to any broad principle of law that applies with "obvious clarity" here. *Third*, the Plaintiffs haven't established that the Fourteenth

Amendment is so clear that case law isn't needed to establish the conduct's unlawfulness. Were we writing on a blank slate, we might've come out differently. We might have found that foundational equal-protection principles create a cause of action *whenever* an official's actions are motivated by racial animus. But the Eleventh Circuit has (time and again) indicated that there's a second element to selective-enforcement claims: differential treatment *vis-à-vis* others who are similarly situated. Given this precedent, we cannot say that Gonzalez violated the Plaintiffs' "clearly established" equal-protection rights.

We, therefore, **GRANT** Gonzalez's motion for summary judgment on Count I.

### B. Due Process

In Count III, the Plaintiffs assert a due-process claim against Gonzalez, *see* SAC ¶ 110, and Gonzalez responds (again) with a request for qualified immunity, *see* MSJ at 9 ("Gonzalez is entitled to qualified immunity as to all claims asserted in the Second Amended Complaint."). This count is very similar to the due-process claim the Plaintiffs brought against the City in Count II.[11] Still, in the year or so since we entered our MTD Order dismissing Count II, the Plaintiffs have done *nothing* to bolster their due-process claim. Indeed, when it comes to Count III, the Plaintiffs have done (almost) nothing at all. *See* MSJ Response at 20 (limiting their defense of this count to two citation-less sentences). As we've explained, the Plaintiffs never say whether Count III advances either a procedural or a substantive claim, so we'll address both possibilities.

#### 1. Procedural Due Process

"It is axiomatic that, in general, the Constitution requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994). "A § 1983 claim alleging a denial of procedural

---

[11] For reasons that remain unclear, Gonzalez didn't join in the City's original motion to dismiss the due-process claim. *See generally* MTD.

due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *J.R. v. Hansen*, 736 F.3d 959, 965 (11th Cir. 2013) (cleaned up); *see also Jones v. Gadsden Cnty. Sch.*, 758 F. App'x 722, 726 (11th Cir. 2018) (same).

"Assuming a plaintiff has shown a deprivation of some right protected by the due process clause, we—when determining if a plaintiff has stated a valid procedural due process claim—look to whether the available state procedures were adequate to correct the alleged procedural deficiencies." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000). "If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." *Id.* "To be adequate . . . the state procedure must be able to correct whatever deficiencies exist and to provide plaintiff with whatever process is due." *Id.* A due process violation is not complete, however, "unless and until the State fails to provide due process." *McKinney*, 20 F.3d at 1557. "In other words, a state may cure a procedural deprivation by providing a later procedural remedy; only when a state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *Id.*; *see also Laskar v. Peterson*, 771 F.3d 1291, 1300 (11th Cir. 2014) ("Accordingly, [the plaintiff's] federal due process claim did not exist until after Georgia's state courts dismissed his petition.").

There are two dispositive problems with the Plaintiffs' procedural-due-process claim here. *First*, they acknowledged (in their response to the MTD) that, had their permit been denied, they *could have* appealed that denial to the Florida Building Commission. *See* MTD Response [ECF No. 63] at 18 ("The Florida Building Commission (FBC) has appellate authority over Florida Building Code interpretations by local building officials."). In fact, Florida's review process is quite a bit more robust than that. As the Plaintiffs concede, the permitting process begins with a review by a "Mechanical Inspector." SAC ¶ 32. The Plaintiffs admit that, if you don't like the Mechanical Inspector's decision,

you can take an appeal to the Broward Board of Appeals. *Id.* ¶ 34. And, the Plaintiffs agree, if you disagree with the outcome at the Board of Appeals, you're entitled to seek review before the Florida Building Commission. *See* MTD Response at 18 (citing FLA. STAT. § 553.775 (3)(a) ("Upon written application by any substantially affected person or state agency or by a local enforcement agency, the commission shall issue declaratory statements pursuant to s. 120.565 relating to the enforcement or administration by local governments of the Florida Building Code or the Florida Accessibility Code for Building Construction.")). But there's more. If you're still unhappy with the result, you could always file suit in Florida state court. *See City of St. Pete Beach v. Sowa*, 4 So. 3d 1245, 1247 (Fla. 2d DCA 2009) ("When an administrative official or agency acts in an executive or legislative capacity, the proper method of attack on the official's or agency's action is a suit in circuit court for declaratory or injunctive relief on grounds that the action taken is arbitrary, capricious, confiscatory, or violative of constitutional guarantees." (quoting *Bd. of Cnty. Comm'rs of Hillsborough Cnty. v. Casa Dev. Ltd.*, 332 So. 2d 651, 654 (Fla. 2d DCA 1976) (cleaned up))).

This system of multiple review layers is more than adequate to satisfy this Circuit's due-process test. As the Eleventh Circuit has said, "even if a plaintiff suffered a procedural deprivation at his administrative hearing, there is no procedural due process violation if the state makes available a means to remedy the deprivation." *Laskar*, 771 F.3d at 1300. In *Laskar*, the plaintiff—a tenured engineering professor—was fired after discovering "misappropriation of . . . resources for the benefit of a company . . . of which [he] was a part owner." *Id.* at 1294. Seeking redress, the plaintiff filed a petition "for a writ of certiorari, or in the alternative, a writ of mandamus with" the Georgia Superior Court— a writ the court summarily dismissed for lack of jurisdiction. *Id.* at 1300. The Eleventh Circuit concluded that the plaintiff had plausibly asserted that the state courts "effectively refuse[d] to make available [to the plaintiff] a means to remedy the constitutional error alleged." *Id.* at 1301.

Our Plaintiffs, by contrast, never even argue that they availed themselves of the appellate procedures Florida law has afforded them. *See generally* SAC; MSJ Response at 20. They never sought review from the Broward Board of Appeals; they never appealed to the Florida Building Commission; and they never pursued their remedies in state court. *See, e.g.*, Dobos Dep. at 33:4–20 ("I wasn't going to go so far as to sign a complaint [with BORA] because now you're losing time."); Asta Decl. ¶ 27 (claiming that an appeal would've been "futile"). This failure to pursue appellate remedies is, of course, fatal to their claim because, "[i]f adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." *Cotton*, 216 F.3d at 1331. In other words, the Plaintiffs' "federal due process claim d[oes] not exist until after [the] state courts dismiss[ ] [their] petition." *Laskar*, 771 F.3d at 1300. Since the state courts never had a chance to review the Plaintiffs' petition, the Plaintiffs' procedural-due-process claim "d[oes] not exist." *Id.*

*Second*, the Plaintiffs' procedural-due-process claim fails because their restaurant eventually opened. *See* SAC ¶ 71. They thus received all the relief they were due. *See McKinney*, 20 F.3d at 1557 ("[T]he state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise.").

