UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-cv-61308-ALTMAN/Hunt

**RED DOOR ASIAN BISTRO**, *et al.*,

    *Plaintiffs*,

*v.*

**ROBERT GONZALEZ**,

    *Defendant.*

_____/

## ORDER

After the Eleventh Circuit's remand of this case, *see Red Door Asian Bistro v. City of Fort Lauderdale*, 2023 WL 5606088 (11th Cir. Aug. 30, 2023), Robert Gonzalez, our sole remaining Defendant, moved for summary judgment on the limited issues of whether he caused the Plaintiffs' injuries and whether the Plaintiffs suffered any damages. After careful review—and taking the evidence in the light most favorable to the Plaintiffs—we now **DENY** the Defendant's Renewed Motion for Summary Judgment [ECF No. 151] and proceed to trial.

### BACKGROUND

Our first Summary Judgment Order set out a detailed account of the facts, which we'll incorporate by reference here. *See 625 Fusion, LLC v. City of Fort Lauderdale*, 595 F. Supp. 3d 1228, 1238–54 (S.D. Fla. 2022) (Altman, J.), *rev'd in part sub. nom, Red Door*, 2023 WL 5606088. We'll therefore limit our recitation to those facts that bear on the issues of causation and damages.[1]

---

[1] In doing so, we'll describe the facts "in the light most favorable to [the non-moving party]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 n.2 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes only and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400

I.      **The Facts**

Our Plaintiffs are Red Door Asian Bistro ("Red Door"), an Asian-fusion restaurant in Fort Lauderdale, Florida, and its owners, Antonio Asta and Zhi Yu Liu. *See* Joint Statement of Undisputed Facts ("JSOUF") [ECF No. 156] ¶¶ 1–4 (citing Deposition of Antonio Asta as Corporate Representative of 625 Fusion, LLC ("Asta 30(b)(6) Dep.") [ECF No. 152-1] at 13–14). On January 23, 2018, the Plaintiffs received a permit from the City of Fort Lauderdale (the "City") to begin renovations on their restaurant. *Id.* ¶ 11 (citing Declaration of John Travers ("Travers Decl.") [ECF No. 152-5]). One of those renovations involved the installation of a new "zero clearance" kitchen hood, which "could be installed so that there was no space between it and another surface." JSOUF ¶ 14 (first citing Asta 30(b)(6) Dep. at 46, 52; and then citing Deposition of Joseph Dobos ("Dobos Dep.") [ECF No. 152-4] at 35–36). The kitchen hood was manufactured by CaptiveAire and was to be installed together with insulation material from Owens Corning, a supply company. *See* Asta 30(b)(6) Dep. at 51:14–52:20 ("When you have a zero clearance hood, basically CaptiveAire installs a one-inch board from Owens Corning[.]").

Beginning on February 2, 2018, "City inspectors began conducting inspections of the work being done pursuant to the permits." JSOUF ¶ 17 (citing City Inspections Records [ECF No. 152-8] at 1). The initial inspections on February 2 and 8, 2018, were conducted by both Robert Gonzalez, the City's Chief Mechanical Inspector, and Andres Vera, a City Mechanical Inspector who (at the time)

---

(11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering Gonzalez's Motion, then, we describe the facts in the light most favorable to the Plaintiffs and rely on Gonzalez's Statement of Facts [ECF No. 152] only where the Plaintiffs have failed to genuinely dispute a proposition Gonzalez has asserted there, *see* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record."); *see also Atl. Cas. Ins. Co. v. Ca'D'Oro, LLC*, 362 F. Supp. 3d 1268, 1272 (S.D. Fla. 2018) (Altonaga, J.) ("At summary judgment . . . [c]ourts must consider the entire record and not just the evidence singled out by the parties." (citing *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987))).

was Gonzalez's subordinate. *See* Plaintiffs' Response Statement of Facts ("Pls.' Resp. SOF") [ECF No. 154] ¶ 18 ("Gonzalez was also in fact present during the initial inspections." (first citing Declaration of Antonio Asta [ECF No. 100-1] ¶ 9; and then citing Dobos Dep. at 18, 28)). During these inspections, Vera saw "insulation material that [he] was not familiar with being used on the exterior of the zero-clearance kitchen hood[.]" Declaration of Andres Vera ("Vera Decl.") [ECF No. 152-6] ¶ 5. According to Vera, he "had concerns regarding the insulation being used on the exterior of the Hood and whether it was appropriate for the use to which it was being put." *Id.* ¶ 11. Gonzalez shared this concern. Declaration of Robert Gonzalez ("Gonzalez Decl.") [ECF No. 152-3] ¶ 15 ("I believe Vera shared my concerns regarding the installation of the Hood as it related to the fire rated ceiling.").

To follow up on their concerns, Vera and Gonzalez conducted several additional visits to Red Door over the next two months. *See id.* ¶¶ 14–15 ("Between February 8, 2018, and April 30, 2018, I visited Red Door on three or four occasions . . . to discuss the issue related to the insulation of the exterior of the kitchen hood. Robert Gonzalez accompanied me on some of these site visits." (cleaned up)). At one of these visits, Gonzalez also noticed that "the Hood was penetrating the ceiling that was fire rated," which he believed "was a life safety concern and did not comply with the Florida Building Code or plans approved by the City for the installation of the Hood." Gonzalez Decl. ¶ 13. Although Gonzalez claims that these inspections were nothing more than "courtesy visit[s]," *id.* ¶ 11, Asta believed they were a way for Gonzalez to "stymie, obstruct, and delay the opening of the Red Door" because of "his racial animus toward Mr. Liu," Asta Decl. ¶ 9. For two reasons, the Plaintiffs came to believe that they were being discriminated against.

*First*, they had installed the kitchen hood according to the manufacturer's specifications and precisely as they had at other restaurants. *See* Dobos Dep. at 19:11–19 ("I got a phone call from Mr. Gonzalez stating that you guys retrofitted this hood and that it's all like a Mickey Mouse job or

whatever. I said that's not the case. This is a hood that you buy. It's a $55,000 hood. Why would I want to mess with the insulation and putting the wrong insulation up[?] That's the way it's shipped."); *see also* Asta Decl. ¶ 18 ("We used and installed the same type of kitchen equipment and incorporated the same construction techniques for the Red Door as [we] did with [our] other successful restaurants, all of which were designed and approved by . . . engineers and architects and were constructed according to applicable Code provisions."). But, while other departments passed their inspections of Red Door by the end of February 2018, *see* Asta Decl. ¶ 18 ("On February 2, 8, and 21, 2018, inspections by the Fire Department, electrical inspectors, and other mandatory City inspectors passed the Red Door project for final inspection."), the hood inspection remained stalled through April, *see* City Inspection Records at 1–2, 4 (reproducing inspection records for May 7 and 8, 2018).

*Second*, at these visits, Gonzalez regularly made offensive remarks about Liu's Chinese heritage, *see id.* ¶ 23 (recounting Gonzalez's "racist and distasteful remarks"), and "routinely attempted to intimidate and humiliate [Asta] and [Liu] by making it clear it was his job to 'call the shots,'" *id.* ¶ 24. And Gonzalez's power trips often took on overtly racial tones. *See id.* ¶ 23 ("I don't know what kind of business that guy does, but we do things different in America. . . . I love working with these Chinese. They think money buys everything. But he's got another thing coming.").

In reality, Gonzalez's claim to "power" was illusory. As Chief Mechanical Inspector for the City, after all, Gonzalez's work was supervised by several different people. His work was reviewed, first, by John Travers, the City's Chief Building Official. *See* Travers Decl. ¶ 1 (noting that he is "the Building Official for the City of Fort Lauderdale" and that, "[a]s the Building Official, I supervise the City's Building Department"). Travers, in turn, was supervised by the Broward County Board of Rules and Appeals ("BORA"). *See* FLORIDA BUILDING CODE: BROWARD COUNTY AMENDMENTS § 113.9.1 (2018) ("The Board shall hear all appeals from the decisions of the Building Official, Assistant Building Official or Chief Inspector[.]"); *see also* Dobos Dep. at 31:3–24 (noting that BORA employees are

"super inspectors" who, "[w]hen you have an issue like this, you call them and get them involved and they try to help you out so that you can get through the process"). The oversight didn't end there. On top of BORA, there's also the Florida Building Commission, which has jurisdiction over BORA. *See* FLORIDA BUILDING CODE: BROWARD COUNTY AMENDMENTS § 113.14.1 (noting that "[a]ny person aggrieved by a decision of BORA . . . may file an appeal" with the "Florida Building Commission"). And, of course, if all else fails, a business can always challenge a decision under the Building Code in state court. The Plaintiffs *never* made use of any of these levels of review. *See generally* Pls.' Resp. SOF. When asked why, Joseph Dobos (Red Door's architect) said that he didn't want to "los[e] time" and that, in any event, "[i]t was not that great of a deal that it needed to be addressed." Dobos Dep. at 33:13–16.