In their MTD Response, the Plaintiffs tried to parry this result by arguing that, "[g]iven the final decision eventually to allow Red Door to open after plaintiffs expended otherwise unnecessary funds, no declaratory and injunction action could be filed." MTD Response at 19; *see also id.* at 18–19 (explaining that they didn't appeal "because there was no adverse official interpretation that would allow an appeal either to the Florida Building Commission or to the Broward County Board of Rules, because after a prolonged process and threats to pursue litigation, the City relented"). In our MTD Order, we rejected this contention, noting that "this delay—and the harm it allegedly caused—doesn't

41

absolve the Plaintiffs of their obligation to seek redress under Florida law because due process also

includes 'the remedial process state courts would provide if asked.'" *625 Fusion*, 526 F. Supp. 3d at

1268 (quoting *Horton v. Bd. of Cnty. Comm'rs of Flagler Cnty.*, 202 F.3d 1297, 1300 (11th Cir. 2000)).[12] In

other words, we said, "if a state court *could* remedy the deprivation 'if asked,' then the plaintiff's

decision not to seek redress doesn't trigger a due-process violation." *See id.* (discussing *McKinney*, 20

F.3d 1550, and noting that "McKinney was complaining of a biased decisionmaker at the board level,

but under Florida law an adequate remedy for that could be obtained in the state courts. So McKinney

had an opportunity for procedural due process and that is all the Fourteenth Amendment requires.").

And we added that the Eleventh Circuit put this requirement to work in a case called *Freeman*

*v. Town of Eatonville*, 225 F. App'x 775 (11th Cir. 2006). There, a club and its owner sued the Town,

alleging that a Town police officer had violated their due-process rights by shutting down the club for

---

[12] In opposing the MTD, the Plaintiffs insisted that they *couldn't* sue the City in state court because there is no "cause of action for the deprivation of rights sought to be vindicated in this complaint." MTD Response at 19. We rejected this argument for two reasons: *First*, the only case the Plaintiffs cited for their position held that *Georgia* law *does* provide a cause of action against a police officer who confiscated the plaintiff's property and then failed to return it. *See Evans v. Holt*, 2018 WL 2294224, at *1 (N.D. Ga. Feb. 22, 2018). The Plaintiffs never explained how this Georgia-law case vindicates their view that *Florida* law *doesn't* provide a cause of action for a building officer who improperly cancels a restaurant's permits. *Second*, the Plaintiffs never really addressed the City's primary contention—that the Plaintiffs could have asked a state-court judge to issue an injunction or to grant them a declaratory judgment. *See* MTD at 12 (citing *City of St. Pete Beach*, 4 So. 3d at 1245). That's probably because, as the Second DCA has made clear, Florida law *did* afford the Plaintiffs a cause of action for the arbitrary and capricious deprivation of a property interest. *See City of St. Pete Beach*, 4 So. 3d at 1247 ("When an administrative official or agency acts in an executive or legislative capacity, the proper method of attack on the official's or agency's action is a suit in circuit court for declaratory or injunctive relief on grounds that the action taken is arbitrary, capricious, confiscatory, or violative of constitutional guarantees." (cleaned up)). Nor did the Plaintiffs deny that, to the extent they're here to recuperate the damages they incurred as a result of the City's permitting delay, they could just as easily have sought those damages in state court. *See, e.g.*, *Freeman v. Town of Eatonville*, 225 F. App'x 775, 780 (11th Cir. 2006) (dismissing due-process claim because "[p]laintiffs could have pursued remedies in state court for lost profits or damages"). In any event, the Plaintiffs could have re-raised this (or any other) arguments in response to Gonzalez's MSJ—but they chose not to do so. *See* MSJ Response at 20. As a result, all of these arguments have been forfeited. *See Access Now*, 385 F.3d at 1330 ("In the first place, the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

a couple of hours. *Id.* at 780. The Eleventh Circuit affirmed the district court's dismissal of the plaintiffs' complaint because the "[p]laintiffs could have pursued remedies in state court for lost profits or damages[.]" *Id.*; *see also 6420 Roswell Rd., Inc v. City of Sandy Springs*, 484 F. Supp. 3d 1321, 1335 (N.D. Ga. 2020) ("Here, like in *Freeman*, [p]laintiff has not shown that it could not have pursued remedies in Georgia state court for lost profits. The Court therefore finds that [d]efendants did not violate [p]laintiff's procedural due process rights."). And this, we concluded, makes sense:

> If plaintiffs could circumvent the state's review procedures by pointing to the damages they incurred from the government's delay, no one would ever exhaust their state remedies. After all, in *every* case in which an alleged due-process violation has been remediated by the government's reversal of a prior decision, that remediation necessarily occurred at some point *after* the initial deprivation. To allow plaintiffs to sue in federal court by relying on the harm they suffered during that interregnum would thus eviscerate the requirement that plaintiffs pursue their available remedies *before* asserting a federal constitutional claim. Not surprisingly, then, the Plaintiffs have failed to cite a single case in support of their proposed damages-from-the-delay exception—nor has the Court found any.

*625 Fusion*, 526 F. Supp. 3d at 1268–69.