At any rate, by the end of April 2018, the kitchen hood still hadn't passed the City's final inspection. *See* City Inspection Records at 5 (showing that the inspection scheduled for April 17, 2018, required a "revision showing new current layout of equipment and one [additional] nozzle"). And the Plaintiffs refused to "retrofit" the hood because doing so would "void the warranty from [the manufacturer] CaptiveAire[.]" Asta 30(b)(6) Dep. at 49:12–18; *see also* Dobos Dep. at 17:10–16 ("We have a $55,000 hood. We would not want to change the insulation. It would kind of insult your intelligence basically to say you change the insulation, you voided the warranty, this doesn't pass, and that was one of the issues and we've had several meetings regarding that.").

Dobos—searching for other ways to pass the City's inspection—contacted CaptiveAire, which produced a letter dated April 24, 2018, explaining: (1) that Red Door's kitchen hood was "designed for 0' Clearance to combustible," and (2) that the "method was tested and approved." Ex. 5 to Asta 30(b)(6) Dep. Exhibits [ECF No. 152-2] at 52 ("CaptiveAire Letter"). Dobos also contacted Rolando Soto—BORA's Chief Mechanical Code Compliance Officer—to resolve some lingering issues with the kitchen hood. *See* Ex. 4 to Dobos Dep. at 120 ("Soto May 9 Email") ("On April 27, 2018, I was

contacted by Mr. Joseph Dobos[,] Registered Architect, with regards to a failed mechanical inspection at [Red Door].”). Soto, in response, sent Dobos a long (and somewhat vague) email that mainly block-quoted several sections of Florida’s Building Code. *See* Ex. 4 to Dobos Dep. at 118–19 (“Soto Apr. 27 Email”).

Dobos wasn’t the only one who spoke with CaptiveAire in April. On April 26, 2018, a representative from CaptiveAire had a conversation with Gonzalez about the hood. *See* Soto May 9 Email at 120 (“Please see below excerpts from the attached test report per my conversation with Mr. Gonzales this morning.”). In a follow-up email to “obac305@icloud.com,” CaptiveAire relayed that it “tested this specific insulation [Red Door was using] to zero inches [clearance,]” and that the “jobsite in question has [three-inch clearance] and therefore is less severe than the test data, which was proven to pass successfully.” *Ibid.* CaptiveAire also expressed concern with the conclusion that “the ETL listed, UL-710 tested, rating is insufficient[.]” *Ibid.* But, even after that conversation, Gonzalez did nothing to pass the hood.

So, Dobos pushed the City to issue a “Correction Notice” as a way of getting Gonzalez and Vera to articulate their grievances in writing. *See* Dobos Dep. at 22:7–16 (“I told both Robert [Gonzalez] and Andres [Vera], [I] said if I have a problem and you’re not passing this, because it got passed by another inspector and it wasn’t an issue. I said if that’s the case, I want a red tag that tells me what I’m doing wrong[.]”). On April 30, 2018, Vera issued Red Door the Correction Notice, which observed that the “[m]aterial used for clearance reduction on the hood is not UL approved for that application” and asked Red Door to “[p]lease provide alternative method for material to be used for the clearance reduction on the hood and submit to city for approval.” Ex. C to Vera Decl. at 7 (“Correction Notice”). At this point, then, Red Door had failed the inspection. *See* Deposition of Tony Sadolf (“Sadolf Dep.”) [ECF No. 152-9] at 29:2–5 (“Q. . . . [A]fter Andres [Vera] gave the red tag and failed it -- the red tag means it failed inspection? A. Yes.”). Frustrated, the Plaintiffs retained a lawyer

(Michael Pizzi), who began scheduling meetings with City officials to try and resolve the kitchen-hood issue. *See* Asta 30(b)(6) Dep. at 51:1–9 ("Q. So my understanding is your next step was to retain counsel? A. Absolutely.").

After failing the Red Door hood, Vera contacted David Burd—an employee of the insulation supplier, Owens Corning—"regarding the material being used on the exterior of the kitchen hood[.]" Vera Decl. ¶ 25. In response, Burd suggested that the Plaintiffs had used the wrong insulation material. *See* Ex. 6 to Asta 30(b)(6) Dep. Exhibits at 54 ("Burd May 3 Letter") ("Because of [a] temperature rating difference, Owens Corning does not recommend the use of" the Plaintiffs' insulation product). The next day, May 4, 2018, Travers forwarded Burd's Letter to Pizzi, contending that he was "obligated to hold the final inspections on the hood installation until such time as the modifications are completed, using a more appropriate product, as recommended by Owens Corning." Ex. B to Travers Decl. at 14 ("Travers May 4 Email"). The Plaintiffs quickly followed up with Burd, however— and, on May 7, 2018, Burd sent another letter to the Plaintiffs, *retracting* his prior comments. *See* Ex. 7 to Asta 30(b)(6) Dep. Exhibits at 55 ("Burd May 7 Letter). In this second letter, Burd said he didn't know "at the time of [his first] letter dated May 3, 2018," *either* that the insulation was "a component of a commercial kitchen hood assembly manufactured by CaptiveAire" *or* that "CaptiveAire has had this assembly tested and certified by Intertek – (ETL) as an acceptable assembly in a zero-clearance application." *Ibid.*

Also on May 7, a City inspector named Tomas Perez determined that the kitchen hood failed that inspection. *See* JSOUF ¶ 36 (citing City Inspection Records at 4). But once "the Plaintiffs provided [Travers] with additional information regarding the Hood[,] including engineering certifications and the results of laboratory testing"—all presumably taken from Burd's second letter, *see* Travers Decl. ¶ 15 ("[A]round Friday, May 5, 2018, representatives of the Plaintiffs provided me with additional information regarding the Hood including engineering certifications and the results of laboratory

testing."); *see also* Asta 30(b)(6) Dep. at 85:15–17 ("Q. And then Red Door provided this letter to the City, correct? A. Yes.")—Travers decided "to have a *reinspection* of the work performed pursuant to the Hood Permit," Travers Decl. ¶ 16 (emphasis added).

So, on May 8, 2018, City Inspector Tony Sadolf, who was accompanied by Travers, *see id.* ¶ 18 ("I accompanied Sadolf on [the] May 8, 2018, inspection."), conducted *another* "on-site inspection of the work being performed on the Hood Permit," *id.* ¶ 17. Sadolf issued Red Door a *passing* inspection. *See* JSOUF ¶ 38 (first citing Travers Decl. ¶¶ 16–19; and then citing Declaration of Tony Sadolf ("Sadolf Decl.") [ECF No. 152-7] ¶¶ 2–5). Finally, on May 9, 2018, the City "close[d] out all open permits regarding the work being done at the Red Door." Travers Decl. ¶ 20; *see also* Asta Decl. ¶ 49 ("On May 9, 2018, I visited City Hall, verified all permits were complete, and received its occupational license from the City to open shortly thereafter, followed by receipt of its liquor license."). The Plaintiffs then "opened Red Door for business following a 'soft opening'" on May 12, 2018. JSOUF ¶ 40 (first citing Plaintiffs' Answer to Second Interrogatories ("Pls.' 2d Rog. Ans.") [ECF No. 151-10] ¶ 11; and then citing Asta 30(b)(6) Dep. at 91:17–25).

Unfortunately for Red Door, this wasn't the end of the story. According to Asta, when he "went to City Hall [on May 9, 2018] to obtain the Occupational License, Gonzalez came up to [him] and stated in a threatening and intimidating manner and tone intended to be heard only by [him]: 'You win. You win. You think you win. We will see how long you stay open. Let me be clear–you are not going to win.'" Asta Decl. ¶ 51. Asta also claims that Gonzalez "smirked and stated in an apparent attempt to mimic and mock a Chinese accent: 'Your boss should go back to China Town. We don't need chinks here.'" *Id.* ¶ 52.