In responding to the MSJ, the Plaintiffs make only two arguments. *First*, they appear to contend that there were *no* "state procedures . . . adequate to correct the alleged procedural deficiencies" *Cotton*, 216 F.3d at 1331—and so (they seem to suggest), their claim can forge forward, even though they never appealed, *see* Plaintiffs' SOF ¶ 156. In support, the Plaintiffs contend that "any appeal to the Broward Board of Appeals would [have] be[en] futile since he (Gonzalez) ha[d] already 'taken care of that.'" Plaintiffs' SOF ¶ 156. This argument fails for three reasons. *One*, the Plaintiffs have cited no case for the viability of this "futility" exception, and at least some courts in our Circuit have expressed "serious doubts that the Eleventh Circuit has recognized a futility exception." *Nicholson v. Moates*, 135 F. Supp. 2d 1185, 1191 n.5 (M.D. Ala. 2001). *Two*, even if there were such a thing as a futility exception, no reasonable jury in our case could find that an appeal to BORA would've been futile. After all, the Plaintiffs' only evidence for this proposition is Gonzalez's comment that he'd "taken care of that." But it's hard to believe that Gonzalez's mere say-so (standing alone) establishes

the futility of any future appeals. *Three*, even if there were a futility exception—and even if an appeal to BORA would've been futile—the Plaintiffs never claim that the other procedures Florida law afforded them are likewise flawed, futile, or inadequate. And the law is clear that "a procedural due process violation occurs not at the point of the original procedural deprivation but rather at the point the state fails 'to provide adequate procedures to remedy the otherwise procedurally flawed deprivation.'" *Maverick Enters., LLC v. City of Alabaster*, 2009 WL 10669605, at *8 (N.D. Ala. Dec. 3, 2009) (quoting *Cotton*, 216 F.3d at 1331). In our case, as we've said, the Plaintiffs could've appealed to BORA and then to the Florida Building Commission, and then to Florida's state courts. The Plaintiffs never so much as suggest that an appeal to the Commission or to the state courts would've been futile. Nor would any such claim have been plausible.

*Second*, the Plaintiffs argue (though it might be overly generous to call this an argument) that: "Gonzalez, as the actor whose racist tirades violated the plaintiffs' constitutional rights, subjecting them to actionable humiliation and harm, violated the plaintiffs' due process protections for all the reasons identified here. The facts state a claim for which relief can be granted, and the disputes within the facts require resolution by a jury." MSJ Response at 20. Note the conspicuous absence here of any citation to *actual* facts in the record. There are at least three dispositive problems with this "argument." *One*, citationless and conclusory blandishments aren't enough to survive summary judgment. *See, e.g.*, *Shenzhen Kinwong Elec. Co. v. Kukreja*, 2021 WL 5834244, at *33 (S.D. Fla. Dec. 9, 2021) (Altman, J.) ("[W]e're at summary judgment now, and—after months of discovery—a lawyer's arguments alone won't do the trick."); *Mack v. Metro. Life Ins. Co.*, 246 F. App'x 594, 598 (11th Cir. 2007) ("[T]o defeat summary judgment [a party] must offer *evidence* from which a jury could reasonably believe [its] arguments." (emphasis added)). *Two*, it's not our job—this late in the case—to hunt down the mystery facts the Plaintiffs believe support their position. *See, e.g.*, *Atlanta Gas Light Co. v. UGI Utils., Inc.*, 463 F.3d 1201, 1209 n.11 (11th Cir. 2006) ("Neither the district court nor this court has an obligation to

parse a summary judgment record to search out facts or evidence not brought to the court's attention."). *Three*, these two sentences do nothing to rebut (or even respond to) the positions we outlined in our MTD Order (and which we've now reiterated here)—positions Gonzalez *expressly* adopted in his MSJ. *See* MSJ at 10.

As we've said, "[t]o overcome a qualified immunity defense, the plaintiff must make two showings." *Corbitt*, 929 F.3d at 1311. *First*, "the plaintiff must establish that the defendant violated a constitutional right." *Griffin*, 496 F.3d at 1199. *Second*, "the plaintiff must show that the violation was clearly established." *Id.* In our case, the Plaintiffs fail at both steps. They have not shown that Gonzalez violated their right to procedural due process. And, even if they had, they haven't shown that any such right was clearly established. Gonzalez's motion for summary judgment on the Plaintiffs' procedural due process claim is, therefore, **GRANTED**.[13]

### 2. Substantive Due Process

"[S]ubstantive due process is untethered from the text of the Constitution so the Supreme Court has been reluctant to expand its scope." *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1329 (11th Cir. 2020) (cleaned up). Courts must thus "exercise the utmost care" when considering substantive-due-process claims. *Id.* Substantive due process protects rights that "are fundamental, that is, rights that are implicit in the concept of ordered liberty." *McKinney*, 20 F.3d at 1556 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). These include the "penumbral right of privacy," *id.* (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)); certain sexual rights in the home, *see Lawrence*, 539 U.S. 558; and the right to marry, *see Obergefell v. Hodges*, 576 U.S. 644 (2015). Unlike a procedural-due-process-claim, "a violation of a substantive due process right . . . is complete when it occurs . . . .

---

[13] In addition to asserting qualified immunity, Gonzalez also moved *to dismiss* Count III. *See* MSJ at 10. Because we've found that Gonzalez is entitled to summary judgment on that count, we won't address his 12(b)(6) arguments.

45

Because the right is 'fundamental,' no amount of process can justify its infringement." *McKinney*, 20 F.3d at 1557.

Substantive due process also prohibits government conduct that "shocks the conscience." *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1375 (11th Cir. 2002) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998)). So, while mere negligence is "categorically beneath the threshold of constitutional due process," *id.* at 1375–76, "deliberately malign" acts are "most likely to rise to the conscience-shocking level," *id.* at 1376 (quoting *Sacramento*, 523 U.S. at 849). But "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Sacramento*, 523 U.S. at 846.

While substantive due process is an elastic concept, its outer boundaries are circumscribed in two main ways. *First*, "areas in which substantive rights are created only by state law . . . are not subject to substantive due process protection . . . because substantive due process rights are created only by the Constitution." *McKinney*, 20 F.3d at 1556 (cleaned up); *see also Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1298 (11th Cir. 2019) ("As we made clear in *McKinney*, fundamental rights in the constitutional sense do not include state-created rights." (cleaned up)). *Second*, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims." *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) (cleaned up).