At this point, Soto (from BORA) reemerged. On the afternoon of May 9, 2018, Soto sent an email to Gonzalez, Travers, Dobos, and others, raising an issue that, according to the Plaintiffs, no City inspector had ever raised before. *See* Asta 30(b)(6) Dep. at 103:5–8 ("Then after the correction

notice, . . . all the sudden after that, a whole slew of other things started coming up."). "[T]here is a misunderstanding," Soto wrote, "about what is the issue. The issue [with the kitchen hood] is not the clearance rating. *The issue is the hood penetrating a fire rated ceiling.*" Soto May 9 Email at 120. Travers answered that, based on a "further review of the listing" and Sadolf's "final inspection on 5-7-18 with a passing result," the "assembly appears to be compliant for the installation[.]" Ex. D. to Travers Decl. at 18–23 ("May 9–15 Email Thread"). Soto nonetheless asked for a meeting with Gonzalez and Sadolf to discuss the inspection. *Id.* at 20 ("Good afternoon Robert and Tony, I need to meet with you both on this issue.").

Sadolf and Soto met on May 15, 2018, "in Robert [Gonzalez's] office." *Id.* at 18–19. As Sadolf recounted in a follow-up email to Soto, Gonzalez, Travers, and others, Soto told Sadolf at the meeting "that someone in [his] department made a complaint that [he] passed the inspection," *id.* at 18, but Sadolf "was not told who made the complaint," *id.* at 19. Sadolf relayed that he felt the "entire situation was handled extremely unprofessional[ly,]" and that, if he "approved the inspection in error, or by mistake, [he could] change the result from pass to fail." *Ibid.* Sadolf also sent an email to Travers and Gonzalez *only*, complaining that he was "extremely irritated by this entire situation, and [ ] would prefer to 'fail' the mechanical inspection, and send the prior mechanical Inspector that failed the inspection before [him,] . . . Tomas [Perez]." *Id.* at 22.

Sadolf got his wish the very next day. On May 16, 2018, Travers and Gonzalez received another email from Soto, affirming "that the Type 1 grease hood installed at this location under permit 18010831 is, to the best of our knowledge, in violation of sections 507.2.7 Type I hoods penetrating a ceiling and 506.3.11 Grease duct enclosures of the 2017 Florida Building Code – Mechanical, Sixth Edition." Ex. F. to Travers Decl. at 26 ("Soto May 16 Email") (emphasis omitted). Travers then allowed Sadolf to reverse his passing inspection and to cancel the approved permit for Red Door's kitchen hood. *See* Travers Decl. ¶ 29 ("On May 16, 2018, I approved Sadolf's request to change the

status of the Hood Permit from passed to cancelled." (cleaned up)); *see also* City Inspection Records at 1–2 (showing that Sadolf was the inspector who recorded the cancellation, leaving a note that said: "(1) 5/16/18 Final inspection result is changed to 'cancel' per Building Official John Travers.").

The City, however, "did not inform the Plaintiffs that the Hood permit had been changed from passed to cancelled." JSOUF ¶ 47 (citing Asta 30(b)(6) Dep. at 90–91). Indeed, "[t]he Plaintiffs only learned of the cancellation from Dobos, who heard it from another inspector on a different jobsite." *Id.* ¶ 48 (citing Asta 30(b)(6) Dep. at 90–91). But Red Door had already begun serving customers. *See id.* ¶ 40 ("On May 12, 2018, the Plaintiffs opened Red Door for business following a 'soft opening.'" (first citing Pls.' 2d Rog. Ans. ¶ 11; and then citing Asta 30(b)(6) Dep. at 91:17–25)). Facing the uncertainty of being "closed at any time," then, Red Door "kept it[s opening] as soft as [it] could" and forewent "any kind of advertisement." Asta 30(b)(6) Dep. at 91:17–25.

In the wake of the permit cancellation, the Plaintiffs' lawyer (Pizzi) continued to hound City officials for final approval. *See* JSOUF ¶¶ 51–59 (detailing Pizzi's correspondence with the City between May 21, 2018, and June 18, 2018). In one of his correspondences, dated June 18, 2018, Pizzi told Travers that Raja Buchanan, the hood's engineer, had since "inspected the [restaurant] from top to bottom and found everything in compliance with his plans and no problems [or] safety issues." Ex. 8 to Asta 30(b)(6) Dep. Exhibits at 65 ("Pizzi June 18 Email"). Pizzi's advocacy culminated in a letter to Mayor Dean Trantalis and City Manager Lee Feldman on July 6, 2018, which detailed the ordeal Red Door had faced over the past several months. *See* Ex. 8 to Asta 30(b)(6) Dep. Exhibits at 56–59 ("Pizzi Letter"). That letter specifically "note[d] that on . . . three occasions, it was requested that Robert Gonzalez, the Chief Mechanical Inspector, recuse himself and end his involvement in this matter," because the first permit denial "was found to be based on erroneous information," and because "Gonzalez . . . [had] pledged to do whatever he could within his power to create problems to

obstruct the business." *Id.* at 58–59. The letter, however, said absolutely nothing about racism or any other kind of ethnic prejudice. *See id.* at 56–59.

Pizzi's letter seemed to work, as it prompted a meeting at Red Door in "early August 2018" between "the Plaintiffs, Attorney Pizzi, Dobos, . . . Buchanan[,] Building Official Travers, and other City representatives . . . to discuss the installation of the Hood and the issue related to the fire-rated ceiling." Defendant's Statement of Facts ("Def.'s SOF") [ECF No. 152] ¶ 74 (citing Asta 30(b)(6) Dep. at 101–03, 112–13); *see also* Pl.'s Resp. SOF ¶ 74 ("[A]dmitted that a meeting took place[.]"). At that meeting, "the City agreed with the Plaintiffs regarding the Hood installation," thus resolving "all issues related to the Hood[.]" JSOUF ¶¶ 64–65 (first citing Asta 30(b)(6) Dep. at 104; and then citing *id.* at 112–13); *see also* Asta 30(b)(6) Dep. at 104:7–10 ("Q. So the issue with the fire rating ceiling, the City ultimately agreed with Red Door's position and said there didn't have to be any change, right? A. Correct."). After that meeting, Buchanan sent the City a letter on August 10, 2018, stating:

> I inspected the hood installation and in my professional opinion, the hood was installed per plans. The hood is a listed hood (zero clearance to combustibles). The grease exhaust duct is wrapped with fire rated wrap from the hood to the exhaust fan. The supply air duct has a fire damper thru the ceiling. The installation of the hood in my professional opinion is safe and I did not see any issue[s] with the way it is installed.

Ex. G to Travers Decl. at 28 ("Buchanan Letter").

Finally, in September 2018, Red Door hosted its "grand opening"—which had been delayed "due to the issues related to the Hood because [the Plaintiffs] knew they could be shut down due to the open permits." Pls.' Resp. SOF ¶ 78 (citing Asta 30(b)(6) Dep. at 68, 92). As a result of all this, the Plaintiffs missed out on their "original February 2018 opening date" and the "lucrative winter visitor season." Asta Decl. ¶ 19.

## II.    Procedural History

Aggrieved by all that transpired, Red Door, Asta, and Liu sued Gonzalez and the City on May 24, 2019. *See generally* Complaint [ECF No. 1]. In their now-operative Second Amended Complaint

("SAC") [ECF No. 53], the Plaintiffs asserted three claims against Gonzalez under the Fourteenth Amendment: violation of the Equal Protection Clause, *see* SAC ¶¶ 96–108 (Count I); deprivation of property and rights without due process, *see id.* ¶¶ 109–22 (Count II); and violation of due process, *see id.* ¶¶ 123–31 (Count III). The Plaintiffs joined the City as a Defendant in Counts I and II. *See id.* ¶¶ 96–122. On March 17, 2021, we dismissed Count II with prejudice because it failed to state an actionable claim. *See* Order on Defendants' Motion to Dismiss Second Amended Complaint [ECF No. 87] at 26. The Defendants then moved for summary judgment on the remaining two counts. *See* Defendants' Amended Motion for Summary Judgment [ECF No. 94].

On March 31, 2022, we granted summary judgment for the Defendants on both remaining counts. *See 625 Fusion*, 595 F. Supp. 3d at 1277. As to the claims against Gonzalez, we found that he was entitled to qualified immunity because the Plaintiffs couldn't show that he violated any "clearly established" equal-protection or due-process rights. *See id.* at 1262, 1270. In our view, the Plaintiffs' equal-protection claim failed as a matter of law because the Plaintiffs never identified a similarly situated comparator, as is generally required for a plaintiff to establish a selective-enforcement claim. *See Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996) ("In order to prevail on an equal protection claim based upon the application of a facially neutral statute, it must be establish[ed] that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff."); *see also 625 Fusion*, 595 F. Supp. 3d at 1257 ("The Eleventh Circuit has routinely held that a selective-enforcement claim (like the one the Plaintiffs bring here) cannot survive without a similarly situated comparator." (first citing *Young Apts., Inc. v. Town of Jupiter*, 406 F. App'x 376, 378 (11th Cir. 2010); then citing *Roy v. Fulton Cnty. Sch. Dist.*, 288 F. App'x 686, 688 (11th Cir. 2008); and then citing *B.T. ex rel. Jackson v. Battle*, 2021 WL 4147087, at *5 (11th Cir. Sept. 13, 2021))). We then held that the Plaintiffs' due-process claim (interpreted under either a *procedural-* or a *substantive*-due process theory) "failed to create a genuine

issue of material fact[.]" *625 Fusion*, 595 F. Supp. 3d at 1270; *see also id.* at 1262–70 (rejecting the Plaintiffs' due-process arguments).