No reasonable jury could find for the Plaintiffs on their substantive-due-process claim against Gonzalez—either as a deprivation of a fundamental right, *see Obergefell*, 576 U.S. at 644, or as conduct that "shocks the conscience," *see Nix*, 311 F.3d at 1375. For starters, the Plaintiffs never actually allege that Gonzalez deprived them of a fundamental right. They say *only* that they were deprived "a property right in the continued operation of their business as guaranteed by the U.S. Constitution." SAC ¶

124.[14] But "[p]roperty rights are state common law rights and are not equivalent to fundamental rights." *Abele v. Hernando Cnty.*, 161 F. App'x 809, 814 (11th Cir. 2005). For this reason, "[n]on-legislative deprivations of state-created property rights, including land-use rights, cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrarily and irrationally." *Id.* (cleaned up). In the end, the permit the Plaintiffs sought was "established [by state law], not the Constitution, and is therefore not a fundamental right." *Coventry First, LLC v. McCarty*, 605 F.3d 865, 870 (11th Cir. 2010).[15]

The Plaintiffs' appeal to the "shocks the conscience" standard fares no better. In their MTD Response, the Plaintiffs insisted that Gonzalez's racial slurs are "no different from the conscious shocking atmosphere arising from calling someone a '[n*****]' in the workplace[.]" MTD Response

---

[14] In their MTD Response, the Plaintiffs suggested that the right they're asserting is "the right not to be discriminated against on account of one's race[.]" MTD Response at 19–20. But, as we explained in our MTD Order, they never made this claim in the SAC. *See generally* SAC. And "a Response to a Motion to Dismiss is not properly used as an attempt to add additional claims or allegations." *W. Surety Co. v. Steuerwald*, 2017 WL 52484499, at *3 (S.D. Fla. Jan. 17, 2017). In any event, "a particular Amendment"—the Fourteenth Amendment's Equal Protection Clause—already "provides an explicit textual source of constitutional protection," *Echols*, 913 F.3d at 1327, for the Plaintiffs' "right not to be discriminated against on account of one's race." As a result, "that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims." *Id.* Either way, the Plaintiffs never reraise this contention in their MSJ Response, so (again) it's forfeited here. *Access Now*, 385 F.3d at 1330 ("In the first place, the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

[15] One could argue that the Supreme Court's recent foray into marriage law casts some doubt on this general principle. S*ee, e.g.*, *Obergefell*, 576 U.S. at 656. Like property rights, after all, marriage is a creature of state law. *See, e.g.*, *Loving*, 388 U.S. at 7 ("[T]he state court is no doubt correct in asserting that marriage is a social relation subject to the State's police power[.]"). One might thus justifiably suppose that the Supreme Court's analysis of fundamental marriage rights reveals some fissure in the old rule that fundamental rights cannot arise from state-created property interests. But we don't read the Court's recent marriage cases so broadly—principally because, in those cases, the Court treated marriage, not as some construct of state law, but as a kind of timeless (and universal) human ritual that constitutes part of the fabric of any "ordered conceptions of liberty." *Obergefell*, 576 U.S. at 656; *see also id.* ("From their beginning to their most recent page, the annals of human history reveal the transcendent importance of marriage."). Even since *Obergefell*, therefore, the Eleventh Circuit has reiterated the principle "we made clear in *McKinney*"—namely, that "fundamental rights in the constitutional sense do not include 'state-created rights.'" *Hillcrest Prop.*, 915 F.3d at 1298 (cleaned up).

at 20. The Plaintiffs then cited two cases for their view that racist words alone can "shock the conscience." *Id.* But neither case had anything to do with either substantive due process or the "shocks the conscious" standard. *See Williams v. Asplundh Tree Expert Co.*, 2006 WL 2131299, at *14 (M.D. Fla. Jul. 28, 2006) (concluding that the plaintiff's Title VII and § 1981 claims survived summary judgment because of testimony that the plaintiff's supervisors regularly called the plaintiff a "[n*****]"); *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir. 1989) (holding that the quantum of force an officer deployed against an arrestee was "objectively unreasonable" under the multi-factor test articulated in *Graham v. Connor*, 490 U.S. 386 (1989), and expressly declining to find a fundamental right because, "to the extent that [the plaintiff] asserts a claim based on substantive due process[,] it cannot be sustained under *Graham*").

We shouldn't be too disappointed, though, because there are *no cases* espousing the Plaintiffs' position that racial slurs alone can "shock the conscience" (at least not in a constitutional sense). To the contrary, the Eleventh Circuit has time and again made clear that only a very narrow range of governmental conduct will "shock the conscience"—a list that, for instance, doesn't even include a state-employed college professor's violent and intentional battery against a student or a firefighter's sexual assault of an apprentice. *See, e.g., Dacosta v. Nwachukwa*, 304 F.3d 1045, 1049 (11th Cir. 2002) (holding that a college professor's intentional physical misconduct—*viz.*, shoving a female student in the face and then slamming a door on her arm with so much force that the glass in the door panel shattered—didn't "shock the conscience" and thus didn't violate the plaintiff's right to substantive due process); *Skinner v. City of Miami*, 62 F.3d 344, 346 (11th Cir. 2006) (holding that stripping an apprentice firefighter naked, threatening to rape him, handcuffing him, and sexually assaulting him as part of a hazing ritual didn't "shock the conscience" and thus didn't violate the plaintiff's right to substantive due process); *accord Costell v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 922 (8th Cir. 2001) (holding that a band teacher's verbal abuse against a student—which included saying that "[the

plaintiff[ could no longer play in the band because she was too stupid"—was "singularly unprofessional," but did not "raise a genuine issue of material fact on whether his behavior was sufficiently shocking to the conscience"); *Koorn v. Lacey Twp.*, 78 F. App'x 199, 203 (3d Cir. 2003) (finding that the "Mayor and Committeeman's alleged racist remarks . . . had no direct, legal effect on the [plaintiff's] property rights . . . . Certainly they had no legal effect on a requisite fundamental right."); *Abeyta v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253, 1257–58 (10th Cir. 1996) ("We are unwilling to hold that actions which inflict only psychological damage may never achieve the high level of brutal and inhuman abuse of official power literally shocking to the conscience," but finding that a teacher who repeatedly—and over a month-and-a-half—called a twelve-year-old student a prostitute in front of the whole class didn't "shock the conscience").