Finally, we found that the City was entitled to judgment as a matter of law on the Plaintiffs' sole remaining claim against it (equal protection) because the Plaintiffs failed to show *either* that Gonzalez was "a final policymaker under Florida law," *or* (if he wasn't) "that some final policymaker violated their constitutional rights," *id.* at 1270–77, as they were required to do to establish municipal liability, *see id.* at 1270–71 ("A municipality 'causes' a violation only (1) when it acts pursuant to 'an official policy enacted by its legislative body (e.g., an ordinance or resolution passed by a city council)'; (2) when 'final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure' or (3) 'on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority.'" (quoting *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016))).

The Plaintiffs then appealed our Summary Judgment Order—but only as to their equal-protection claim against Gonzalez. *See Red Door*, 2023 WL 5606088, at *6 n.3 ("With regard to the due-process claim, the district court granted the City's motion to dismiss and Gonzalez's motion for summary judgment. Red Door does not challenge either decision on appeal, so it has abandoned those issues." (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014))); *id.* at *9 ("Red Door's briefing does not raise any distinct issue regarding the district court's grant of summary judgment to the City on the § 1983 municipal liability claim. Accordingly, we deem any appeal of that ruling to be abandoned." (citing *Sapuppo*, 739 F.3d at 680)).

On appeal, the Eleventh Circuit reversed our entry of summary judgment for Gonzalez on that count. In the panel's view, "this case is better characterized as alleging 'misapplication (i.e., departure from or distortion of the law),' rather than 'selective enforcement (i.e., correct enforcement

in only a fraction of cases).'" *Id.* at \*7 (quoting *E & T Realty v. Strickland*, 830 F.2d 1107, 1113 (11th Cir. 1987)). The court therefore held that "proof of a similarly situated comparator is not necessary for Red Door to establish the core elements of [their] equal-protection claim[.]" *Id.* at \*8 (first citing *Wayte v. United States*, 470 U.S. 598, 608 (1985); and then citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)). That "Red Door . . . established a 'convincing mosaic' of race discrimination based on the totality of the record evidence" was sufficient to "allow a jury to infer intentional discrimination." *Id.* at \*8 n.4 (quoting *Lewis*, 934 F.3d at 1185). Accordingly, the Eleventh Circuit held that, "[i]f a jury found that Gonzalez failed or impeded inspection of the kitchen hood for bogus reasons and that his true reason was racial animus, it could reasonably conclude that his conduct 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.* at \*8 (quoting *Wayte*, 470 U.S. at 608); *see also ibid.* ("Gonzalez asserts the defense of qualified immunity. But it need hardly be said that a City official using the permit process to intentionally discriminate based on race violates clearly established law." (first citing *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1218 (11th Cir. 2005); and then citing *Smith v. Lomax*, 45 F.3d 402, 407 (11th Cir. 1995))).

But the Eleventh Circuit refused to decide whether Gonzalez had actually "acted as the decisionmaker and so caused Red Door's injuries." *Id.* at \*9; *see also ibid.* ("We would prefer that the district court address these issues first." (citing *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 & n.4 (11th Cir. 2001))). Following the remand, then, Gonzalez moved for summary judgment on that issue, arguing that he is "entitled to judgment as a matter of law because he was not the decisionmaker as to any act that allegedly delayed the opening of the Plaintiffs' restaurant and therefore was not the moving force behind any alleged constitutional violation." Defendant's Renewed Motion for Summary Judgment ("Def.'s MSJ") [ECF No. 151] at 2. We'll consider that Motion now.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court

must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## ANALYSIS

Following the remand, "[t]he sole remaining claim in this case is an equal protection claim against Gonzalez individually." Def.'s MSJ at 2; *see also Red Door*, 2023 WL 5606088, at *9 ("In sum, we vacate the grant of summary judgment on Red Door's equal-protection claim against Gonzalez, and we remand for further proceedings on that claim."). On that claim, the Eleventh Circuit left open the question we address here: whether the Plaintiffs have put forth sufficient evidence from which a "reasonable jury could conclude that [Gonzalez] acted as the decisionmaker and so caused Red Door's injuries." *Red Door*, 2023 WL 5606088, at *9.

Before we get into answering that question, though, we should first dispel any confusion the parties might be harboring about the scope of the Eleventh Circuit's ruling. In their Response, the Plaintiffs insist that "[t]he Eleventh Circuit's summary judgment factual finding that 'Red Door was treated worse and subjected to illegitimate delays and costs *because* Gonzalez departed from the ordinary building code due to anti-Asian animus' necessarily includes a finding that Gonzalez was the cause of Red Door's injuries." Plaintiffs' Response to Def.'s MSJ ("Pls.' MSJ Resp.") [ECF No. 153]

at 5 (quoting *Red Door*, 2023 WL 5606088, at *8). The Eleventh Circuit made no such finding. Instead, it said only that a jury *could* "reasonably conclude that [Gonzalez's] conduct had a discriminatory effect and that it was motivated by a discriminatory purpose" *if* it first finds that Gonzalez took some action that "failed or impeded inspection of the kitchen hood for bogus reasons and [because] his true reason was racial animus." *Red Door*, 2023 WL 5606088, at *8 (cleaned up). But the Court explicitly declined to decide whether Gonzalez *actually* took some action that "caused Red Door's injuries." *Id.* at *9. So, the Plaintiffs are simply wrong when they say that "Gonzalez does not challenge, and indeed cannot question, the Eleventh Circuit's conclusion that Red Door incurred injuries because of his actions," Pls.' MSJ Resp. at 5, since (1) the Eleventh Circuit never reached that conclusion, and (2) Gonzalez's Motion *directly* challenges that proposition, *see, e.g.*, Def.'s MSJ at 3 ("Gonzalez simply was not the . . . cause of any delay.").

Because "a causal connection between [Gonzalez's allegedly discriminatory] acts or omissions and the alleged delay" is a question that remains unresolved, Def.'s MSJ at 3; *see also Red Door*, 2023 WL 5606088, at *9 ("We would prefer that the district court address these issues first." (cleaned up)), Gonzalez has again moved for summary judgment on the Plaintiff's equal-protection claim. In addition to arguing that the Plaintiffs have failed to show causation, Gonzalez also contends that they haven't suffered a "[c]onstitutionally [s]ignificant[ ] [d]elay[.]" Def.'s MSJ at 3. We'll take up Gonzalez's causation and damages arguments in turn.

## I.  Causation

As the Eleventh Circuit explained, the "core elements" of an equal-protection claim are "(1) a discriminatory motive; and (2) a discriminatory effect." *Red Door*, 2023 WL 5606088, at *8 (first citing *Wayte*, 470 U.S. at 608; and then citing *Lewis*, 934 F.3d at 1185). The "'discriminatory effects' requirement encompasses both inequality of opportunity and a causation element." *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1345 n.20 (11th Cir. 2000) (first citing *Lucas v. Townsend*, 967 F.2d

549, 551 (11th Cir. 1992); and then citing *Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 148 (5th Cir. 1977)). To prevail on their equal-protection claim, then, the Plaintiffs "must establish an adequate causal link between the alleged harm and the alleged unlawful conduct." *Dixon v. Burke County*, 303 F.3d 1271, 1275 (11th Cir. 2002) (citing *Barts v. Joyner*, 865 F.2d 1187, 1195–96 (11th Cir. 1989)). For damages to be sufficiently "caused by a constitutional tort," a plaintiff must show that (1) *but for* that constitutional tort, "such injuries and damages would not have occurred," and that (2) his injuries and damages "were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000); *see also ibid.* ("Although § 1983 addresses only constitutional torts, § 1983 defendants are, as in common law tort suits, responsible for the natural and foreseeable consequences of their actions.").