Indeed, the only two published decisions in which the Eleventh Circuit *has ever* found that a defendant's conduct "shocked the conscience" involved violent and intentional physical assaults by teachers against children. In *Neal ex rel. Neal v. Fulton County Board of Education*, for example, the Eleventh Circuit concluded that a high school coach violated a student's right to substantive due process when he struck the student in the face with a metal lock and dislodged his eye. *See* 229 F.3d 1069, 1076 (11th Cir. 2000). And, in *Kirkland ex rel. Jones v. Greene County Board of Education*, the court found that "repeatedly striking a thirteen-year-old student with a metal cane, including once on the head as he was doubled over protecting his chest, when he was not armed or physically threatening in any manner" violated the boy's substantive-due-process rights. 47 F.3d 903, 905 (11th Cir. 2003).

Without minimizing for a moment the extent of the Plaintiffs' alleged monetary and emotional injuries, *see* SAC ¶¶ 123–131, they haven't identified a single case in which words alone—even combined with the temporary denial of a business permit—have been found to "shock the conscience." Nor have they pointed to a single case in which something less grievous than violent physical battery has been held to constitute a violation of substantive due process. Even death itself,

in fact, sometimes fails to meet this (very) high bar. *See, e.g., Sacramento*, 523 U.S. at 833 (finding that a police officer's "conscious disregard" of the risk of death to another motorist was not conscience shocking); *Nix*, 311 F.3d at 1374 (finding that a high school science teacher's conduct didn't "shock the conscience," even though the teacher brought in a live wire, which—when the teacher looked away—*killed* one of the students).[16]

All of this is to say that the Plaintiffs have failed to establish that Gonzalez violated their substantive-due-process rights—much less that he violated any *clearly established* substantive-due-process rights. Gonzalez's motion for summary judgment is, therefore, **GRANTED** as to the Plaintiffs' substantive-due-process claim.

***

Because the Plaintiffs have failed to create a genuine issue of material fact with respect to their due-process claim, we **GRANT** Gonzalez's motion for summary judgment on Count III.

## II.      The Case Against the City

The case against the City likewise fails. "[T]he Supreme Court has placed strict limitations on municipal liability under § 1983." *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003). A municipality can be liable under § 1983 only when "the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). That's because "*Monell*,[17] the Supreme Court has explained, is a case about responsibility, and is meant to limit § 1983 liability to

---

[16] Again, we outlined all of these points in our MTD Order, and Gonzalez expressly adopted them in his motion. *See* MSJ at 19. Rather than respond to them, the Plaintiffs say only this: "Gonzalez, as the actor whose racist tirades violated the plaintiffs' constitutional rights, subjecting them to actionable humiliation and harm, violated the plaintiffs' due process protections for all the reasons identified here. The facts state a claim for which relief can be granted, and the disputes within the facts require resolution by a jury." MSJ Response at 20. For the reasons we've already given—*q.v.*, our discussion of the Plaintiffs' procedural-due-process claim—that's just not enough to withstand summary judgment.

[17] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

acts which the municipality has officially sanctioned or ordered." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (cleaned up). A municipality "causes" a violation only (1) when it acts pursuant to "an official policy enacted by its legislative body (e.g., an ordinance or resolution passed by a city council)"; (2) when "final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure"; or (3) "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Id.* (cleaned up).

The Plaintiffs proceed only under the third of these avenues—ratification. *See* MSJ Response at 17 ("These are conflicting material facts as to whether the City was aware of and condoned Gonzalez's racist behavior and in term [sic] ratified it."). "[R]atification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policy making authority." *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002). "The final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it." *Id.*; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality op.) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). In other words, "local government policymakers [must have] had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis[.]" *Garvie v. City of Ft. Walton Beach*, 366 F.3d 1186, 1189 (11th Cir. 2004) (cleaned up); *see also Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) ("When plaintiffs are relying not on a pattern of unconstitutional conduct, but on a single incident, they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory.").

But who is a final policymaker? An official "is a final policy maker only if his decisions have legal effect without further action by the governing body," and only if "the governing body lacks the power to reverse the member or employee's decision[.]" *Holloman*, 370 F.3d at 1292. It follows that a "municipal official is *not* a final policymaker when his or her decisions are subject to meaningful administrative review." *Maschmeier v. Scott*, 269 F. App'x 941, 943 (11th Cir. 2008) (emphasis added). "Generally, the existence of a reviewing body with the power to reverse or amend the decision of the employer suffices to find that an official is not a final policymaker." *Dixon v. Hansell*, 844 F. App'x 198, 201 (11th Cir. 2021). A plaintiff may, however, "attempt to demonstrate that the reviewing body's administrative review is not meaningful, such that the official should be considered the final policymaker," by showing that "the reviewing body has defective procedures, merely rubber stamps the official's decision, or ratifies the official's decision and improper motive." *Lopez v. Gibson*, 770 F. App'x 982, 992 (11th Cir. 2019) (cleaned up). "[W]hether an official had final policymaking authority is a question of state law." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality op.).

Let's start with the obvious: Gonzalez is not a final policymaker under Florida law. Why? Because Gonzalez's decisions are subject to *at least three* levels of meaningful review: first, by the Chief Building Official, *see* FLA. STAT. § 468.604(1) ("It is the responsibility of the . . . building official to administrate, supervise, direct, enforce, or perform the permitting and inspection of construction[.]"); then by BORA, *see* FLORIDA BUILDING CODE: BROWARD COUNTY AMENDMENTS § 113.9.1 (2018) ("The Board shall hear all appeals from the decisions of the Building Official, Assistant Building Official or Chief Inspector[.]"); and finally by the Florida Building Commission, *see id.* § 113.14.1 (noting that "[a]ny person aggrieved by a decision of BORA . . . may file an appeal" with the "Florida Building Commission").