According to Gonzalez, "the Plaintiffs have presented no . . . evidence linking *his* conduct to the alleged delay," because he "was not the decisionmaker as to the complained of acts and therefore not the cause of any delay." Def.'s MSJ at 3. Specifically, Gonzalez points us to "three acts that [the Plaintiffs] claim . . . resulted in a delay in the opening of the restaurant," *id.* at 5—none of which he believes he caused, *see ibid.* ("[T]he undisputed evidence shows that Gonzalez was not the cause of any of these acts.").

*First* is the "issuance of the correction notice on April 30, 2018." *Ibid.*; *see also* JSOUF ¶ 22 ("On April 30, 2018, City Inspector Vera drafted and signed a correction notice[.]" (first citing Vera Decl. ¶ 24; and then citing Ex. C to Vera Decl. at 7 ("Correction Notice"))). Gonzalez says he wasn't responsible for the correction notice because it was "Vera and not Gonzalez [who] signed and prepared" it. Def.'s MSJ at 5 (first citing Vera Decl. ¶ 24; and then citing Correction Notice at 7).

*Second*, Gonzalez points us to Vera's April 2018 communications with "Owens Corning, the manufacturer of the insulation material being used on the exterior of the Hood," in which Vera expressed concern "about the . . . insulation product the Plaintiffs were using for the Hood." JSOUF

¶ 29 (first citing Vera Decl. ¶ 21; and then citing Ex. D to Vera Decl. at 11–13 ("Owens Corning Comm'ns")). After Owens Corning "suggested that the Plaintiffs had used the wrong insulation material," JSOUF ¶ 30 (citing Owens Corning Comm'ns at 13 ("Because of [a] temperature rating difference, Owens Corning does not recommend the use of [the Plaintiffs' insulation] product for this specific application.")), Building Official Travers "advised [that he was] . . . 'obligated to hold the final inspections on the hood installation until such time as the modifications are completed, using a more appropriate product, as recommended by Owens Corning,'" *id.* ¶ 32 (quoting May 4 Travers Email at 14). Gonzalez insists that there's "no evidence establishing any causal connection between Gonzalez and the communications with Owens Corning." Def.'s MSJ at 9. Instead, he says, it was Vera—not Gonzalez—"who contacted Owens Corning." *Id.* at 6; *see also* Vera Decl. ¶¶ 21, 23 ("In late April 2018, I contacted Owens Corning, the manufacturer of the insulation being used on the outside of the kitchen hood. . . . Robert Gonzalez did not participate [in] my telephone calls with Owens Corning and did not tell [me] what to say to Owens Corning."). In Gonzalez's view, then, any delays stemming from these communications cannot be attributed to him. *See* Def.'s MSJ at 6 ("This undisputed evidence establishes the absence of any causal connection between Gonzalez and the communications with Owens Corning." (emphasis omitted)).

*Third*, Gonzalez argues that he "was not involved in the decision to reopen the permit" on May 16, 2018. Def.'s MSJ at 9; *see* JSOUF ¶ 46 ("On May 16, 2018, and at Sadolf's request, Travers gave Sadolf permission to change the Hood Permit's status from passed to cancelled." (first citing Travers Decl. ¶¶ 28–29; then citing Sadolf Decl. ¶¶ 10–11; and then citing City Inspection Records at 2)). Gonzalez claims that Tony Sadolf first raised the issue of reopening the permit, *see* Def.'s MSJ at 9 ("Following the [May 15, 2018] meeting [between Sadolf and Soto], Sadolf sent an email outlining his displeasure and concerns with the meeting to Soto, Building Official Travers, Gonzalez, and others." (first citing Def.'s SOF ¶¶ 53–54; and then citing May 9–15 Email Thread at 22–23)); *see also*

May 9–15 Email Thread at 22 ("I am extremely irritated by this entire situation, and I would prefer to 'fail' the mechanical inspection, and send the prior mechanical Inspector that failed the inspection before me."). Travers (not Gonzalez) then "allowed Sadolf to reverse his inspection and to cancel the approved permit for Red Door's kitchen hood." Def.'s MSJ at 9 (first citing Def.'s SOF ¶¶ 55–56; then citing Sadolf Decl. ¶ 11; then citing Travers Decl. ¶ 29; and then citing City Inspection Records at 1–2). In Gonzalez's view, then, he isn't responsible for "the decision to change the status of the Hood Permit from passed to failed in mid-May 2018." Gonzalez Decl. ¶ 20.

The Plaintiffs appear to concede that Gonzalez did not *personally* sign the Correction Notice, call Owens Corning, or tell Travers to reopen the permit.[2] Instead, they argue that, regardless of whether Gonzalez *directly* participated in those discrete events, "the chain of events leading to these delays was initiated by [ ] Gonzalez's discriminatory intent"—and, therefore, that any resulting "delays were not unforeseen but were precisely the outcome Gonzalez sought to achieve through his discriminatory actions." Pls.' MSJ Resp. at 8–9. The Plaintiffs thus advance a "cat's paw" theory of causation, seeking to "impos[e] individual liability under § 1983 on subordinate governmental employees with unlawful motives who cause the real [*i.e.*, final] decision-makers to [discriminate]." *Id.* at 7 (quoting *Smith v. Bray*, 681 F.3d 888, 898 (7th Cir. 2012)). Outlining this doctrine, the Eleventh

---

[2] *Compare* Def.'s SOF ¶ 30 ("On April 30, 2018, City Inspector Vera drafted and signed a correction notice[.]" (first citing Vera Decl. ¶ 24; and then citing Correction Notice at 7)), *with* Pls.' Resp. SOF ¶ 30 ("As to ¶ 30, admitted that City Inspector Vera claims to have issued a correction notice on April 30, 2018, which speaks for itself."); and *compare* Def.'s SOF ¶ 37 ("In late April 2018, Vera had contacted Owens Corning, the manufacturer of the insulation material being used on the exterior of the Hood, and relayed to him a 'question' and 'concern' about the Owens Corning insulation product the Plaintiffs were using for the Hood." (first citing Vera Decl. ¶ 21; and then citing Owens Comm'ns)), *with* Pls.' Resp. SOF ¶ 37 ("As to ¶ 37, admitted as to Vera claims to have contacted Owens Corning."); and then *compare* Def.'s SOF ¶ 56 ("On May 16, 2018, and at Sadolf's request, Travers gave Sadolf permission to change the Hood Permit's status from passed to cancelled." (first citing Travers Decl. ¶¶ 28–29; then citing Sadolf Decl. ¶¶ 10–11; and then citing City Inspection Records at 2)), *with* Pls.' Resp. SOF ¶ 56 ("As to ¶ 56, admit Sadolf and Travers claim that on May 16, 2018, Travers gave Sadolf permission to change the Hood Permit's status from passed to cancelled at Sadolf's request.").

Circuit has explained that, "[w]hen the intentionally discriminating [subordinate] does not [himself] have decisionmaking authority, the plaintiff must [establish] that the discriminating [subordinate's] racial animus (1) was intended to cause and (2) did cause the . . . injury." *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1297 (11th Cir. 2021) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331–32 (11th Cir. 1999)).

We'll start with intent. Taking the facts in the light most favorable to the Plaintiffs—as we must at this stage of the case, *see Pennington*, 261 F.3d at 1265—we're satisfied that a reasonable jury *could* find that Gonzalez "intended to cause" delays in Red Door's permitting process for racially motivated reasons, *Ziyadat*, 3 F.4th at 1297. For starters, the Eleventh Circuit has already ruled that a jury "could reasonably conclude that [Gonzalez's] conduct . . . 'was motivated by a discriminatory purpose.'" *Red Door*, 2023 WL 5606088, at *8 (quoting *Wayte*, 470 U.S. at 608). And the Plaintiffs have adduced ample evidence for their view that Gonzalez *wanted* to prevent Red Door from opening because of its owners' racial identity. *See* Asta Decl. ¶ 23 ("Included among [Gonzalez's] racist and distasteful remarks about [the Plaintiffs] are these: There is a reason we don't have many chinks trying to open. . . . Las Olas is not China Town. . . . He should go back to Hong Kong where he belongs."); *see also Ziyadat*, 3 F.4th at 1297 ("[L]ower-level employees intended to cause injury where they had said they were 'out to get' and 'get rid' of the plaintiff[.]" (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 426 (2011))). Although Gonzalez disputes the implications of those statements, *see* Gonzalez Decl. ¶ 23 ("I did not make any statements to or about the Plaintiffs that I understood to be derogatory toward Asians."), the Plaintiffs have "demonstrate[d] that there is indeed a material issue of fact" as to Gonzalez's specific intent, *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). That's enough to survive summary judgment on this prong of the causation inquiry.