The Florida Supreme Court, in fact, has come to this same conclusion in a case that's almost identical to ours. *See Raben-Pastal v. City of Coconut Creek*, 573 So. 2d 298, 302 (Fla. 1990). In that case,

the "chief building official" of the City of Coconut Creek halted the development of a residential real-estate project by issuing an "official stop-work order pending implementation of agreed repairs." *Id.* at 299. The developer sued the city's chief building official under § 1983. *Id.* The case went up to the Florida Supreme Court, which addressed nearly the same question we face here: "May a municipality be held liable to an owner-developer [under § 1983] for the wrongful [acts] of the municipality's chief building official[?]" *Id.* The court—applying the same Building Code we apply here—concluded that the chief building official "does not meet the criteria of a final policy-maker." *Id.* at 302. The chief building official's decisions were "not final because [they were] subject to review by [BORA]." *Id.* Our Plaintiffs' case is, of course, even weaker since Gonzalez isn't *even* the chief building official; he's that official's subordinate. *See* Travers Decl. ¶ 1 (noting that he is "the Building Official for the City of Fort Lauderdale" and that, "[a]s the Building Official, I supervise the City's Building Department"). As in *Raben-Pastal*, then, Gonzalez does "not possess the type of policy-making authority that would make the City . . . liable for his actions." *Id.*

Against all this, the Plaintiffs advance eight arguments—all unpersuasive. In the first four, the Plaintiffs contend that Gonzalez *is* the final policymaker. In the last four, the Plaintiffs say that *other* people who (in their view) are final policymakers *ratified* Gonzalez's decisions. We address each in turn.

*First*, trying to circumvent *Raben-Pastal*'s holding, the Plaintiffs cite a Middle District of Florida decision—*Lewis v. School Board of Citrus County*, 2008 WL 11434588, at *2 (M.D. Fla. May 2, 2008)—for the proposition that "whether Gonzalez himself was a final decisionmaker . . . . is an issue of fact," MSJ Response at 16. The court did say that in *Lewis*. But it did so in the context of whether the defendant was the "official decisionmaker" with respect to the plaintiff's *termination* (*i.e.*, whether the defendant in fact made the actionable decision)—*not* in the context of the totally different issue we face here: *viz.*, whether Gonzalez was the "final policymaker" such that *the City* should be liable for his

actions under § 1983. Nor could *Lewis* have said what our Plaintiffs claim it said. The Supreme Court, after all, has long held that "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself *a legal question* to be resolved by the trial judge[.]" *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (emphasis added).

*Second*, the Plaintiffs point out that BORA "is a separate entity from the City." Response at 17. But the Plaintiffs never explain why this matters. Nor, it goes without saying, do they cite any cases for the proposition that it does. And that's probably because they understand that it doesn't. Again, in *Raben-Pastal*, the Florida Supreme Court held that the chief building official—the equivalent of Travers (Gonzalez's boss)—was *not* the "final policymaker" because his decisions were "subject to review by [BORA]." *Raben-Pastal*, 573 So. 2d at 302. This was true *even though* (as the Plaintiffs point out) BORA "is a separate entity from the City." The Plaintiffs have provided *no* reason for us to stray from the Florida Supreme Court's unambiguous ruling here.

*Third*, still resisting, the Plaintiffs ask us to ignore *Raben-Pastal* and—without a single citation to any case or statute—to treat Gonzalez, Sadolf, Travers, and Vera as "final policymakers" because their decisions "have final consequences." MSJ Response at 17. This argument is frivolous. For one thing, the question of whether an official is a final policymaker is not contingent on whether the official's actions have "final consequences." It, rather, depends on whether a "governing body lacks the power to reverse the member or employee's decision[.]" *Holloman*, 370 F.3d at 1292. For another, as a matter of fact, no reasonable jury could find that Sadolf, Travers, and Vera's actions have "final consequences" (whatever that means). That's because it was the *Plaintiffs'* decision not to appeal to BORA. And it's blackletter law that a "decision is still subject to review even if individuals must file an appeal to have the decision reviewed . . . and even if review was available but not performed[.]" *Holmes v. City of Ft. Pierce*, 2022 WL 247976, at *4 (11th Cir. Jan. 27, 2022). Finally, again, the Plaintiffs' argument ignores the Florida Supreme Court's decision in *Raben-Pastal*, where the chief building

official—like the city officials we have here—made certain decisions that delayed the plaintiff's construction project. *Raben-Pastal*, 573 So. 2d at 299 (noting that the chief building official "refused to lift the stop-work order for the next five months due to his concerns that other structural defects might exist"). In other words, in that case (too) the official's actions had "final consequences." But that didn't convert those officials into "final policymakers."

*Fourth*, the Plaintiffs try to distinguish *Raben-Pastal* by noting that "the City Code [in that case] identifie[d] the[ officials] as not final policy makers, with their decisions subject to review by someone working for the City." MSJ Response at 17. Here, the Plaintiffs' argument isn't entirely clear—but they seem to be suggesting that the chief building official's decisions in *Raben-Pastal* were "subject to review by someone working for the City." *Id.* There are at least two problems with this argument. *One*, the review board in *Raben-Pastal* was the very same review board we have here: BORA. In that case, as here, BORA—the "*Broward County* Board of Rules and Appeals"—was a county (not a city) institution. But that didn't matter. It didn't matter, in other words, that BORA did not "work[ ] for the City." All that mattered, as in our case, was that BORA exercised appellate review over the city's decisions. *Two*, even if the Plaintiffs were right on the law, Gonzalez's actions *were* supervised by other City employees—including Travers.

*Fifth*, the Defendants suggest that, if Gonzalez wasn't the final policymaker, maybe Vera was. And, they add, Vera "was a decisionmaker," Vera knew about Gonzalez's racial animus, and Vera (armed with that knowledge) "gave the Red Door a tag, delaying the process of opening." MSJ Response at 16. But, as we've established, Vera was Gonzalez's *subordinate*. Red Door Dep. at 88:13–15 (explaining that Vera "works under Gonzalez"). To the extent Gonzalez wasn't a final policymaker, Vera couldn't have been one either.[18] In any event, this Vera-was-the-final-policymaker argument fails

---

[18] The Plaintiffs mistakenly claim that the Defendants "admit . . . Vera . . . was a final decisionmaker." MSJ Response at 16. In saying so, however, the Plaintiffs conflate two of the Defendants' separate

on its own terms. Again, the City can only be held responsible for Gonzalez's actions if some higher-up in the City "ratified" his misconduct. *Praprotnik*, 485 U.S. at 127 (plurality op.) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). Since Vera falls beneath Gonzalez in the City's hierarchy, he couldn't have *ratified* anything Gonzalez did.[19]