To avoid trial, then, Gonzalez must show that no reasonable juror could find that his conduct actually "*did* cause the . . . injury." *Ziyadat*, 3 F.4th at 1297 (emphasis added); *see also Mueller v. Rodin*,

2021 WL 2592368, at *2 (S.D. Fla. Apr. 8, 2021) (Altonaga, J.) ("When the *nonmoving* party has the burden of proof at trial, the moving party is entitled to a judgment of law if it shows [ ] an absence of evidence supporting the nonmoving party's case[.]" (citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Cntys.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991))). To make that determination, "we merely apply the operative causation standard—whatever it may be—to the actions of the lower-level employee." *Ziyadat*, 3 F.4th at 1297.

For § 1983 claims, "[c]ausation has two required elements: cause-in-fact and legal or proximate cause." *Smith v. City of Oak Hill*, 587 F. App'x 524, 527 (11th Cir. 2014) (citing *Jackson*, 206 F.3d at 1168 n.16)); *see also Maumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019) ("[A] standard requirement of any tort claim is that plaintiff show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct. . . .  Indeed, 'but-for' causation has long been a standard prerequisite in § 1983 claims generally." (cleaned up)). A defendant's action is the proximate cause of an injury "if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1224 (11th Cir. 2021) (quoting *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So. 3d 977, 982 (Fla. 2018)); *see also Dees v. Hyundai Motor Mfg. Ala., LLC*, 368 F. App'x 49, 51 (11th Cir. 2010) ("[I]n [cat's-paw-theory] cases, 'causation must be truly direct[, and] the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee."). The but-for causation standard is met if "the discriminatory conduct had a 'determinative influence' on the injury." *Ziyadat*, 3 F.4th at 1297–98 (quoting *Sims v. MVM, Inc.*, 704 F.3d 1327, 1336 (11th Cir. 2013)).

This one's very close. But, when viewed in the light most favorable to the Plaintiffs, the summary-judgment record contains sufficient evidence for a reasonable jury to conclude that Gonzalez caused Red Door's injuries. To substantiate that Gonzalez caused the "illegitimate delays

and costs" stemming from the inspection process, Pls.' MSJ Resp. at 1, the Plaintiffs point us to evidence of one allegedly discriminatory act Gonzalez took that "prompt[ed] the end-of-April sequence of events highlighted in Gonzalez's motion," *id.* at 9. As the Plaintiffs explain:

> Prior to the incidents highlighted in his motion, Mr. Gonzalez had already communicated with the manufacturer of the hood and received a letter from them confirming that the hood was designed for zero clearance and had been appropriately certified under an ETL listing—a detail Gonzalez could have easily verified. Despite receiving this information in April, Mr. Gonzalez still refused to approve the kitchen hood installation[.]

*Ibid.* (citing *Red Door*, 2023 WL 5606088, at *1–2).

Although the Plaintiffs don't cite any record evidence for this point, *see ibid.*, Gonzalez (helpfully) suggests that the Plaintiffs are referring to "Rolando Soto's May 9, 2018, email, which included a portion of a forwarded April 26, 2018, email message from Brady Ambrose of CaptiveAire to 'obac305@icloud.com' that references a 'conversation with Mr. Gonzales this morning,'" Defendant's Reply ("Def.'s Reply") [ECF No. 155] at 5 (quoting May 9 Soto Email at 120). In that email, CaptiveAire (the hood's manufacturer), explained that it had "tested this specific insulation [*i.e.*, the one Red Door was using] to zero inches [clearance,]" and that the "jobsite in question has [three-inch clearance] and therefore is less severe than the test data, which was proven to pass successfully." May 9 Soto Email at 120. CaptiveAire also expressed concern with the conclusion that "the ETL listed, UL-710 tested, rating is insufficient[.]" *Ibid.*

From that evidence, a reasonably jury could infer that, by April 26, 2018, Gonzalez knew that "there were no actual issues with the kitchen hood assembly or insulation." Pls.' MSJ Resp. at 9. Despite knowing this, he did nothing to stop Vera—his subordinate, *see* Gonzalez Decl. ¶ 1 ("I was Chief Mechanical Inspector at the City of Fort Lauderdale from 2017 through June 2019.")—from issuing the Correction Notice on April 30, 2018, which required Red Door to "provide [an] alternative method for material to be used for the clearance reduction on the hood and [to] submit [it] to the City for approval," Correction Notice at 7.

It would *also* be reasonable for the jury to infer that, had Gonzalez disclosed to Vera that the "hood was designed for zero clearance and had been appropriately certified under an ETL listing," Pls.' MSJ Resp. at 9, Vera wouldn't have failed Red Door's inspection on that basis, *see* Sadolf Dep. at 29:2–5 ("Q. . . . [A]fter Andres [Vera] gave the red tag and failed it -- the red tag means it failed inspection? A. Yes."); *see also Moreno v. Wal-Mart Stores E., LP*, 2024 WL 1513457, at *9 (S.D. Fla. Apr. 5, 2024) (Altman, J.) ("[I]n federal court, we don't care whether that inference is based on another inference—so long as both inferences are reasonable." (citing *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982))). Nothing in the record suggests that Vera *also* communicated with CaptiveAire, and Vera himself said that it wasn't until May 3, 2018—*viz.*, after he issued the Correction Notice—that "a representative of Owens Corning provided [him] with correspondence regarding the material being used on the exterior of the kitchen hood[.]" Vera Decl. ¶ 25.

Plus, it was only *after* Building Official Travers learned of the hood's "engineering certifications and the results of laboratory testing" on May 5, 2018, Travers Decl. ¶ 15—facts Gonzalez had known about for well over a week by that point—that he ordered the "reinspection of the work performed pursuant to the Hood Permit," which resulted in the hood being cleared on May 8, *id.* ¶ 16. So, it's reasonable to believe that, if Gonzalez had disclosed that information sooner, the subsequent proceedings scrutinizing the clearance issue—and any delays arising therefrom[3]—could have been avoided.

If the jury, in sum, were to find that Gonzalez's "true reason" for not disclosing that information was "racial animus," it could also "reasonably conclude that his conduct 'had a

---

[3] *See* Travers Decl. ¶ 10 ("During the May 3, 2018, meeting, the issue related to the insulation material being used on the exterior of the Hood was discussed, and there was a dispute as to whether the insulation material was appropriate for this application."); JSOUF ¶ 36 ("On Monday, May 7, 2018, City Inspector Thomas Perez conducted a final on-site inspection and failed the work being done pursuant to the Hood Permit." (citing City Inspection Records at 2)); Sadolf Decl. ¶ 4 ("During my May 8, 20[18], inspection, I was mainly focus[ed] on the kitchen hood's clearance from combustibles.").

discriminatory effect'" on—*i.e.*, caused—the delay in the issuance of Red Door's permit. *Red Door*, 2023 WL 5606088, at *8 (quoting *Wayte*, 470 U.S. at 608). In other words, *but for* Gonzalez's "tortious . . . omissions," *Jackson*, 206 F.3d at 1168, Red Door would have passed the hood inspection sooner. And, because Vera's decision to issue the Correction Notice is not "so unusual, extraordinary, or bizarre (i.e., so unforeseeable)" a result of Gonzalez's conduct, "the question of foreseeability as it relates to proximate causation . . . must be left to the factfinder to resolve." *Colon*, 14 F.4th at 1224 (cleaned up).

Gonzalez offers two reasons for his view that the Soto Email "does not support any basis for liability against [him]." Def.'s Reply at 5.. But neither establishes "an absence of evidence supporting" the Plaintiffs' causation theory. *Mueller*, 2021 WL 2592368, at *2 (cleaned up).

*First*, Gonzalez says that his omission couldn't have "caused the chain of events that resulted in the alleged discriminatory acts" because, by "April 26, 2018, it had been almost two months since Vera first raised the issue related to the insulation used on the Hood, and Vera's testimony that he identified the issue independent of Gonzalez remains undisputed." Def.'s Reply at 5. But, even if Vera came to believe that the insulation was faulty on his own, *but see* Asta Decl. ¶ 9 ("Gonzalez was present with Andres Vera and others from the City during the initial inspection."), Gonzalez could have dispelled Vera's concerns *before* Vera issued the Correction Notice by telling him that the insulation *had already* passed testing for "zero inch[ ]" clearance and was "ETL listed," Soto May 9 Email at 120. Additionally, that Vera first raised the hood-clearance issue—which, it turns out, *wasn't* an issue at all, *see ibid.* ("The issue is not the hood clearance rating."); Sadolf Dep. at 25:4–6 ("Tony Asta showed me the documentation that the hood has a zero clearance rating from the manufacturer, and I said I don't see a problem.")—*doesn't* mean that Gonzalez couldn't have caused Red Door's injuries by exacerbating the delays for discriminatory reasons, *see McDonald v. Fla. Dep't of Transp.*, 655 So. 2d 1164,

1168 (Fla. 4th DCA 1995) ("[T]wo separate acts can be the proximate cause of the same injury." (cleaned up) (citing *Jones v. Utica Mut. Ins. Co.*, 463 So. 2d 1153 (Fla. 1985)).