*Sixth*, the Plaintiffs allege that "Asta brought up the racist remarks issue at a City meeting and to other officials in the City including Sadolf and Travers, but they laughed the issue off." MSJ Response at 16. The insinuation is that *maybe* Sadolf, Travers, or these unnamed "other officials" are the "final policymakers" who ratified Gonzalez's actions. There are three problems with this argument. *One*, as we've said, Sadolf is unquestionably Gonzalez's subordinate—so, like Vera, he couldn't have "ratified" Gonzalez's misconduct. *Two*, Travers isn't a final policymaker, either, because (as the chief building official) his decisions are *likewise* subject to BORA review. *See Raben-Pastal*, 573 So. 2d at 301 (holding that the "chief building official"—*i.e.*, Travers—has no final policymaking authority). *Three*, the Plaintiffs never tell us who these "other officials" are, so we have absolutely no idea *who* they're talking about. "Judges are not like pigs, hunting for truffles buried in briefs." *United*

---

contentions. In the first contention, as we've seen (*q.v.*, our discussion of Gonzalez's liability), the Defendants argue that Gonzalez couldn't have "deprived" the Plaintiffs of their constitutional rights because he wasn't the relevant decisionmaker—*i.e.*, because he wasn't the guy who did the things the Plaintiffs are here complaining about. Instead, the Defendants say, Vera did those things. MSJ at 3–5. But that's not the same as "admitting" that Vera was a "final policymaker" for purposes of holding *the City* responsible for the (alleged) constitutional deprivation. On this *second* issue, the Defendants are clear that only BORA (or someone higher) qualifies as the "final policymaker." *Id.* at 7 ("The problem for the Plaintiffs as to ratification is that none of the City employees alleged[ly] informed such as the building official have final policy making authority for the City because their decisions are subject to review.").

[19] For this same reason, we're unmoved by the Plaintiffs' allegation that "Dobos told Sadolf that Gonzalez directed racist remarks toward Asta." MSJ Response at 16. Like Vera, Sadolf was Gonzalez's *subordinate*. *See* Sadolf Dep. at 11:6–10 ("I'm a mechanical plan[s] examiner."); FLORIDA BUILDING CODE: BROWARD COUNTY AMENDMENTS § 104.4 (2018) ("It shall be [the chief mechanical inspector's] duty and responsibility to supervise and coordinate the work of all subordinate Plans Examiners . . . within his or her particular discipline.").

*States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *see also Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (noting that the district court has no independent obligation to "mine the record"). Since the Plaintiffs haven't established *who* these people are, they've failed (as a matter of law) to show that these people exercised "final policymaking" authority.

*Seventh*, the Plaintiffs aver that "[m]any City staff knew Gonzalez was a racist and made racist comments such as 'chink,' but they laughed it off." MSJ Response at 16. But, for two reasons, that's not evidence of anything. *One*, we again have no idea who these unidentified "City staff" members are—and there's certainly no indication that they hold the kinds of roles that might qualify them as "final policymakers" under Florida law. Are we talking about janitors? Secretaries? Low-level staffers? We don't know because the Plaintiffs never deign to tell us. Now, we recognize (of course) that the evidentiary standard at summary judgment is lower than the standard that governs a plaintiff's claims at trial. But that doesn't mean a plaintiff can skirt past summary judgment without proof of *anything*. As we've explained in other contexts, to survive summary judgment, "[t]he non-movant . . . must do more than simply show that there is some metaphysical doubt as to the material facts. It must come forward with some affirmative evidence to support its claim." *A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1342 (S.D. Fla. 2021) (Altman, J.) (cleaned up). And, without pointing to *some* evidence (anything at all) that the "City staff" they're referring to are "final policymakers," the Plaintiffs cannot survive summary judgment. *Two*, we certainly don't condone the making of racist remarks. Nor do we think it's a stretch to say that "City staff" shouldn't be laughing at racial slurs. But remember that, for a municipality to be liable under § 1983, the plaintiff must show that the final policymakers "ratified" the unconstitutional action *for an unconstitutional reason*. *See, e.g.*, *Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir. 1998) ("A policymaker's approval of an unconstitutional action can constitute unconstitutional county policy only when the policymaker approves a subordinate's decision and the basis for it." (cleaned up)). And the Plaintiffs present no evidence that, in addition to

laughing at racial slurs, these mystery staffers (whoever they are) approved of Gonzalez's decisions at all—much less that they did so *because of their* racial animus.

*Eighth*, the Plaintiffs argue that "Asta and his lawyers complained to the City Mayor, City Commission, City Manager, Building Official, and Deputy Building Official, all of whom ratified and continued to authorize and approve Gonzalez's racially motivated actions even after being informed of Gonzalez's misconduct." MSJ Response at 16–17. For this, the Plaintiffs cite only paragraphs 140 and 141 of their SOF, *see* MSJ Response at 16—which, in turn, refer to paragraphs 11 and 12 of Asta's declaration. In that declaration, Asta says:

> 11. City supervisors and policy makers at meetings on May 1, May 3, and May 7, 2018, all of which were memorialized through City memoranda, were well aware of the improper actions of Defendant Gonzalez yet explicitly ratified his conduct and made it the equivalent of City policy.
>
> 12. I personally and through my lawyers complained to the Mayor, City Commission, City Manager, Building Official, and Deputy Building Official, all of whom ratified and continued to authorize and approve the actions of Gonzalez even after they were explicitly informed of Gonzalez's actions. Each of those City Officials supported Gonzalez's decisions and conduct until myself, my lawyers and the Red Door repeatedly complained and after suffering millions of dollars in damages while the Red Door remained closed.

Asta Decl. ¶¶ 11–12.

Again, three problems. *One*, the Eleventh Circuit has repeatedly told us that an official may have final policymaking authority with respect to *some issues* but not *others*. In the Eleventh Circuit's words: A "final policymaking authority over a *particular subject area* does not vest in an official whose decisions *in the area* are subject to meaningful administrative review." *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1325 (11th Cir. 2003) (emphasis added); *see also, e.g.*, *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 638 (11th Cir. 1991) (holding that the mayor was not a final policymaker with respect to zoning decisions because the city charter gave the city counsel final word over zoning). And our Plaintiffs have cited *no* authority for the proposition that *any* of these individuals (the Mayor, the City Commissioners, the City Manager, the Building official, or the Deputy Building Official) are final

policymakers with respect to decisions made *under the Florida Building Code.* What's worse, we've gone ahead and reviewed the Florida Building Code ourselves—truffle-hunting, one might say, without any help from the Plaintiffs or their lawyers. And that Code (in our view) only further undermines the Plaintiffs' position. It suggests, in fact, that *only* BORA and the Florida Building Commission (and no one else) has appellate jurisdiction over Building Code decisions. *See* FLORIDA BUILDING CODE: BROWARD COUNTY AMENDMENTS §§ 113.9.1, 113.14.1 (2018).