So, while Vera might not have been "acting with discriminatory animus" when he issued the Correction Notice, the jury could still find that he was "caused to make th[at] decision" by Gonzalez's omissions, which (a jury could reasonably believe) *were* "motivated by discriminatory animus." *Cromartie v. Cent. Ala. Food Servs.*, 2023 WL 5197872, at *5 n.4 (M.D. Ala. Aug. 11, 2023). We'll let the jury resolve that question at trial. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." (cleaned up)).

*Second*, Gonzalez contends that he didn't cause any of the delays because "it was other inspectors[,] including Vera, Perez, and Sadolf[,] who determined whether the Hood passed or failed[.]" Def.'s Reply at 5. Here, Gonzalez just ignores the cat's-paw theory of causation, by which "a lower-level employee's animus *can be imputed* to a decisionmaker." *Ziyadat*, 3 F.4th at 1298 (emphasis added). As we've said, a reasonable jury *could* find that Gonzalez's failure to disclose that the hood was safe caused the delay between April 30, 2018 (when Vera issued the Correction Notice) and May 9, 2018 (when Sadolf first passed the inspection).

Moreover, "[a] genuine factual dispute exists" as to whether Gonzalez's actions led to the *re-opening* of the permit on May 16, 2018. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012). To be sure, it's undisputed that *Travers*—not Gonzalez—"gave Sadolf permission to change the Hood Permit's status from passed to cancelled" on May 16, 2018, because the hood was penetrating a fire-rated ceiling. JSOUF ¶ 46 (first citing Travers Decl. ¶¶ 28–29; then citing Sadolf Decl. ¶¶ 10–11; and then citing City Inspection Records at 2). But Gonzalez needn't have been directly "involved in the decision to change the status of the Hood Permit from passed to failed," Gonzalez Decl. ¶ 20, to be liable for the damages that decision caused, *see Prof. Ass'n of Coll. Educators v. El Paso*

*Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 266 (5th Cir. 1984) ("[I]f an improper motive sets in motion the events that lead to termination that would not otherwise occur, 'intermediate step[s] in the chain of causation' do not necessarily defeat the plaintiff's claim." (quoting *Bowen v. Watkins*, 669 F.2d 979, 986 (5th Cir. 1982))).

That's because, when viewed in the light most favorable to the Plaintiffs, the record suggests that it was *Gonzalez* who first raised the ceiling-penetration issue. Gonzalez has admitted that, while "on a courtesy visit" to Red Door, Gonzalez Decl. ¶¶ 11–12; *see also* Vera Decl. ¶¶ 14–15 ("Between February 8, 2018, and April 30, 2018, I visited Red Door on three or four occasions for courtesy visits . . . to discuss the issue related to the insulation of the exterior of the kitchen hood. . . . Gonzalez accompanied me on some of these site visits."), he noticed that "the Hood was penetrating the ceiling that was fire rated," Gonzalez Decl. ¶ 13; *see also ibid.* ("I believed this was a life safety [sic] concern and did not comply with the Florida Building Code or plans approved by the City for the installation of the Hood."). Notably, Gonzalez came to this conclusion on his own. *See id.* ¶ 14 ("My belief regarding the Hood penetrating the fire rated ceiling was based on *my* visual inspection of the Hood installation, *my* review of the approved plans for the Hood, and *my* years of training and experience as a mechanical inspector." (emphases added)).

We also know that Travers, who ultimately "approved Sadolf's request to change the status of the Hood Permit from passed to cancelled" on May 16, 2018, Travers Decl. ¶ 29 (citing City Inspection Records at 2), *was aware* that Gonzalez had flagged this issue, *see id.* ¶¶ 22–23 ("Around [May 8, 2018], I became aware of concern that the Hood was penetrating a fire-rated ceiling and was therefore not [in compliance] with the Florida Building Code or the plans approved by the City for the Hood. . . . I know that Gonzalez and Vera had this concern."). Both Soto and Sadolf learned of it from Vera, *see* Soto Email at 120 ("[I] called Mr. Andres Vera. . . . He explained to me that the hood was penetrating a fire rated ceiling[.]"); Sadolf Dep. at 43:17–22 ("Q. Do you dispute that? Do you have any basis for

saying he's wrong? A. From what I was told, the hood penetrates a fire-rated ceiling. So I'm not sure. Q. Okay. Told by who? A. Andres [Vera.]"), who was with Gonzalez when he discovered the ceiling-penetration issue, Vera Decl. ¶¶ 17–20 ("During one of these courtesy visits, Gonzalez and I were able to inspect the installation of the Hood as it related to the ceiling. . . . Gonzalez shared my concerns regarding the installation of the Hood as it related to the fire rated ceiling."). And it's undisputed that Vera *never* noticed this issue during at least two prior inspections. *See* Vera Decl. ¶¶ 3, 8 ("On February 2 [and 8], 2018, I conducted an initial on-site inspection of the work being performed pursuant to the Hood Permit[.]"); City Inspection Records at 7–8 (omitting any notes about this issue).

Drawing all reasonable inferences for the Plaintiffs, we think a jury *could* conclude that all roads lead back to Gonzalez. So, even if Sadolf and Travers didn't reopen the permit "because Gonzalez directed, instructed, or asked [them] to do so," Sadolf Decl. ¶ 15; *see also* Travers Decl. ¶ 31 ("Gonzalez was not involved with my decision to change the status of the Hood Permit to cancelled."), Gonzalez nonetheless could have "cause[d]" that to happen if the "'complaints [he] registered against [the Plaintiffs] were racially motivated'" and if Sadolf and Travers "would not have *considered* [the ceiling-penetration issue] if [Gonzalez] had not brought [those concerns to light] in reprisal" against the Plaintiffs' race, *Prof. Ass'n of Coll. Educators*, 730 F.2d at 266–67 (emphasis added) (quoting *London v. Fla. Dep't of Health & Rehab. Servs.*, 448 F.2d 655, 657 (5th Cir. 1971)).

Granted, "[w]here a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee"—thus breaking the chain of but-for causation. *Pennington*, 261 F.3d at 1270. And "there can be no proximate cause, and therefore no liability, if the adverse action is entirely justified apart from the biased [subordinate's] recommendation." *Duncan v. Alabama*, 734 F. App'x 637, 639 (11th Cir. 2018) (citing *Staub*, 562 U.S. at 421–22). But our record is far from clear that the decision to reopen the permit was *either* "completely independent" of Gonzalez's influence, *Pennington*, 261 F.3d at 1270, *or* entirely justified,

*cf. Sirpal v. Univ. of Miami*, 509 F. App'x 924, 927 (11th Cir. 2013) ("[T]his is not a cat's paw case because the independent investigation determined that dismissal was, apart from [the subordinate's] recommendation, entirely justified." (citing *Staub*, 562 U.S. at 421–22)).

Gonzalez was consistently included in the discussions between the building officials leading up to the reopening of the permit—including (1) Soto's May 9th email, in which he raised the "issue [of] the hood penetrating a fire rated ceiling," Soto May 9 Email at 120; *see also ibid.* ("To: 'Robert Gonzalez'"); (2) the May 15th meeting between Soto and Sadolf, at which Sadolf offered to "change the result from pass to fail," May 9–15 Email Thread at 19; *see also id.* at 18 ("The 'meeting' was in Robert[']s office."); and (3) Sadolf's May 15th email, where he said that he "would prefer to 'fail' the mechanical inspection," *id.* at 18; *see also ibid.* ("To: . . . Robert Gonzalez"). And, while Soto "concluded" on May 16, 2018, that the hood was "in violation of sections 507.2.7 . . . and 506.3.11 . . . of the 2017 Florida Building Code - Mechanical, Sixth Edition," Soto May 16 Email at 26, we know nothing about the scope of Soto's investigation—except that he learned of this issue from Vera, who (in turn) discovered it from Gonzalez, *see* Soto May 9 Email at 120 ("[Vera] explained to me that the hood was penetrating a fire rated ceiling[.]"); Gonzalez Decl. ¶¶ 13–15 ("Based on my own inspection, it appeared to me that the Hood was penetrating the ceiling that was fire rated. . . . I believe Vera shared my concerns[.]"). Based on this view of the facts, we cannot say that Sadolf and Travers's ultimate "decision [to reopen the permit] was *completely independent* of [Gonzalez's allegedly biased inspection], and therefore untainted." *Pennington*, 261 F.3d at 1270 (emphasis added).