*Two,* even if the Mayor, the City Commission, or the City Manager *could be* final policymakers for our purposes, there's no evidence that any of them *ratified* any of Gonzalez's decisions.[20] For one thing, there's no evidence that they did *anything* after the parties' May 2018 meetings. As evidence to the contrary, all Asta has given us is his conclusory statement—in a declaration filed alongside the Plaintiffs' MSJ Response—that these individuals "ratified" Gonzalez's conduct. But conclusory assertions are not enough to withstand summary judgment. *See, e.g., Lujan,* 497 U.S. at 888 ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *United States v. Stein,* 881 F.3d 853, 857 (11th Cir. 2018) ("An affidavit cannot be conclusory[.]"); *Solliday v. Fed. Officers,* 413 F. App'x 206, 207 (11th Cir. 2011) ("Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion.").

*Three,* even if none of these things were true—that is, even if these City officials *were* final policymakers and even if they *did* ratify Gonzalez's actions—the Plaintiffs' claim would *still* fail. That's because the Plaintiffs have adduced no evidence that any of these people adopted Gonzalez's discriminatory *motive.* It's not enough, remember, for the final policymaker to *know* about the

---

[20] We've already explained why, under the holding of *Raben-Pastal,* the Chief Building Official (Travers) and his subordinates have no final policymaking authority.

unconstitutional motive; the final policymaker must also *adopt* that racial animus as his own. As the

Eleventh Circuit has said in a similar context:

> Lawmakers' support for legislation can come from a variety of sources; one
> commissioner may support a particular piece of legislation for a blatantly
> unconstitutional reason, while another may support the same legislation for perfectly
> legitimate reasons. A well-intentioned lawmaker who votes for the legislation—even
> when he votes in the knowledge that others are voting for it for an unconstitutional
> reason and even when his unconstitutionally motivated colleague influences his vote—
> does not automatically ratify or endorse the unconstitutional motive.

*Matthews*, 294 F.3d at 1298; *see also Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006) ("[F]or

a municipality to be liable under a ratification theory, the final policymaker must ratify not only the

decision of its member with an unconstitutional motive, but also the unconstitutional basis itself.").

Our Plaintiffs haven't given us *any* competent evidence that *any* of their proposed policymakers

adopted Gonzalez's unlawful *motive*. Indeed—for reasons that remain unclear—the Plaintiffs chose

not to depose any of these officials. They didn't uncover any of these officials' discriminatory emails,

correspondence, text messages, or other memoranda. And they offered no statements from other

people—secretaries, associates, embittered former spouses—who might have attested to these

officials' racial animus. Again, no evidence just isn't enough to survive summary judgment.[21]

---

[21]     Oddly, the Plaintiffs never suggest that the one individual who could *arguably* be construed as
a final policymaker—Soto (the BORA member)—ratified Gonzalez's decisions. We'd have expected
the Plaintiffs to point to Soto's May 16, 2018 Email to support their ratification contentions. In that
email, which followed Soto's investigation into Sadolf's passing inspection, Soto concluded: (1) that
Gonzalez did not exceed his authority as chief mechanical inspector; and (2) that Red Door's kitchen
hood violated the Florida Building Code. Soon after that email, Travers and Sadolf reversed the initial
approval. *See* Exhibit F to Travers Decl. at 32; Inspection Records at 1–2. Is this enough to survive
summary judgment?
         It isn't. *First*, as we've indicated, the Plaintiffs elected *not* to press this argument—which is
reason enough to disregard it. *See Campbell*, 26 F.4th at 873 (holding that the "failure to raise an issue
in an initial brief . . .  should be treated as a forfeiture of the issue, and therefore the issue may be
raised by the court *sua sponte* [only] in extraordinary circumstances"); *Case v. Eslinger*, 555 F.3d 1317,
1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order
that did not consider an argument they chose not to develop for the district court at the time of the
summary judgment motions." (cleaned up)). *Second*, there's no evidence that Soto *knew* of Gonzalez's
discriminatory intent—nor is there any indication that Soto *adopted* that intent. Fairly read, the evidence

Because the Plaintiffs haven't shown that some final policymaker violated their constitutional rights, we **GRANT** the City's motion for summary judgment as to Count I.

*      *      *

After careful review, we **ORDER AND ADJUDGE** as follows:

1. The Defendants' Motion for Summary Judgment [ECF No. 94] is **GRANTED**.

2. Pursuant to FED. R. CIV. P. 58, we'll enter final judgment separately.

3. The Clerk of Court shall **CLOSE** this case.

4. All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**.

**DONE AND ORDERED** in the Southern District of Florida, this 31st day of March 2022.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

*may* suggest only that Soto acceded to Gonzalez's decision to reverse the passing inspection—either because he trusted the quality of Gonzalez's work or because, being lazy and disinterested, he exercised an undignified tendency to rubber-stamp Gonzalez's recommendations. Neither is grounds to hold the City responsible for Gonzalez's racist prejudices. As we've said, for a city to be liable under § 1983, the final policymaker must have "ratif[ied] not only the decision itself, but also the unconstitutional basis for it." *Matthews*, 294 F.3d at 1297. *Third*, even if there *were* evidence that Soto had ratified Gonzalez's unconstitutional decisions for unconstitutional reasons, Soto is only one member of BORA, and there's no evidence that any of his colleagues *either* knew about Gonzalez's animus *or* harbored any racial animus themselves. In other words, BORA has at least six "Code Compliance Officers" (of which Soto is only one)—so, Soto's (corrupted) vote is, standing alone, really neither here nor there. *See, e.g.*, *Rainbow City*, 434 F.3d at 1313 ("An improper motive of one of the members of a nine-member Planning Commission is not imputed to the rest of the Commission.").