Nor can we say that the decision to reopen the permit was, "apart from [Gonzalez's] recommendation, entirely justified." *Staub*, 562 U.S. at 421; *cf. Wood v. Calhoun County*, 262 F. App'x 954, 956 (11th Cir. 2015) ("[T]he Board specifically found that [the plaintiff's] admission that he violated a direct command and intended to continue doing so justified his termination independent of his supervisor's actions. The Board's independent evaluation, therefore, broke the causal link

between [the plaintiff's] supervisor's alleged animus and his termination[.]"). Here, "the City ultimately agreed with the Plaintiffs [in August 2018] that [the] Hood *had* been properly installed in accordance with the approved plans and the Florida Building Code." Travers Decl. ¶ 37 (emphasis added). It therefore appears that the decision to reopen the permit was *not* justified *at all.* Gonzalez thus hasn't shown that this decision was "clearly made on an independent and a legally permissive basis," such that "the causal relationship between [Gonzalez's] illicit motive and [Sadolf and Travers's] ultimate decision [was] broken[.]" *Willis v. Marion Cnty. Auditor's Off.*, 118 F.3d 542, 547 (7th Cir. 1997) (first citing *Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996); and then citing *Connecticut v. GATX Terminals Corp.*, 18 F.3d 417, 420 (7th Cir. 1994)); *cf. Mosley v. Preston Cycles W., LLC*, 2024 WL 2873720, at *6 (11th Cir. June 7, 2024) (suggesting that the decision may not be "unrelated to [the] biased recommendation" where evidence "rebuts [the decisionmaker's] independent knowledge about these issues or shows [that the decisionmaker] *was wrong about them*" (emphasis added)).

On the crucial question of causation, then, Gonzalez's Motion is **DENIED**.

## II.  Damages

Gonzalez's damages argument fares no better. In passing, Gonzalez briefly contends that "the evidence does not show a constitutionally significant delay" in Red Door's opening. Def.'s MSJ at 3 (cleaned up). But Gonzalez never explains what makes a delay *constitutionally* "significant" or "insignificant," *see id.* at 3–4, "leaving it for the Court or Red Door to identify a legal context for his argument," Pl.'s Resp. at 10. We obviously won't be doing that. *See Horowitz v. Allied Marine, Inc.*, 2023 WL 3568113, at *17 (S.D. Fla. May 19, 2023) (Altman, J.) ("[W]e don't grant summary judgment on arguments a party hasn't supported with either evidence or legal citations." (cleaned up)); *see also M/Y P.I.I. LLC v. H&R Marine Eng'g, Inc.*, 544 F. Supp. 3d 1334, 1346 (S.D. Fla. 2021) (Altman, J.) ("The law demands that lawyers present their clients' cases with argument and citation. It doesn't—nor should it—permit lawyers to fling whatever arguments they might conjure (however far-fetched or

frivolous) at the judge in the hopes that, by a prodigious use of a Westlaw account, that intrepid judge (and his smart law clerk) might find the one case that stands in support of their proposition.").

Nor do we accept Gonzalez's assertion that "[a]ny action prior to May 12, 2018" (the day the restaurant first opened) cannot undergird the Plaintiffs' damages claim because there was "no delay in the Plaintiffs' anticipated opening of the restaurant." Def.'s MSJ at 3. To Gonzalez, the Plaintiffs incurred no actual damages because the restaurant ended up opening within the three-to-four-month time frame its architect expected the renovations to take. *See ibid.* ("[T]he Plaintiffs' contention of a delay is difficult to reconcile with the actual evidence regarding the anticipated schedule for opening the restaurant."); *cf.* Dobos Dep. at 7:15–18 (testifying that he expected the renovations to take "[p]robably three months, four [months] max"); Travers Decl. ¶ 4 ("The City issued the permits for the November 2017 applications on January 23, 2018." (cleaned up)). That's wrong for at least three reasons.

*First*, while Dobos testified that he expected the restaurant to open sometime between April and May 2018, *see* Dobos Dep. at 7:15–18 (stating that he expected the renovations to take "[p]robably three months, four [months] max"), *other* evidence suggests that Red Door planned to open its doors as early as February 2018, *see* Asta Decl. ¶ 19 ("Despite our best efforts, the original February 2018 opening date for the Red Door was intentionally and unnecessarily delayed for more than several months beyond the lucrative winter visitor season due to Defendants' violations of our rights."). At summary judgment, we must assume that the Plaintiffs would've opened by the earlier date, *see Pennington*, 261 F.3d at 1265 (noting that, at summary judgment, we must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"), in which case Red Door's opening *would have been* delayed.

*Second*, even if Red Door didn't expect to open until late May, the Plaintiffs nonetheless sustained an injury if, but for Gonzalez's discriminatory conduct, they *could have* opened sooner. By

Gonzalez's logic, he'd be free to discriminate against the Plaintiffs for four months so long as he made sure to cut it out by May 23rd. That (obviously) is not our law. Instead, Red Door's damages must be calculated based on the "*actual* losses caused (directly and proximately) by the defendant['s] tort," *Pattee v. Ga. Ports Auth.*, 512 F. Supp. 3d 1372, 1379 (S.D. Ga. 2007) (emphasis added) (citing *Jackson*, 206 F.3d at 1168)—*viz.*, the lost profits for the days on which Red Door *would have been* open "except for [Gonzalez's] constitutional tort," regardless of the Plaintiffs' subjective expectation, *Jackson*, 206 F.3d at 1168.

*Third*, Gonzalez (it should by now go without saying) is wrong that "[a]ny action prior to May 12, 2018," is irrelevant to the Plaintiffs' damages claim, Def.'s MSJ at 3, since, under the cat's-paw theory, Gonzalez's *pre*-opening conduct *could have* caused Red Door's *post*-opening damages, *see, e.g.*, *Ziyadat*, 3 F.4th at 1298 ("Pursuant to the cat's-paw theory, a defendant may be held liable for the racial animus of its non-decisionmaking employee when, as is alleged here, that employee's discriminatory conduct causes a decisionmaking employee to take an injurious action against the plaintiff." (citing *Stimpson*, 186 F.3d at 1332)). So, we'll leave that for the jury to decide at trial. *See Georgia v. Brailsford*, 3 U.S. (Dall.) 1, 4 (1794) (Jay, C.J.) ("It may not be amiss here, gentlemen, to remind you of the good old rule that on questions of fact it is the province of the jury[.]").

In a final effort to reduce his potential liability at trial, Gonzalez pivots and contends that "the alleged delay in [Red Door's] grand opening [to September 2018] had minimal financial impact on the restaurant's operations." Def.'s MSJ at 4 (citing Pls.' 2d Rog. Ans. ¶ 13); *see also* Pls.' 2d Rog. Ans. at 8 (showing Red Door's month-to-month ledger). But Gonzalez simply ignores the fact that Red Door "didn't advertise as much as [it] normally would" once the hood permit was reopened, Asta 30(b)(6) Dep. at 121:23–122:10, believing that it "could be shut down by the fire marshal at any moment," *id.* at 67:4–5. So, we don't know how much Red Door *would have* earned absent the City's delay in *permanently* passing Red Door's inspection. *See Wilson v. S&L Acquisition Co.*, 940 F.2d 1429, 1438 (11th

Cir. 1991) (noting that the purpose of damages "is to make the plaintiff whole [and] to restore the plaintiff to the economic position the plaintiff would have occupied but for the illegal discrimination"). Nor does Gonzalez appreciate the *other* costs the Plaintiffs apparently incurred fighting the allegedly discriminatory delay. *See* JSOUF ¶ 32 ("Following the issuance of the Correction Notice, the Plaintiffs retained Michael J. Pizzi, Jr., Esq., to act on their behalf." (citing Asta 30(b)(6) Dep. at 50–51, 63–64)).

Because Gonzalez has failed to show an absence of evidence supporting the Plaintiffs' damages claim, we'll **DENY** summary judgment on that issue as well.

\* \* \*

Accordingly, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendant's Renewed Motion for Summary Judgment [ECF No. 151] is **DENIED**.

2. By **September 13, 2024**, the parties shall submit an amended joint scheduling report, proposing dates for trial and all remaining pre-trial deadlines.

3. The Clerk shall **REOPEN** this case.

**DONE AND ORDERED** in the Southern District of Florida on September 4, 2024.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record